# EXHIBIT 38

ASIAN-AMERICAN ENROLLMENT ROSE AFTER LEGAL PRESSURE

https://asianamericanforeducation.org/en/call_for_complaint_2017_en/

* After the Student for Fair Admissions filed a lawsuit in 2014 and Asian American Coalition for Education (AACE) filed a joint complaint against Harvard University in 2015, Harvard's admission rate of Asian-Americans jumped from 17% prior 2014 to 22% in 2016.

* After a few Asian-American students filed a complaint against Princeton University since 2006, its admission rate of Asian Americans increased from 14.7% in 2007 to 21.9% in 2012 and 25.4% in 2014.

1      **EXHIBIT 39**

2      **Excerpt from chapter 7 in *The Price of Admission***



3



Americans. His parents had gone to college in Korea, ruling out legacy preference for their son in the United States, and they couldn't afford to donate to a university; in fact, Henry applied for financial aid to pay his college tuition.

His Groton guidance counselor knew the score. She discouraged Henry from applying to the Ivy League, telling him it was a long shot at best, and advised him to lower his expectations to second- and third-tier schools. When Henry disregarded her advice, he was spurned by four Ivies—Harvard, Yale, Brown, and Columbia—as well as Stanford University and Massachusetts Institute of Technology. While they rejected Henry, Ivy League universities admitted thirty-four of his Groton classmates. Brown accepted the daughter of a best-selling author; Harvard, the grandson of one of its biggest donors; Columbia, an African American candidate; and Stanford, the daughter of an oil tycoon who chaired the university's board.

"When the decisions came out, and all these other people started getting in, I was a little upset," Henry told me. "I feel I have to hold myself to a higher standard." Added his mother, Suki Park, "I was naive. I thought college admissions had something to do with academics."

Unlike Henry, Stanley Park seemed to have a special hook to bolster his academic credentials, which included a 1500 SAT score. Stanley was born and raised in California, where voters abolished affirmative action in public university admissions in 1996. In the wake of that ban, the University of California, Los Angeles, revamped its admissions criteria to favor students who had conquered "life challenges," such as family illness, being raised by a single parent, or being the first in the family to go to college.

Stanley, who graduated from University High in Irvine in 2002, had overcome more than his share of adversity. After his parents—immigrants of modest means with only high school educations and little English—divorced in 1999, he lived with his mother. When she was diagnosed with breast cancer a year later, he began tutoring children to help pay the rent.

"All the money he earned tutoring was donated to his family," his high school guidance counselor wrote in Stanley's college recommendation. "In the time I have known Stanley I have been impressed with his incredible balance. It's easy to view him as a top mathematics student, but there is so much more to this complex young man that makes him interesting. For the past three years, he has gone to the Bethel Korean Church at 6:30 a.m. every Sunday

morning. Once there, he loads vans with food, and with other church members distributes food to the homeless."

Stanley's own college application essay movingly recounted how his mother's illness had inspired him. "I have the most loving and caring mother anyone can ever have," he wrote. "I admire her so much because she works hard even after her divorce last year. She sacrificed her youth and free time so that I might have a promising future. She went as far as to giving up her whole Christmas bonus to pay for an SAT class. Then something unfair happened to my mother; she was diagnosed with breast cancer. When my mother had her breasts removed, I could visibly see the pain and shame on her face. Although I am very grateful that she is alive, I could not bear to see my mom in that kind of pain. Now that she can't work as hard as she used to, I do not want to let all my mom's past sacrifices for me to be in vain. I slowly realized that the only thing I can do to help out was to make her happy by showing her the fruits of her sacrifices. I began to study harder in school and take my volunteer work… more seriously."

Nevertheless, UCLA and the state university's other elite campus, Berkeley, rejected Stanley while admitting black and Hispanic applicants with far lower scores. Stanley learned the hard way that the "life challenge" preference at his state university was a back-door substitute for affirmative action. It was never meant for him or other Asian Americans at all.

