# EXHIBIT 43

**UCLA MEDICAL SCHOOL'S ASIAN ENROLLMENT DECLINED 35% FROM 2019 TO 2022**

https://www.latimes.com/business/story/2024-05-30/is-ucla-a-failed-medical-school-debunking-a-dumb-right-wing-meme

https://www.yahoo.com/news/column-ucla-failed-medical-school-130036473.html

(As for a case Sibarium mentions in which Lucero supposedly pushed to admit a Black student whose grades and test scores were below the UCLA average, he doesn't say whether the student was admitted.)

It's true that the entering medical school class at UCLA has become more diverse over time. Figures issued by UCLA and published by the Beacon show that from 2019 through 2022, the number of whites in the 173-member class declined to 46 from 49, the number of Black students rose to 25 from 22, Hispanic students rose from 25 to 37, a catchall "other" category grew to 20 from eight, and American Indians, Hawaiians and other Pacific Islanders went from zero to three. The number of Asian students declined to 55 from 84.

Does this validate the article's assertion, voiced by an anonymous source (of course), that "a third to a half of the medical school is incredibly unqualified"?

The math doesn't pencil out. As blogger and statistics maven Kevin Drum notes, given that the number of nonwhite and non-Asian students increased by only 30 in three years, even if "every single one of these students was woefully unqualified, that's about 17% of the class. How do you get from there to 'a third to a half'?"

By the way, the median grade-point averages and scores on the Medical College Admission Test of accepted applicants haven't declined at all since 2020 — the MCAT average in 2023 was the same as in 2020, and the GPA rose by a hair.

In emails to the medical school class, Dubinett and his fellow deans have reinforced their commitment to merit-based admissions and diversity training. "Students and faculty members are held to the highest standards of academic excellence," they wrote. "Highly qualified medical students and trainees are admitted … based on merit in a process consistent with state and federal law." That said, "we are enriched by the diverse experiences each of you brings to our community."

UCLA, then, is standing firm against the right wing's drive to pretend that racial and ethnic discrimination doesn't exist in our society and to undermine efforts to wipe it out. Would that more institutions took that stand, instead of capitulating to a dishonest, braying mob.

This story originally appeared in Los Angeles Times.

1

1          # EXHIBIT 44

2          **UW'S DIVERSITY WEBPAGE**

3  https://www.washington.edu/diversity/

4





5

1      # EXHIBIT 45

2      **BROWN UNIVERSITY MEDICAL SCHOOL FACULTY PROMOTION CRITERIA**

3 https://brownmedicine.org/3/wp-content/uploads/2023/06/Promotion-Criteria-and-

4 DOM-guidelines-for-Senior-Ranks.pdf

**Major Criterion:** Demonstrated commitment to diversity, equity, and inclusion

    2. Effort toward advancing diversity, equity, and inclusion in at least one area for which candidate is evaluated.
- e. Research
- f. Teaching
- g. Clinical care
- h. Service.

**Minor Criterion:** Exceptional clinical skills

    Evidence of outstanding clinical ability

5

# EXHIBIT 46

**UCLA MEDICAL SCHOOL'S RACE-BASED FELLOWSHIP PROGRAM**

The Dean of UCLA Medical School says it does not discriminate based on race.

His own research center runs a Fellowship program (named 'iDIVERSE') that

barred white and Asian researchers from applying.

https://freebeacon.com/campus/the-dean-of-ucla-medical-school-says-it-does-n

ot-discriminate-based-on-race-his-own-research-center-runs-a-minorities-only-fe

llowship/



# EXHIBIT 47

**UC Admission Reader's Opinion Piece in New York Times**

https://www.nytimes.com/2013/08/04/education/edlife/lifting-the-veil-on-the-holisti

c-process-at-the-university-of-california-berkeley.html?unlocked_article_code=1.6

Ew.hDKN.WtxDzNosRmxO&smid=em-share

≡ The New York Times        EDUCATION LIFE | Confessions of an Application Reader

After the next training session, when I asked about an Asian student who I thought was a 2 but had only received a 3, the officer noted: "Oh, you'll get a lot of them." She said the same when I asked why a low-income student with top grades and scores, and who had served in the Israeli army, was a 3.

≡ The New York Times        EDUCATION LIFE | Confessions of an Application Reader

Officially, like all readers, I was to exclude minority background from my consideration. I was simply to notice whether the student came from a non-English-speaking household. I was not told what to do with this information — except that it may be a stressor if the personal statement revealed the student was having trouble adjusting to coursework in English. In such a case, I could refer the applicant for a special read.

Why did I hear so many times from the assistant director? I think I got lost in the unspoken directives. Some things can't be spelled out, but they have to be known. Application readers must simply pick it up by osmosis, so that the process of detecting objective factors of disadvantage becomes tricky.