—

**ASIAN AMERICANS** are the new Jews, inheriting the mantle of the most disenfranchised group in college admissions. The nonacademic admissions criteria established to exclude Jews, from alumni child status to leadership qualities, are now used to deny Asians. "Historically, at the Ivies, the situation of the Asian minorities parallels very closely the situation of the Jewish minorities a half a century earlier," said former Princeton provost Jeremiah Ostriker.

Once ostracized, Jewish students are now widely coveted for their intellectual prowess. Today, many Jewish applicants have admissions hooks, often as children of alumni, donors, or faculty. Having apologized profusely for restricting Jewish enrollment in the past,

At another mainly Hispanic high school near Los Angeles, Belmont, UCLA student and outreach worker Alex Paredes helped Rosaura Novelo edit her application essay, which appeared tailored to fit the "life challenge" criterion. "It has been difficult for my parents, Mexican immigrants who did not even get to third grade in school, to raise a family of seven," Rosaura's essay began. "My father is the only person in the family who works, getting only minimum wage….Our situation has taught me to appreciate education, learn how to overcome challenges that I have been faced with, and to take advantage of the benefits that come from all my hard work….Taking advantage of the opportunities my parents have provided me with has sometimes been difficult because of all the challenges I have had to overcome….Things have not been handed to me on a silver platter, which makes it challenging for me….My community has also been an obstacle: gangs and violence are an everyday occurrence." UCLA—which took twenty-four Belmont seniors in 2002, tripling the previous year's number—admitted Rosaura despite an SAT score of 980, 520 points below Stanley Park's.

When I dropped by University High in Irvine on the same trip, I found that its admissions to Berkeley and UCLA were plummeting. University High is one of the best public schools in California, with a mean SAT score of 1247 in 2003–4 compared with a state average of 1015. It's also 45 percent Asian American. UCLA admits from University High dropped from 112 in 1998 to 65 in 2004, and Berkeley admits from 91 to 46 over the same period, relegating more University High graduates to less selective campuses such as Riverside and Santa Cruz. As a highly ranked school, University High didn't qualify for University of California outreach, hurting its students' prospects under comprehensive review. In other words, Stanley Park's mother had moved to a cramped Irvine apartment she could barely afford to provide him a better education—and may thereby have thwarted his admission to Berkeley and UCLA.

from rural states, popularized to squelch Jewish applicants from New York City, now hurts Asian students concentrated in metropolitan areas, particularly Los Angeles.

Now as then, a lack of preferences can be a convenient guise for racism. Much as college administrators justified anti-Jewish policies with ethnic stereotypes—one Yale dean in 1918 termed the typical Jewish student a "greasy grind"—so Asians are typecast in college admissions offices as quasi-robots programmed by their parents to ace math and science tests. Asked why Vanderbilt poured resources into recruiting Jews instead of Asians, a former administrator told me, "Asians are very good students, but they don't provide the kind of intellectual environment that Jewish students provide."

Similarly, MIT dean of admissions Marilee Jones rationalized the institute's rejection of Henry Park by resorting to stereotypes. Although she wasn't able to look up his application because records for his year had been destroyed, "it's possible that Henry Park looked like a thousand other Korean kids with the exact same profile of grades and activities and temperament," she emailed me in 2003. "My guess is that he just wasn't involved or interesting enough to surface to the top." She added that she could understand why a university would take a celebrity child, legacy, or development admit over "yet another textureless math grind." College administrators who made such remarks about black or Jewish students might soon find themselves higher education outcasts.

—

"ASIAN AMERICAN" is not an identity deeply rooted in history or tradition. Chinese and Japanese students popularized the term in the 1970s in an effort to be included in affirmative action programs. In 1977, the federal government (which had previously counted immigrants from China, Japan, Korea, and so forth by their countries of origin) introduced "Asian or Pacific Islander" as a data collection category—defined as "a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands."

The strategy worked almost too well. Soaring Asian enrollment soon provoked a backlash. In 1984, with Asian Americans accounting for more than a quarter of its freshman class,

2

1

# EXHIBIT 40

2

**MR. JOHN MOORES'S ACCUSATION IN *THE PRICE OF ADMISSION***

on her SATs and is the daughter of a struggling Korean-immigrant pastor. "No matter how bad your situation is, someone has it worse."