It's an extreme version of the American non-conversation about race.

When the invitation came to sign up for the next application cycle, I wavered. My job as an application reader — evaluating the potential success of so many hopeful students — had been one of the most serious endeavors of my academic career. But the opaque and secretive nature of the process had made me queasy. Wouldn't better disclosure of how decisions are made help families better position their children? Does Proposition 209 serve merely to push race underground? Can the playing field of admissions ever be level?

For me, the process presented simply too many moral dilemmas. In the end, I chose not to participate again.

*Ruth A. Starkman teaches writing and ethics at Stanford and, from 1992 to 1996, taught writing at the University of California, Berkeley.*

1

# EXHIBIT 48

CALIFORNIA STATE AUDITOR'S REPORT ON UC'S ADMISSIONS IN 2020 - SECTIONS

https://information.auditor.ca.gov/reports/2019-113/index.html



COMMITMENT · INTEGRITY · LEADERSHIP

View full PDF report

**The University of California**
Qualified Students Face an Inconsistent and Unfair Admissions System That Has Been Improperly Influenced by Relationships and Monetary Donations
*Report Number: 2019-113*

| Public Letter | Summary | Introduction | Sections | Appendices | Response to the Audit |

September 22, 2020
*2019-113*

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As directed by the Joint Legislative Audit Committee, my office conducted an audit of the University of California's (university) admissions process. Our review assessed the risk for fraud and inappropriate admissions activities at four campuses and we conclude that the university has allowed for improper influence in admissions decisions, and it has not treated applicants fairly or consistently.

From academic years 2013–14 through 2018–19, we found the four campuses we reviewed—UC Berkeley, UCLA, UC San Diego, and UC Santa Barbara—unfairly admitted 64 applicants based on their personal or family connections to donors and university staff. Campuses admitted 22 of these students through their student-athlete admissions processes, even though the students did not have the athletic qualifications to compete at the university. UC Berkeley admitted the remaining 42 students, most of whom were referred to the admissions office because of their families' histories as donors or because they were related or connected to university staff, even though their records did not demonstrate competitive qualifications for admission. By admitting 64 noncompetitive applicants, the university undermined the fairness and integrity of its admissions process and deprived more qualified students of the opportunity for admission.

The university has also failed to ensure that campuses fairly and consistently treat the thousands of prospective students who apply each year. Neither UC Berkeley nor UCLA have developed methodologies for how they determine which applicants to admit. Nevertheless, both of those campuses admitted thousands of applicants whose records demonstrated that they were less qualified than other applicants who were denied admission. Applicants' chances of admission were also unfairly affected by UC Berkeley's, UCLA's, and UC San Diego's failures to properly train and monitor the staff who review and rate applications. We found that staff were sometimes overly strict or overly lenient in their review of applications, thereby making the applicants' chances of admission unduly dependent on the individual staff who rated them rather than on the students' qualifications.

The Office of the President has allowed the weaknesses in these practices to persist because it has not conducted adequate oversight of campuses' admissions processes. Although it conducted an internal review of admissions processes after the recent nationwide college admissions scandal, the Office of the President relied heavily on campuses to review themselves and did not attempt to identify inappropriate admissions activity. Stronger standards and oversight are necessary to improve the university's ability to guarantee a fair and merit-based admissions process and to detect and prevent inappropriate admissions decisions.

Respectfully submitted,

ELAINE M. HOWLE, CPA
California State Auditor

# EXHIBIT 49

**UC BERKELEY LAW SCHOOL DEAN, MR.** Erwin Chemerinsky's PUBLIC TEACHING TO USE

RACE WHILE CONCEALING IT

https://x.com/realchrisrufo/status/1674548940522549248



https://www.newyorker.com/news/our-columnists/the-sad-death-of-affirmative-acti

on

"What colleges and universities will need to do after affirmative action is eliminated is find ways to achieve diversity that can't be documented as violating the Constitution," Erwin Chemerinsky, the dean of the University of California, Berkeley, School of Law, told me. "So they can't have any explicit use of race. They have to make sure that their admissions statistics don't reveal any use of race. But they can use proxies for race."

1

# EXHIBIT 50

**UC Riverside Chancellor's letter of censure to Professor Perry Link**

https://drive.google.com/file/d/1rlivgzTvMD1BeGMAZsFJou-5MXlhN97f/view?us

p=drive_link



**Office of the Chancellor**
4108 Hinderaker Hall
900 University Avenue
Riverside, CA 92521

August 16, 2024

Professor Perry Link,

I write to impose discipline in the form of this Letter of Censure. This is my determination after carefully reviewing and considering the Hearing Committee Report ("Hearing Report") of the Committee on Privilege and Tenure ("the Committee") dated June 21, 2024, the hearing transcripts and exhibits/evidence, including the post hearing briefs from you and the administration, and the post-Hearing Report Letter from you and the Administration's response.