Asian applicants to Berkeley or UCLA who hadn't confronted a life challenge soon rued this gap in their resumes. Albert Shin, another University High student and the son of an engineer, scored 1540 on his SAT, had a 3.9 grade point average, and could read English, Korean, and Latin. Both Berkeley and UCLA turned him down. "It would be okay to look at social disadvantage a little bit, but judging it more than academics would be wrong," Albert told me. He, Stanley Park, and Hyejin Jae enrolled at the university's San Diego campus. As of March 2006, Stanley Park was a senior bioengineering major with a 3.5 grade point average, and "pretty worried" about admission to medical school. Financial aid and a job as a nuclear medicine assistant at a San Diego hospital had helped pay his tuition.

By 2003, parental complaints that comprehensive review meant rejecting top Asian and white students caught the attention of John Moores, then chairman of the university's board of regents. Studying Berkeley's admissions records, he found that in 2002—the year Albert, Stanley and Hyejin were rebuffed—Berkeley turned down 1,421 Californians with SAT scores above 1,400, including 662 Asian Americans. Of the 359 students accepted with SAT scores of 1,000 or less, 231 were black, Hispanic, or Native American.

The regents chairman accused his flagship campus of "blatantly" discriminating against Asian Americans and denounced comprehensive review as "fuzzy…It's silly to pretend that very low scoring applicants should be admitted to one of America's premier universities with the expectation that somehow these students will learn material that they missed in K–12." University officials disputed Moores's contention, noting that SAT scores are an imperfect measure of academic ability. Still, in April 2004, a university study group compared a statistical model of how the UC admissions process was supposed to work with actual cases. Buried deep inside its report was the finding that "somewhat fewer Asian students, and more African American and Chicano/Latino students (and, in some cases, White students) were admitted" on most campuses than would have been expected. One possible explanation: "small but real racial or ethnic effects on admissions decisions."

# EXHIBIT 41

**Professor Tim Groseclose's protest**

https://youtu.be/zUsuIr1E_6s?si=c7acYOK9LykvZh8a&t=31

Professor Tim Groseclose talking to media about his observations of UCLA violating Prop 209

---

https://dailybruin.com/2012/11/08/submission-faculty-letter-misrepresents-mare-reports-findings

Professor Tim Groseclose talking about racial discriminations identified in Professor Robert Mare's reports

# DAILY BRUIN   ADVERTISE  DONATE  SUBMIT

NEWS  SPORTS  ARTS  OPINION  THE QUAD  PHOTO  VIDEO  ILLUSTRATIONS  CARTOONS  GRAPHICS  THE STACK  PRIME  ENTERPRISE

COMMUNITY, OPINION

## Submission: _Faculty letter misrepresents Mare report's findings_

**By Daily Bruin Staff**
Nov. 8, 2012 11:53 p.m.

**By Tim Groseclose**

In an Oct. 30, 2012 Daily Bruin column, a group of 57 professors criticized a Daily Bruin news article and column, which documented evidence that UCLA is using race in admissions, a violation of Proposition 209.

**Editor's Note: Portions of this submission have been previously published on Professor Tim Groseclose's blog, specifically his analyses of tables in the Mare report.**

The 57 faculty also criticized a report by law professor Richard Sander, who described statistical analyses showing that UCLA is using race in admissions.

The 57 professors cite a report by UCLA sociologist Robert Mare. They write that "(Mare's) report found no signs of race-based reader bias in the awarding of applicant holistic scores."

The professors either did not read the Mare report carefully, or they are intentionally trying to misrepresent its findings.

Mare analyzed two major parts of the admissions process: the scores that each applicant receives from two initial reviewers in the first round of the process, and the scores that some applicants receive in "second chance" (Mare's term) reviews by senior admissions staff. The latter reviews include "Final Review," "Supplemental Review," and "School Review."

Sander and Mare found little, if any, evidence of racial bias in the initial reviews. However, both researchers found evidence of bias in the second-chance reviews. Sander was not given data about particular aspects of the second-chance reviews; he could therefore only conclude that the total effect of all aspects of the second-chance reviews contained racial bias. Meanwhile, Mare analyzed each aspect of the second-chance reviews separately.