As outlined in my decision letter, to which this letter is attached, I conclude that clear and convincing evidence was presented in the hearing on this matter before the Committee on Privilege and Tenure establishing that you engaged in conduct that violated APM 015, Part II, Sections D.1 and C.5.

I issue this Letter of Censure pursuant to my authority under APM 016, Section II:

> 1. Written Censure A formal written expression of institutional rebuke that contains a brief description of the censured conduct, conveyed by the Chancellor. Written censure is to be distinguished from an informal written or spoken warning, and must be delivered confidentially to the recipient and maintained in a designated personnel file or files indefinitely or for a lesser period of time specified in the writing. Informal written or spoken warning is not an official disciplinary action.

Consistent with APM 016, this Letter of Censure will remain indefinitely in a confidential personnel file maintained by the Office of the Vice Provost for Administrative Resolution and will not be subject to disclosure unless permitted by applicable privacy laws and University policy.

Sincerely,

Kim A. Wilcox
Chancellor

# EXHIBIT 51

**UC Riverside's persecution of Professor Perry Link**

https://www.wsj.com/opinion/uc-riversides-dei-guardians-came-after-me-39d8e2

6e



1  https://en.wikipedia.org/wiki/Perry_Link




This article **needs additional citations for** verification. Please help improve this article by adding citations to reliable sources. Unsourced material may be challenged and removed.
Find sources: "Perry Link" · news · newspapers · books · scholar · JSTOR
*(December 2024) (Learn how and when to remove this message)*



**Perry Link**

**Born**           1944 (age 80–81)
**Nationality**    American
**Alma mater**     Harvard University

**Scientific career**

**Thesis**         *The rise of modern popular fiction in Shanghai* (1976)

**Chinese name**

Chinese            林培瑞

Transcriptions     [show]

**Eugene Perry Link, Jr.** (Chinese: 林培瑞; pinyin: *Lín Péiruì*; born 6 August, 1944 Gaffney, South Carolina) is Chancellorial Chair Professor for Innovative Teaching Comparative Literature and Foreign Languages in College of Humanities, Arts, and Social Sciences at the University of California, Riverside and Emeritus Professor of East Asian Studies at Princeton University. Link taught Chinese language and literature at Princeton University (1973-77 and 1989-2008) and UCLA (1977-1988). He specializes in modern Chinese literature and Chinese language.[1]

Link is a Harvard University alumnus who received his B.A. in philosphy in 1966 and his Ph.D. in 1976. Link has been a Board Member of the Committee for Freedom in Hong Kong (CFHK) since 2021. CFHK is a US-based non-profit organisation, which presses for the preservation of freedom, democracy, and international law in Hong Kong.[2]

## Tiananmen Square  [edit]

Link helped Chinese dissident Fang Lizhi and Fang's wife obtain refuge at the U.S. Embassy following the crackdown on the 1989 Tiananmen Square protests.[3] Fang remained at the embassy for a year until negotiations resulted in Fang's being allowed to leave and settle in the U.S.[3]

Link has translated many Chinese stories, writings and poems into English. Along with Andrew J. Nathan, he translated the *Tiananmen Papers*, which detailed the governmental response to the 1989 democracy protests. In 1996, China blacklisted Link, and he has been denied entrance ever since. In 2001, Link was detained and questioned upon arriving in Hong Kong because of his involvement in the *Tiananmen Papers*. After roughly one hour, he was allowed to enter Hong Kong, where he spoke at the Hong Kong Foreign Correspondents Club. He has been banned from the People's Republic of China since, however.[4]

## Controversy at U.C. Riverside  [edit]

From 2022 to 2024, Link faced disciplinary action at U.C. Riverside after expressing concerns in a faculty search committee about prioritizing a Black candidate's race over qualifications.

Link was removed from the search committee and subjected to a disciplinary process, including hearings resembling a trial, where termination was suggested as a penalty.

Link said his comments were intended to caution against elevating race as the "overriding criterion," and that the comments were reported to the university without his knowledge.

Although a faculty committee unanimously found that Link did not violate any conduct codes, UC Riverside chancellor Kim Wilcox issued Link a formal letter of censure.[5][6] [7]

Link was recommended by the university to keep the process confidential and warned that the disclosure of any details of his disciplinary process "may result in discipline."

In December 2024, Link went public about his experience in an op-ed published in the Wall Street Journal.[8]

2

3