With the latter analysis at least three of his statistical estimates imply racial bias.

The first of these estimates is the .391 number in column F of his Table 10. Because it is



The first of these estimates is the .391 number in column F of his Table 10. Because it is positive and statistically significant, this means the following: Suppose you take a black and a white student who are identical on every other variable in Professor Mare's data set. That is, they have identical grades and SAT scores, have parents with identical incomes and educational backgrounds, etc. They're also identical on the "Limits to Achievement" variable that Professor Mare created.

To construct this, Mare recorded such things as whether the applicants' life experience includes homelessness, whether their life experience includes incarceration, whether their life experience includes being a victim of discrimination, and so on.

The .391 number means that the black student has a significantly higher probability of being selected for "Supplemental Review." Remember the two students are identical on everything but race. Thus, it indicates a violation of Prop. 209.

The second of Mare's estimates that implies racial bias is the -.706 number in column G of his Table 10. It indicates the following: suppose you take two students who have been selected for supplemental review.

Suppose one is black and one is white, but otherwise they are identical on all the variables that Professor Mare included in his analysis. The fact that the number is negative (and highly significant statistically) means that the black student is more likely to receive a lower holistic score than the white student. Lower scores are better, which means that the black student is more likely to be admitted. Once again, that's a violation of Prop. 209.

A third estimate by Mare that implies a racial bias is the -.865 number in column D of his Table 10. This number indicates that black students receive significant racial preferences in the "Final Review" stage of the admissions process. (The latter occurs when the scores of two initial readers differ by more than 1.0. When this happens, a senior staff member conducts a third holistic review of the applicant. The applicant's final holistic score is determined by that senior staff member.)

Mare's Table 10 contains eight columns. Five do not show any statistically significant evidence that UCLA is giving racial preferences toward African Americans; however, three do. It is thus false to conclude that Mare found "no signs of race-based reader bias."

Further, when he calculates the net effect of the entire admissions process (that is, all eight aspects, represented by the eight columns of Table 10), Mare finds that the net effect is substantial. Specifically, on page 74, he writes: "Absent the adjusted disparities estimated in this analysis 121 fewer Black applicants would have been admitted, which amounts to approximately 33 percent of the actual number admitted."

The 57 professors also claim the following about Mare's report: "An extensive, independent analysis of UCLA's holistic review process concluded that it works as intended by our faculty."

Here, however, is what Mare actually wrote: "The holistic ranking process for freshman admissions at UCLA appears to work much as intended."    Note that the 57 professors omitted the word "much."

Again, they either did not read the report carefully, or they are intentionally trying to misrepresent its findings.

*Groseclose is a professor of political science.*

# EXHIBIT 42

**EXCERPTS FROM PROFESSOR TIM GROSECLOSE'S BOOK *CHEATING***





TIM GROSECLOSE

Of the students who fell into the above category, the following were the admission rates of African Americans and North Asians, broken down by whether they were rich or poor:

| Group | Admission Rate |
|---|---|
| Poor African Americans | 55% |
| Rich African Americans | 38% |
| Poor North Asians | 23% |
| Rich North Asians | 18% |

Note that *rich* African Americans were admitted much more frequently than *poor* North Asians.[58]

The following thought experiment helps illustrate just how remarkable these numbers are. Suppose you were a rich North Asian student applying to UCLA, and suppose you learned that your initial evaluators gave you scores of 2.5 and 4.0. Now suppose you're only goal is to maximize your chance of being admitted to UCLA, and suppose a magic genie allows you to change (i) your income status to poor or (ii) your skin color to black. Which would you choose?

It's obvious from the above statistics that you're better off changing your skin color. That raises your probability of admission by 20%—from 18% to 38%. By contrast, if you change your income status, that raises your probability of admission only 5%—from 18% to 23%.

The change in skin color would give you four times the advantage that you'd receive from changing your family income. Although this is only a rough measurement, it suggests that, in at least one aspect of its admissions process, the degree to which UCLA grants racial preferences is about four times the degree to which it grants class-based preferences—even though the former is illegal and the latter is legal.

116