1          UNITED STATES DISTRICT COURT

2     FOR THE WESTERN DISTRICT OF WASHINGTON

3

| | |
|---|---|
| **Stanley Zhong; Nan Zhong,** individually and as next friend of his **Minor Son,** | Case No. 2:25-cv-00348 |
| Plaintiffs, | |
| v. | FIRST AMENDED COMPLAINT |
| **The Regents of the University of Washington** in their official capacities**; The University of Washington; Ana Mari Cauce,** in their personal capacity and their official capacity as the President of the University of Washington; **Paul Seegert**, in their personal capacity and their official capacity as the Director of Admissions at the University of Washington; **Magdalena Balazinska**, in their personal capacity and their official capacity as Chair of the Paul G. Allen School of Computer Science & Engineering at the University of Washington; **Tadayoshi Kohno**, in their personal capacity and their official capacity as Associate Director of the Allen School for DEIA (Diversity, Equity, Inclusion & Access); **Chloe Dolese Mandeville**, in their personal capacity and their official capacity as Assistant Director for Diversity & Access; **Other persons Does 1-20** acting in concert with those named above, | JURY TRIAL DEMANDED |
| Defendants. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

## I. INTRODUCTION

1. Plaintiffs Stanley Zhong ("Stanley") and Nan Zhong ("Nan"), individually and acting on behalf of his Minor Son ("Minor Son"), pursuant to Federal Rule of Civil Procedure 5.2(a), collectively referred to as "Plaintiffs," bring this civil rights action against the University of Washington ("UW") and the named UW officials (collectively, "Defendant UW").

2. Plaintiffs allege that the University of Washington and its officials discriminated against highly qualified Asian-American applicants, including Stanley, in the admissions, and, by maintaining the same race-conscious policies, place the Minor Son under an imminent threat of similar discrimination. That conduct violates: (1) the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; (2) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.; (3) 42 U.S.C. § 1981, which guarantees equal contractual rights regardless of race; and (4) RCW 49.60.400's prohibition on racial discrimination in public education.

3. This case is about the most basic of American promises: to give meaning to the Declaration of Independence's promise that *all human beings are created equal*. Especially over the past half-century, the nation has made a concerted effort to transform this ideal from a lofty aspiration to enforceable guarantee. At the heart is the simple but profound rule: that racial discrimination is more than unfair—it is illegal and indeed, unconstitutional.

4.  And yet, in one of the most competitive and consequential domains of American life, college admissions, our elite public universities like UW—and the government actors who fund and partner with them—proudly discriminate against Asian American applicants based on their race and have done so for decades. UW operates as though anti-discrimination law protects only *certain* minorities of their preference. Under this conception, Asian Americans are treated not as beneficiaries of civil rights, but as exceptions who are not entitled to civil rights.

5.  UW does not openly call these policies what they are—racial discrimination. Instead, UW uses euphemistic language like "affirmative action" and "holistic review." Racial favoritism is rebranded as "progress," and UW reframes race preferences as somehow desirable. But discrimination by another name is still discrimination. Focusing on the benefit to some rather than the burden on others is a rhetorical sleight of hand. Forcing one competitor to begin a race far behind the starting line is no different than giving his rival a head start. In a zero-sum admissions process, selecting winners based on race necessarily predetermines losers. UW's rhetoric obscures the harm, but does not erase it.

6.  The results speak for themselves. For years, UW's college admissions systemically penalized hard-working Asian American students—not because they lack merit, but because they don't fit the racial preferences that UW wants to engineer. In the name of vague notions of restitution for past racial injustice, universities like UW have simply created new victims.

7.  Stanley and the Minor Son of Nan Zhong do not ask for special treatment. They ask only for what the Constitution guarantees: an equal shot. A chance to be

1    evaluated on the strength of their character, their intellect, and their

2    achievements, without penalty for race. The Constitution demands nothing less.

3    8.   Plaintiffs seek declaratory and injunctive relief to ensure that UW's admissions

4         policies comply with federal and state law and to allow Asian Americans

5         applicants like Stanley Zhong and the Minor Son an equal opportunity to

6         compete for admission on the basis of merit, free from discrimination. Plaintiffs

7         also seek nominal damages and other appropriate relief for the injuries suffered

8         to their civil rights.

## II. PARTIES

### A. Plaintiffs

9.   Plaintiff Stanley Zhong is a second-generation Asian American student who at all

     relevant times was a resident of the state of California. Stanley was denied

     admission to UW despite extraordinary credentials. Stanley Zhong is a US

     citizen.

10. Like his older brother, Nan Zhong's Minor Son is an Asian American student and

    a minor child with strong academic ambitions and performance to match. He

    intends to apply to UW. Because he faces a credible and imminent harm of being

    subjected to the same discriminatory admissions policies, the Minor Son has

    standing to seek prospective relief as recognized by the Supreme Court in *Gratz

    v. Bollinger,* 539 U.S. 244 (2003)*, and Northeastern Fla. Chapter of the

    Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656 (1993). He

    is a resident of the state of California.

11. Plaintiff Nan Zhong proceeds on behalf of and as next friend of his Minor Son pursuant to Fed. R. Civ. P. 17(c); he is a first-generation immigrant from China and a permanent resident of California. He is also the father of Stanley Zhong.

12. The 2024 decision of the Second Circuit Court of Appeals in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161, affirms that an "equal protection claim can be asserted by individuals alleging they suffered harm from the discriminatory policy or law, as well as other individuals (such as a parent or guardian) or organizations that also have standing to sue."

13. Plaintiff Nan Zhong also proceeds individually because he personally suffers concrete injury due to emotional distress, financial impact, and denial of equal opportunity for his children.

14. Nan suffered a direct financial injury in the form of non-refundable application fees paid to institutions that engaged in discriminatory practices. These are concrete, personal financial losses—not merely generalized grievances. Directly attributable to the discriminatory policies and programs of UW, these losses further support Nan's individual standing to bring this claim.

15. Nan also faces imminent harm in the form of non-refundable application fees for his Minor Son. This prospective injury—directly traceable to the discriminatory policies and programs of UW—further establishes his individual standing to seek forward-looking relief, as recognized by the Supreme Court in *Gratz v. Bollinger* and *Northeastern Fla. Chapter*.

16. Stanley and Nan reached out to multiple legal resources and entities for representation. However, these entities either declined to take the case or failed to respond. Consequently, Stanley and Nan are compelled to represent themselves as pro se litigants.

**B. Defendants**

17. Defendant the Regents of the University of Washington is a non-profit educational institution organized under the laws of the state of Washington. Collectively, they are the governing board of UW. Each regent is sued in their official capacity.

18. Defendant the University of Washington is a public educational institution and a recipient of federal financial assistance, subject to Title VI of the Civil Rights Act of 1964. The University's undergraduate admissions office, operating under the direction of senior administrators and the Regents, is directly responsible for implementing the discriminatory policies and practices challenged in this action.

19. Defendant Ana Mari Cauce is the President of the University of Washington during the relevant admissions cycles and currently exercises authority over the University's operations and enforcement of admissions policies. She repeatedly issued statements opposing equal treatment regardless of race mandated by I-200, which Plaintiffs allege contributed to a culture of noncompliance within UW. As the top administration, her statements reflect UW's institutional commitment to racial preferences in violation of federal and state law. She is sued in her personal and official capacities.

20. Defendant Paul Seegert is the Director of Admissions at the University of Washington. In this capacity, he oversees admissions policies and practices systemwide and has ultimate authority over the implementation of UW's "holistic review" framework. His office approved and enforced admissions practices that systematically disadvantaged Asian-American applicants such as Stanley Zhong. He is sued in his personal and official capacities.

21. Defendant Magdalena Balazinska is the Chair of the Paul G. Allen School of Computer Science & Engineering at the University of Washington. In that role, she oversees the Allen School's admissions and related policies. When presented with evidence of Allen School's 15% enrollment target for certain racial groups, instead of actually addressing the problem, she covered it up by claiming Allen School does not use race as a factor in its admissions. She is sued in her personal and official capacities.

22. Defendant Tadayoshi Kohno is the Allen School's Associate Director for DEIA (Diversity, Equity, Inclusion & Access). He co-led the creation of the Allen School's *5-year Strategic Plan for Diversity, Equity, Inclusion, and Access*, which set the 15% enrollment target for certain racial groups in clear violation of laws. He is sued in his personal and official capacities.

23. Defendant Chloe Dolese Mandeville is the Allen School's Assistant Director for Diversity & Access. She co-led the creation of the Allen School's *5-year Strategic Plan for Diversity, Equity, Inclusion, and Access*, which set the 15% enrollment target for certain racial groups in clear violation of laws. According to Defendant Tadayoshi Kohno himself, "In summer 2020 Chloe and I started working on a

1    5-year strategic plan to guide our DEIA work." She is sued in her personal and

2    official capacities.

## III. JURISDICTION AND VENUE

4    24. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the

5        claims arise under the Constitution and laws of the United States. The Court also

6        has jurisdiction under 28 U.S.C. § 1343(a)(3) because Plaintiffs seek to redress

7        the deprivation of civil rights under color of state law.

8    25. The Court has supplemental jurisdiction over Plaintiffs' state-law

9        claims—including the claim under RCW 49.60.400—pursuant to 28 U.S.C. §

10       1367, because those claims form part of the same case or controversy as the

11       federal claims. Plaintiffs further seek declaratory relief under 28 U.S.C. §§

12       2201–2202.

13   26. Venue is proper for Defendant UW because a substantial part of the events or

14       omissions giving rise to the claim occurred, and will occur, in this judicial district

15       and division. *See* 28 U.S.C. § 1391(b)(2). Venue is additionally proper because

16       at least one of the defendants resides in this judicial district and division and all

17       the defendants associated with UW reside in Washington. *See* 28 U.S.C. §

18       1391(b)(1).

## IV. FACTUAL ALLEGATIONS

### A. The Legacy of Anti–Asian Discrimination and Widespread Culture of Anti-Asian Discrimination at Elite Universities

27. The Zhongs belong to an oppressed minority given the history of the United States. Asian Americans have long faced systemic exclusion and discrimination in the United States. The Chinese Exclusion Act of 1882 barred Chinese immigrants from entering the country or obtaining citizenship—a policy so discriminatory that Congress formally apologized in 2012. Other Asian communities have faced similar patterns of xenophobia, violence, and exclusion throughout U.S. history. During World War II, over 120,000 Japanese Americans were forcibly incarcerated based solely on their ancestry.

28. In recent decades, UW along with this nation's most elite educational institutions has continued this sad history. These institutions of higher education, including UW, subject Asian Americans to a quiet but no less insidious form of discrimination. Cloaked in the language of "affirmative action" and "holistic review," UW and other institutions of higher education hold Asian American applicants to higher standards than applicants of other races, penalizing Asian applicants specifically because they were born with the wrong skin color.

29. Across the country, defenders of race-conscious admissions have downplayed or outright denied the existence of anti–Asian American discrimination. These denials, however, are untenable. Within the world of college admissions, discrimination against Asian Americans has become the worst-kept secret: admissions officers, consultants, and students alike understand that being Asian

is a major disadvantage because these institutions discriminate on the basis of race behind closed doors.

30. A 2016 national survey revealed that fully 42% of private college admissions officers and 39% of their public counterparts acknowledged that Asian American applicants are held to higher standards than students of other races. Studies suggest that privileged, wealthy African American applicants are admitted at significantly higher rates than low-income, underprivileged Asian American applicants with identical academic credentials. If affirmative action were truly about leveling the playing field, this outcome is indefensible.

31. Together with many elite universities, Harvard openly gave preferential treatment to some racial groups at the expense of Asian-American applicants until its practice was ruled illegal by the Supreme Court in *SFFA v. Harvard* in 2023. Notably, following the Supreme Court's ruling in *SFFA*, not a single Harvard administrator apologized for the harm their policies inflicted on Asian-American applicants.

32. In the first admissions cycle after the Supreme Court's decision in *SFFA*, Asian American enrollment at several elite universities surged dramatically. At the Massachusetts Institute of Technology (MIT), Asian enrollment rose from 40% to 47%, while Columbia University saw an increase from 30% to 39%. These striking changes—occurring in a single year—far exceed what could be attributed to the limited use of race as a "plus factor" under *Grutter v. Bollinger*, and instead point to the prior, unlawful suppression of qualified Asian American applicants in the name of promoting diversity.

33. Historical evidence suggests that elite universities were aware of such discriminatory practices but chose to ignore or deny them until forced to respond to legal scrutiny. In 2006, Asian American applicant Jian Li filed a formal complaint against Princeton University, alleging racial discrimination in admissions. In the years following, Princeton's Asian American admit rate rose from 14.7% in 2007 to 25.4% in 2014. Similarly, after SFFA filed suit against Harvard in 2015, Harvard's Asian American admit rate increased from 17% in 2014 to 22% in 2016, after remaining flat for years. By 2024, that number had climbed to 37%.

34. These patterns demonstrate a troubling reality: elite institutions were fully capable of admitting more Asian American students without any meaningful change in the quality of applicants. The only change was legal pressure—confirming that Asian American applicants had long been disadvantaged by covert, race-conscious policies that prioritized demographic targets over merit.

**A.1. Parallel Situation at the University of California**

35. Since the voters passed Proposition 209 in California in 1996 and Initiative 200 in Washington in 1998, both the University of California (UC) and UW have been prohibited by state laws from using racial preferences for decades. Nevertheless, both institutions disagreed with the Supreme Court's ruling in *SFFA v. Harvard*, implying their desire to circumvent the ban. UC's actions strongly suggest how UW may be operating.

36. Every UC campus is actively pursuing a goal of at least 25% Hispanic enrollment.

37. In 2003, Mr. John Moores, then-chairman of UC Board of Regents, accused UC's flagship campus of "blatantly" discriminating against Asian Americans.

38. UCLA and UC Berkeley rejected Stanley Park, a Korean American student who faced serious adversity (single immigrant parent with cancer and no college degree), while accepting non-Asian students with SAT scores 520 points lower.

39. After the adoption of "holistic review" around 2007, UC deliberately discontinued public-facing websites with admissions data.

40. As documented by Professor Tim Groseclose in a detailed study of UCLA admissions, the switch to "holistic" review was adopted explicitly to increase enrollment of socalled "underrepresented minorities," at the expense of more qualified Asian American applicants.

41. UCLA sociology professor Robert Mare documented a consistent pattern of anti-Asian discrimination in admissions at UCLA.

42. After Dr. Jennifer Lucero took over UCLA medical school admissions in June 2020, the number of Asian matriculants at UCLA medical school declined from 84 to 55 from 2019 through 2022, a drop of 35%.

43. According to whistleblowers with direct knowledge, the admissions committee at UCLA's medical school routinely and openly discusses applicants' race—or racial proxies—and uses race as a factor in admissions decisions.

FIRST AMENDED COMPLAINT

44. The California State Auditor's 2020 report found UC Berkeley and UCLA "admitted thousands of applicants whose records demonstrated that they were less qualified than other applicants who were denied admission."

45. In an extraordinary public admission, UC Berkeley Law School Dean Erwin Chemerinsky said the quiet part out loud. In a public talk to a large audience, Mr. Chemerinsky admitted that his school systematically considers race in its internal decision-making and **actively conceals this practice**. These comments —caught on video—confirm that UC clings to racial preferences, but has just evolved ever more elusive ways of doing so.

46. In November 2022, Mr. Erwin Chemerinsky said in a media interview:

> "What colleges and universities will need to do after affirmative action is eliminated is find ways to achieve diversity that **can't be documented** as violating the Constitution … But they can use proxies for race." (Emphasis added.)

47. At a legal conference convened after the Supreme Court's decision in *SFFA*, Mr. Erwin Chemerinsky moderated a panel discussion featuring Timothy Lynch, General Counsel of the University of Michigan, and Kevin R. Johnson, Dean of UC Davis School of Law. When attendees expressed concern about the legality of certain proposed strategies in light of the Court's ruling, Mr. Lynch emphasized the importance of maintaining plausible deniability, cautioning: "You should be aware right now of the record you're creating … What are your faculty saying in

emails? What are they saying in public?" Note that the University of Michigan has also been prohibited by state laws from using racial preferences since 2006.

48. In another exchange regarding how plaintiffs often seek to uncover evidence of discriminatory intent, the panelists stated the following:

Lynch: "The key question in terms of creating the record is what can you say right now is the race-neutral explanation for doing it, and how do you avoid having your faculty colleagues muddy the record."

Chemerinsky: "Great point."

Johnson: "I think Tim offered a lot of sound advice. ... In fact—and I won't name the president of the University of California's name who said this— she said that if we weren't getting sued for our efforts at outreach, we weren't doing enough in terms of our admissions procedures and process."

49. Senior university administrators not only preach and practice "unstated Affirmative Action", they also actively persecute those who advocate for academic excellence over identity politics. This was exemplified by the case of Professor Perry Link at UC Riverside, who from 2022 to 2024 faced retaliation for advocating academic excellence over racial preferences.

## B. Asian Americans Are Acutely Aware of the Discrimination

50. As documented in the SFFA's legal complaint against Harvard (page 60), Asian-American applicants and their families know that they are being discriminated against by elite universities.

51. Asian American students like Stanley and prospective applicants like the Minor Son have long internalized the unspoken rules of an admissions game that is rigged against them. They resort to downplaying their achievements and interests in math and science (or chess). They avoid mention of bilingual households, or they omit involvement in Asian cultural organizations. It is well documented that many Asian-American applicants attempt to appear "less Asian" on their college applications to escape the penalty for their racial identity.

52. These learned behaviors are passed down from older students, for example from Stanley to Minor Son. Guidance counselors and even college admissions consultants also communicate to Stanley, Minor Son, and other Asian American students the harsh reality that Asian identity is a liability. This racial double standard is common knowledge, a moral stain on our educational institutions, and a direct violation of the American compact that all Americans are entitled to their civil rights.

53. No student in America should be compelled, as do Stanley and the Minor Son, to obscure their heritage or downplay their authentic achievements out of fear that their racial identity will count against them.

## C. Extraordinary Qualifications of Stanley Zhong

54. It is against this backdrop that Stanley faced the admissions process. Stanley is not merely a qualified applicant—he is, by any objective measure, among the top college applicants in the country.

55. Stanley Zhong attended Henry M. Gunn High School, ranked #14 in California by U.S. News & World Report and the #1 best public high school in the San

1    Francisco Bay Area according to Niche. Within this competitive setting, Stanley

2    still stood head and shoulders above his peers. He distinguished himself as a

3    National Merit Scholarship finalist. Although Stanley's high school does not

4    publish individual student rankings based on grade point average, he is

5    confirmed to be *at least* within the top 9% of his class, as he qualified for the

6    University of California's "Eligibility in the Local Context" (ELC). ELC guarantees

7    admission to a UC campus for California high school students who rank in the

8    top 9% of their class, as determined by their GPA in UC-approved coursework

9    completed in the 10th and 11th grades. In fact, UC Merced offered him admission

10   even though he did not apply.

11   56. He achieved a perfect PSAT score without any preparation and went on to score

12       1590 out of 1600 on the SAT, after just a few nights of self-study and without any

13       paid tutoring or test prep.

14   57. Stanley's high school grade point average was 3.97 (unweighted) and 4.42

15       (weighted).

16   58. Stanley's excellence extended well beyond the classroom. He took on leadership

17       roles in a variety of academic and volunteer organizations. While still in high

18       school, he co-founded and served as the 2nd president of OpenBrackets, a

19       nonprofit run by high schoolers that delivered free coding lessons to more than

20       500 students in underserved communities across California, Washington, and

21       Texas. It received positive feedback from Stackoverflow co-founder Mr. Jeff

22       Atwood. For this work, Stanley was awarded the President's Volunteer Service

Award at its highest level. He also co-founded and led his school's competitive programming club.

59. Mr. Josh Paley, Stanley's high school Computer Science teacher, has offered to testify as a character witness.

60. Stanley is a self-taught programmer whose extraordinary talent has earned him top honors in some of the world's most competitive coding contests—often outperforming industry professionals.

61. Stanley placed 2nd in Carnegie Mellon's picoCTF cybersecurity challenge and was invited to CMU with expenses paid, took 6th in Stanford's ProCo, and reached the elite Platinum Division of the USA Computing Olympiad. Twice, he placed 2nd globally (2nd and 1st in the U.S., respectively) in MIT's Battlecode high school division, qualifying for invitations to MIT with expenses paid. (Unfortunately, one of those trips didn't happen due to COVID.) He also ranked among the top 500 globally in both Google Code Jam (427th) and Meta Hacker Cup (329th) —competitions dominated by seasoned software professionals from around the world.

62. His skill was so advanced that in 2019, Google invited him for a full-time software engineer interview, unaware he was only 13 years old; the interview was canceled only after his age came to light because minors can't sign Google's employment agreement.

63. Stanley repeatedly demonstrated extraordinary initiative far beyond his years. After reading an NPR story in April 2020 about state unemployment systems

1    buckling under COVID-related demand due to outdated COBOL infrastructure,

2    Stanley independently taught himself COBOL, published sample code to GitHub,

3    and volunteered his help to the "COBOL Cowboys" featured in the

4    article—earning a personal phone call and words of encouragement from their

5    CEO.

64. Frustrated by the lack of free e-signature tools during the pandemic, in 2021,

    Stanley launched RabbitSign, the world's only unlimited free e-signature service

    with SOC 2, ISO 27001 and HIPAA compliance included. Built by Stanley on

    Amazon Web Services, RabbitSign was so secure and well-architected that AWS

    called it "one of the most efficient and secure" applications they had reviewed

    and decided to feature it in a case study—a prestigious recognition that is

    notoriously difficult to attain, even for seasoned professionals. Stanley's

    innovation drew national attention: RabbitSign was spotlighted on *Viewpoint with*

    *Dennis Quaid*—a program that has previously interviewed Fortune 500 CEOs

    and U.S. presidents—for its potential to help reduce healthcare costs through

    accessible, secure digital tools.

65. Stanley's college application essay, substantially reflected in the *Viewpoint*

    interview referenced above, recounted his motivation for creating RabbitSign, a

    free HIPAA-compliant e-signing platform designed to help reduce America's

    healthcare costs. He described how he overcame repeated rejections to

    eventually partner with a mission-aligned organization and launch RabbitSign as

    the first Activism Corporation—an innovative model aimed at tackling corporate

FIRST AMENDED COMPLAINT

greed using free market forces. A nearly identical version of this essay helped advance him from a National Merit Scholarship semifinalist to a finalist.

66. Just before his 18th birthday, Stanley underwent one of the most rigorous and objective evaluations available in the modern labor market: Google's full-time software engineer interview process. Five randomly assigned professionally trained Google engineers assessed Stanley, devoting over ten hours to evaluating his technical skills, communication abilities, and teamwork—precisely the traits elite universities purport to assess through "holistic" admissions.

67. Importantly, the structure of Google's process eliminates any risk of favoritism: interviewers are randomly assigned, shielded from outside influence, and incentivized to avoid inflating evaluations, as doing so could lead to internal compensation disparities.

68. Mr. Dan Bloomberg, a longtime Google employee who served on Google's hiring committees for 18 years, has agreed to testify about Google's interview process.

69. Based solely on their independent assessments, the Google engineers recommended Stanley for an L4 software engineer role, a position typically reserved for candidates with a Ph.D. or equivalent industry experience. Google extended the offer in September 2023, just after Stanley's 18th birthday.

70. Stanley's full-year job performance evaluation in January 2025 confirmed the wisdom of Google's decision: Stanley met all expectations and demonstrated strong potential for continued growth. That Google—an employer with far more applicants than even the most competitive universities—recognized Stanley as

1    qualified for a postdoctoral-level role, while UW deemed him unworthy of

2    undergraduate admission, provides compelling circumstantial evidence of the

3    discriminatory standards UW applies to Asian American applicants.

## 4  D. Stanley Applied on Merit—UW Rejected on Race

5    71. For enrollment in Fall 2023, Stanley applied to the undergraduate programs at

6    UW Seattle. His first-choice major was Computer Science in the College of Arts

7    & Science, Allen School. His second-choice major was Human Centered Design

8    and Engineering in the College of Engineering.

9    72. Like many Asian American candidates for admission, Stanley naively dared to

10   hope that, despite the well-known barriers facing applicants who look like him, his

11   individual merit might still prevail. That maybe, just maybe, UW would look past

12   his race.

13   73. Unfortunately, like too many Asian American students, he learned that it would

14   not. Despite extraordinary academic credentials, internationally recognized

15   accomplishments, his application to UW was rejected.

16   74. Stanley's story was cited in a congressional hearing in September 2023, and

17   reported in national news.

18   75. After Stanley's story first hit the news in October 2023, multiple independent

19   college admissions experts and counselors (unconnected to UW) reviewed

20   Stanley's application materials, including his essay. Tellingly, not one of these

21   experts could identify a legitimate, performance-based reason why Stanley would

FIRST AMENDED COMPLAINT

have been rejected by a school of UW's caliber. Some of them have offered to testify as expert witnesses when this lawsuit proceeds to trial. By all objective indicators, Stanley appeared to be the kind of candidate any top university would eagerly admit. The absence of any apparent, merit-based explanation for this "bizarre" result raises a strong inference that Stanley's race played a role in UW's decision. There is no other explanation.

76. The rejection by UW defies common sense and contradicts expert assessments of his application. As the Supreme Court noted in *Miller v. Johnson*, 515 U.S. 900, 901 (1995), "bizarreness" can serve as "persuasive circumstantial evidence that race for its own sake … was a legislature's dominant and controlling rationale." Similarly, the stark disparity between Stanley's qualifications and the UW campuses' admissions decisions raises serious concerns about the role of race in UW's admissions process. This striking incongruity strongly suggests that UW's admissions policies are being applied in a discriminatory fashion.

77. Stanley was denied the opportunity to compete for admission to UW on equal footing with other applicants on the basis of race or ethnicity due to UW's discriminatory admissions policies and practices.

78. Stanley is ready and able to apply to UW when it ceases its intentional discrimination against Asian Americans.

79. As a result of the unlawful discrimination, Stanley Zhong has suffered significant harm, including but not limited to the loss of educational opportunities,

reputational damage, and emotional distress. Plaintiffs seek all available legal and equitable relief to remedy these injuries.

**E. UW's Motive and Intent to Racial Balance its Student Body and its Enduring Commitment to Racial Engineering**

80. For decades, UW openly defended and advocated for race-conscious admissions policies as central to its institutional mission.

81. In 1998, Washington voters approved Initiative 200 (I-200), a state law prohibiting discrimination against or preferential treatment for any individual or group based on race in public education. The measure closely aligns with the principles of the Fourteenth Amendment's Equal Protection Clause. In response, then–University of Washington President Richard L. McCormick lamented the initiative's passage, stating: "The recent passage of Initiative 200 has deprived us of a tool that has been useful in promoting diversity for decades." He further affirmed: "Diversity is a critically important value to the educational mission of the University of Washington."

82. In a 2000 interview with *University of Washington Magazine*, President McCormick reaffirmed his longstanding opposition to Initiative 200, stating: "*I doubt that we will ever look back at the passage of I-200 as a good thing.*" He further remarked: "*That was unfortunate. Initiative 200 brought, as we anticipated it would, a significant decline in the diversity of the freshman class we enrolled in 1999 … It would be very heartening if we turned the corner and **restored at least some of the loss** we experienced in 1999.*" (Emphasis added.) The latter

statement reveals a strong institutional desire to **restore racial composition in enrollment**, even decades after voters and the law prohibited such practices—reflecting a clear intent to racially engineer UW's student body in defiance of constitutional and statutory constraints.

83. According to *University of Washington Magazine*, in 1997—just before the passage of Initiative 200—the UW student body was 27 percent minority, compared to only 17 percent of the state population. Despite this, President McCormick insisted that the university was not doing enough to enroll minority students. A closer look reveals the real reason for this narrative: **Asian Americans were enrolling at UW in far greater numbers than their share of the state population.** At the time, Asian Americans made up 19 percent of the UW student body, yet only 6 percent of the state's population, according to census figures. When Asian American students are removed from the calculation, Black, Hispanic, and Native American students together comprised only 8 percent of the UW student body—compared to 11 percent in the state overall. These figures suggest that the administration's concern about "declining diversity" was not based on a genuine lack of minority enrollment, but rather on a **desire to reengineer the racial balance** by reducing Asian American representation in favor of other racial groups, in clear tension with the principles of equal protection and the text of I-200.

84. On May 17, 1999, UW News reported the results of the University of Washington's first admissions cycle following the enactment of Initiative 200. The data revealed a 32% decline in admissions offers to African American applicants,

a 14% decline for American Indian applicants, and a 17% decline for Hispanic/Latino applicants. In contrast, offers to Asian American applicants **increased by 10%**. In response, President McCormick stated:

> We are very disappointed by this outcome for 1999, and we are committed to moving these numbers back up in the years ahead. Maintaining diversity on our campus is going to be a long-term challenge. The UW is determined to admit a diverse student body, and we will do so through expanded outreach to middle and high schools, by raising more scholarship funds, and by further revisions to our admissions policies. These efforts may take a few years to **produce the kind of results we want**, but we are going to make them work. (Emphasis added.)

President McCormick's remarks make clear that UW administrators were dissatisfied with an admissions outcome that, while race-neutral in compliance with I-200, produced increased Asian American enrollment and reduced representation from other racial groups. The phrase "results we want" unmistakably signals **a predetermined racial outcome**—a desire to restore the racial balance that existed prior to I-200. The fact that increased Asian American representation coincided with public disappointment at the university's highest levels supports the inference that UW's concept of "diversity" implicitly excluded Asian Americans, and that subsequent changes in outreach and admissions policy were undertaken **with racial balancing as the intended result**.

85. On December 3, 1998, shortly after the passage of Initiative 200, President McCormick issued a public statement reaffirming the University's commitment to

1   racial diversity. He declared: *"Administrators and faculty are hard at work revising*

2   *University admissions criteria so that the classes we admit will still **reflect the***

3   ***diversity of our society** … we are committed to doing everything within our*

4   *power to achieve this result."* (Emphasis added.)

5   86. This official statement by UW's highest-ranking administrator openly advocates

6   for aligning the racial composition of incoming classes with that of the broader

7   population—effectively endorsing **proportional racial representation** as a

8   guiding admissions objective. Such a goal is constitutionally impermissible.

9   President McCormick's remarks reveal not only the University's intent to preserve

10  race-conscious outcomes despite I-200's legal mandate, but also a willingness to

11  revise admissions criteria to achieve those outcomes—raising serious questions

12  under both state and federal law.

13  87. Ironically, despite UW's fervent rhetoric about promoting "diversity," the institution

14  has shown hostility toward **diversity of thought**. In 2022, the Foundation for

15  Individual Rights and Expression (FIRE)—a nationally respected nonpartisan

16  organization—ranked UW as the **lowest-rated public university in the country**

17  for freedom of speech and expression. One notable example involved Professor

18  Stuart Reges of the Computer Science Department, who publicly criticized the

19  university's land acknowledgment statements as performative virtue signaling. In

20  response, UW administrators took disciplinary action against him, prompting

21  Professor Reges to file a federal lawsuit alleging violations of his First

22  Amendment rights. This incident underscores a troubling reality: while UW

champions diversity in theory, it appears far less tolerant of dissenting viewpoints that challenge prevailing campus orthodoxy.

88. During oral argument in *SFFA v. University of North Carolina*, Justice Clarence Thomas remarked, *"I've heard the word 'diversity' quite a few times, and I don't have a clue what it means."* His comment reflects the growing skepticism—both judicial and public—toward the vague and often inconsistent ways in which universities invoke "diversity" to justify their policies.

89. At the University of Washington, the word "diversity" clearly functions as a **proxy for race**. Former UW President Richard McCormick's repeated public statements reveal that UW interpreted the passage of Initiative 200—which banned racial preferences in public education—as a serious setback precisely because it impeded the University's ability to shape the racial composition of its student body. It is apparent from his comments that UW viewed I-200 negatively not because it limited educational excellence or freedom, but because it prevented racial engineering of enrollment numbers.

90. A few things become undeniable from President McCormick's remarks and UW's institutional conduct:

    a. Whatever UW says about "diversity," what UW actually means is **race**—specifically, racial balancing.

    b. UW strongly opposes I-200 because it **restricts the University's ability to consider race in admissions**.

c. Asian Americans, despite being a racial minority, **do not count in UW's definition of underrepresented minorities**.

d. When Asian American enrollment increases, UW expresses disappointment; when it decreases, the University describes it as progress toward "diversity."

e. UW's commitment to achieving certain demographic outcomes is unwavering—**its racial targets are non-negotiable**.

91. The university's rhetoric about "educational benefits of diversity" is increasingly unconvincing and appears to be a **subterfuge for racial preferences**. This is underscored by UW's own Title VI website, which gives the following example of conduct that might create a hostile environment:

> An international student is repeatedly singled out by a professor to answer questions about the student's country of origin and ethnic identity, which the student feels compelled to answer. As a result, other students tease and make jokes directed at that student both in class and outside of class.

While UW claims to value diversity in the classroom for its supposed educational benefits, this example illustrates that forcing students to speak about their ethnic identity can, in fact, be alienating and stigmatizing—especially when it treats students as representatives of their racial or national group. Far from enhancing education, such practices undermine individual dignity and create division, further demonstrating the incoherence of UW's diversity rationale.

92. Since the passage of Initiative 200 in 1998, UW has spent decades working to circumvent, undermine, and ultimately reverse prohibitions on race-based preferences. That long-standing institutional commitment to racial preferences was on full display in 2019, when UW publicly supported Initiative 1000 (I-1000), a legislative effort to repeal I-200 and reauthorize racial preferences in public education. The University again revealed its position in 2023, when it openly objected to the Supreme Court's decision in *SFFA*. In both instances, UW made clear that it remains deeply committed to using race as a factor in admissions, regardless of constitutional constraints or the will of Washington voters.

93. In an effort to repeal Initiative 200, UW President Ana Mari Cauce sent a letter to the Washington State Legislature on January 24, 2018, urging support for Initiative 1000. In her letter, she lamented the impact of I-200 on the University's ability to compete for certain students, writing: *"These talented and promising students are especially targeted and heavily recruited by private universities, as well as public universities in other states, and when they leave our state to attend college, they are less likely to return."* The message was clear: UW viewed the legal restriction on race-based admissions as a competitive disadvantage and sought legislative action to restore its ability to **use race as a factor in** admissions decisions—further confirming its institutional commitment to racial preferences over race-neutral policies.

94. In April 2019, the Washington state legislature passed I-1000. It was scheduled to take effect in July unless it was sent to the voters as a referendum. UW

embraced I-1000 enthusiastically. On June 20, 2019, UW President Ana Mari Cauce published a [statement](#) in the UW Presidential Blog, writing:

> I am on the record supporting this change in the law … we are still not a country where we judge people simply by the "content of their character."

It is self-contradictory that judging people by the "content of their character" somehow requires classifying them by their race. This turns equal protection on its head and reveals the extent to which UW has (unfortunately) come to view race as a defining feature of personhood. President Cauce continued:

> I-1000 is not about quotas, which I would never endorse or support. It is about leveling the playing field so that we can better compete in admission and hiring with top public universities and private universities, around the country and right here in our state.

Effectively, she argued that because other universities are permitted to engage in race-conscious decision-making, UW must be allowed to do the same to remain competitive. But this rationale ignores a fundamental legal principle: both federal and state laws prohibit racial discrimination and require that individuals be treated equally, without regard to race. President Cauce's concept of "leveling the playing field" applied to institutions, not to applicants—and her statement failed to acknowledge the inequality imposed on those who would be disadvantaged by race-based preferences.

95. On August 1, 2023, following the Supreme Court's ruling in *SFFA v. Harvard*, UW published a blog post on its official Presidential Blog titled "*Affirmative action*

*ruling won't change our values or our mission*." The statement, attributed to
President Ana Mari Cauce, expressed clear dissatisfaction with the Court's ruling:

> [The decision] created much disappointment and concern … We remain
> wholeheartedly committed to our values and conviction that diversity, equity
> and belonging are intrinsic requirements for educational success and for the
> success of our society.

This statement from the University's highest-ranking official openly signaled UW's
continued desire to prioritize race and other identity-based factors in admissions,
notwithstanding the Supreme Court's unambiguous rejection of such practices
under the Equal Protection Clause and Title VI. It is a direct expression of **racial
intent by a final policymaker**, and thus highly probative under *Arlington
Heights*.

One might have hoped that a great university would welcome the restoration of
merit-based, equal treatment. Instead, UW's chief decision-maker expressed
"disappointment and concern" that the University could no longer use race as a
basis for selecting students—revealing a deep institutional resistance to
constitutional equality and a preference for race-based decision-making.

96. When viewed alongside President Cauce's prior statements in support of
Initiative 1000, her reaction to the Supreme Court's ruling in *SFFA v. Harvard*
reveals a troubling inconsistency. In 2018 and 2019, she justified her
endorsement of I-1000 by claiming it was necessary to "level the playing field" so
that the University of Washington could compete with other institutions that were

permitted to consider race. Yet in 2023, when the Supreme Court actually leveled

the playing field by prohibiting all universities from using race in admissions,

President Cauce expressed disappointment and concern. This contradiction

suggests that her support for I-1000 was never truly about fairness or

competitiveness—it was always about **restoring UW's ability to engage in**

**racial preferences**.

97. At UW, "diversity" has become a euphemism for racial engineering—no longer

about the broad inclusion of talent or perspectives, but rather a justification for

denying opportunity to applicants who do not fit the University's preferred

demographic profile. Chief among those disadvantaged are Asian Americans,

who, despite being a federally recognized minority group and consistently

overqualified, are excluded from UW's concept of underrepresentation and

routinely passed over in pursuit of "ethnic diversity."

98. UW's persistent efforts to evade legal restrictions on racial preferences—from its

promotion of I-1000, to its opposition to the *SFFA* ruling, to its conduct since

I-200—expose a deeply entrenched institutional bias. Its disparate treatment of

Asian American applicants is no accident; it reflects a deliberate pattern in which

Asian Americans are excluded from diversity initiatives and held to higher

standards. When given the choice between race-neutral equal treatment and

race-conscious admissions, UW consistently opts for the latter—even at the cost

of discriminating against more qualified Asian American students.

99. By defending racial criteria, expressing dissatisfaction with race-neutral

outcomes, and elevating "diversity" as a non-negotiable institutional priority, UW

has revealed its intent to maintain racial preferences in defiance of constitutional and statutory mandates. The result is a system in which high-achieving Asian American applicants like Stanley and Minor Son are systematically penalized—not for lack of merit, but for being "overrepresented" by UW's preferred racial metrics.

100.    The macro-level political environment in Washington State has undoubtedly enabled and encouraged UW's discriminatory practices in admissions. In January 2022, Governor Jay Inslee issued Executive Order 22-02, which rescinded Executive Order 98-01—the prior directive implementing Initiative 200's ban on racial preferences. In its place, EO 22-02 instructed the Washington Student Achievement Council (WSAC) to produce a report analyzing disparities in higher education outcomes across racial and ethnic groups, including the "equity demographics" of faculty and staff, and the "progress of existing programs designed to identify and remedy discrimination."

101.    In its 2026 Strategic Action Plan, WSAC made its position explicit:

One sign of inequity is the racial distribution of students at public high schools compared to public postsecondary institutions. In Washington, the racial demographic makeup of public high schools is different than public higher education in the state. For instance, Hispanic or Latino students make up over a quarter of the public high school population but account for 12 to 14 percent of the public higher education population. Ensuring racial equity in our state requires that our higher education system reflects the diversity of our population.

This statement strongly implies that WSAC views any racial disparity between high school and college enrollment as a problem to be "fixed" through demographic manipulation. At UW, where Asian American students are overrepresented relative to their share of the general population—and where Hispanic representation is lower—it is not difficult to infer that "equity" initiatives will seek to reduce Asian American enrollment in favor of increasing Hispanic enrollment, irrespective of academic merit.

102.    If racial balancing is the standard, then by WSAC's logic, every divergence in racial distribution—between elementary and middle schools, between regions, between departments within a university—must be corrected until racial composition is uniform everywhere. That is not only absurd in principle, it is unconstitutional in law.

103.    The fundamental flaw in this thinking lies in equating disparity with discrimination, and statistical underrepresentation with injustice. If that standard were applied consistently, one might demand that 7.2% of NFL players be Asian Americans, since Asian Americans make up 7.2% of the U.S. population. Yet no one sues the NFL for racial discrimination, because it is understood that representation in professional sports reflects differences in talent and interest—not discrimination.

104.    Conversely, while Asian Americans are statistically overrepresented on college campuses, this is a reflection of academic excellence, not privilege or favoritism. Rejecting more qualified Asian American applicants to admit others with lower qualifications—solely to balance racial statistics—is not only unfair, it

1  is unconstitutional. As the Supreme Court has repeatedly affirmed, the

2  Constitution protects individuals, not groups. In college admissions, it is the

3  individual applicant's merit and achievement, not skin color, that must be the

4  basis for judgment.

5 **F. UW's Action for Racial Balancing its Student Body**

6  105.    In addition to its evident motive and intent to engage in racial balancing, the

7  University of Washington also possesses the means and opportunity to

8  manipulate the racial composition of its student body through its current "holistic"

9  admissions process. This framework—lacking transparency, third-party oversight,

10  or enforceable accountability—provides ample discretion to prioritize race behind

11  closed doors while maintaining public deniability. In practice, UW's stated intent is

12  matched by its actions. The convergence of motive, means, and opportunity

13  establishes a compelling inference of intentional and systemic racial

14  discrimination.

15  106.    In or around Fall 2021, the University of Washington's Paul G. Allen School of

16  Computer Science and Engineering (the "Allen School") published its **Diversity,**

17  **Equity, Inclusion, and Access Five-Year Strategic Plan**. As part of Goal O.1,

18  the plan states that the Allen School will:

19  Measure the percentage of domestic Black, Hispanic, and American

20  Indian/Alaska Native, Hawaiian/Pacific Islander undergraduates and, **by**

21  **year 5**, evaluate whether the percentage is **at least 15%** (the UW-Seattle

22  average). (Emphasis added.) (See Exhibit 1.)

This language does not reflect a passive demographic observation. Rather, it clearly identifies a race-specific numerical benchmark to be achieved within a defined time horizon—strongly suggesting the presence of an institutional objective to engineer the racial composition of the undergraduate student body. Further, the plan enumerated a series of tactics to achieve this goal.

The use of terms such as *"by year 5"* and *"at least 15%"* is incompatible with a neutral policy. These are **evaluative and prescriptive terms**, not descriptive ones. When an institution measures progress against a percentage-based racial benchmark over time, it implies a race-based target or quota, even if race is not explicitly used in a formal admissions formula. As recognized in *Arlington Heights* and reaffirmed in *SFFA v. Harvard*, such race-conscious objectives can be **probative of discriminatory intent**.

107.    Moreover, selecting the UW-Seattle campus average as a benchmark is both arbitrary and unjustified. There is no educational, legal, or policy rationale for requiring each school within the university system to match or exceed that campus-wide average. Basic mathematics dictates that if some schools exceed the average, others must fall below it. Therefore, requiring all schools to meet or exceed the UW-Seattle average can only be understood as an effort to impose system-wide racial balancing—a practice explicitly condemned by the Supreme Court (*Parents Involved*, 551 U.S. at 730).

108.    This 15% enrollment goal for specified racial groups amounts to a set-aside, akin to what the Supreme Court invalidated in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978). When coupled with Washington's

Initiative 200, which has banned racial preferences in public education since

1998, the Allen School's actions reflect a **willful and knowing violation** of both

federal and state law. Despite exceptional legal clarity on this point, the

University pursued this policy with **blatant disregard and callous indifference**

to the constitutional rights of Asian American applicants, whose increased

representation was clearly not among the intended outcomes of the Allen

School's racial targets.

109.    According to his own statements, Defendant Tadayoshi Kohno co-led, along

with Defendant Chloe Dolese Mandeville, the development of the Allen School's

**Five-Year Strategic Plan for Diversity, Equity, Inclusion, and Access** in 2020.

This plan included the 15% enrollment target for specified racial groups, a policy

that violates both federal and state anti-discrimination laws. Notably, Defendant

Kohno spoke about this plan with pride, as if the implementation of such unlawful

racial preferences were a commendable accomplishment.

110.    Rather than being held accountable for instituting an unlawful race-based

target, Defendant Kohno was promoted to Associate Dean of the College of

Engineering at UW, while Defendant Dolese Mandeville received the 2023 UW

Distinguished Staff Award. These rewards demonstrate UW's institutional

endorsement of racially discriminatory practices and highlight a culture that

prioritizes racial engineering of the student body—even in blatant defiance of the

law.

111.    As of August 5, 2025, the web page that previously hosted the Allen School's

strategic plan

(https://www.cs.washington.edu/who-we-are/diversity-equity-inclusion-access/strategic-plan) now displays the message "page has been eaten." (See Exhibit 2.) This disappearance further suggests a conscious effort to obscure incriminating evidence in the face of pending litigation.

112.    In addition to its Five-Year Strategic Plan for Diversity, Equity, Inclusion, and Access, the Allen School's official Departmental Broadening Participation in Computing (BPC) Plan—effective from December 15, 2021, to December 15, 2023—provides direct evidence that the Allen School implements race-conscious policies in violation of both federal and state law. The Plan sets forth explicit racial enrollment goals, including a directive to "increase the percentage of domestic BHN [Black, Hispanic, Native] undergraduates to the UW-Seattle average" and "increase the percentage of domestic BHN Ph.D. students by 10 percentage points" over the next five years. These are not generalized commitments to diversity, but clearly defined racial benchmarks—**numerical racial targets for admissions outcomes**—that reflect precisely the kind of racial balancing the Supreme Court explicitly condemned in *Bakke*, *Gratz* and *SFFA*.

113.    The BPC Plan further outlines a series of recruitment and outreach initiatives aimed at elevating BHN representation to meet those targets, including race-conscious K–12 outreach, retargeted summer camps, culturally tailored pedagogy, and partnerships with identity-based organizations. These measures are focused not on individual disadvantage or socioeconomic need, but on racial identity alone, with the express purpose of altering the racial composition of the

Allen School to achieve statistical parity. This reveals that race remains a motivating factor not only in outreach and recruitment but in the broader admissions-related infrastructure.

114.    These practices, formalized in a departmental plan, directly contradict Defendant Magdalena Balazinska's public claim in her letter to the AACE that "The University of Washington (and thus the Allen School) does not use race as a factor in admission decisions… We do not use race as a factor when admitting students to our outreach programs." In reality, the Allen School's own documents supply compelling evidence that race was a motivating factor in the rejection of Stanley Zhong's application.

115.    UW's race-conscious practices have not escaped federal notice. On March 14, 2025, the U.S. Department of Education's Office for Civil Rights ("OCR") announced a sweeping Title VI enforcement initiative, opening formal investigations into 45 universities for "race-exclusionary practices" that violate the Civil Rights Act. UW appears on that list as a chief offender.

116.    OCR's decision to single out UW is significant. Title VI investigations are initiated only where the agency has received credible evidence that an institution continues to deploy race as a decision-making factor after *SFFA*. Thus, a federal body has already found sufficient cause to suspect UW of maintaining unlawful racial preferences.

**G. Documented Instances of Race-based Discrimination in UW's Admissions and Hiring**

### G.1. Race-based Admissions and Scholarships

117.   In April 2024, UW Professor Cliff Mass published a blog post sharing the following observations and commentary regarding UW's admissions practices:

> Highly biased decision-making in admissions is being made by many departments as part of the DEI initiative. Key to this approach has been dropping valuable objective measures such as the SAT and GRE exams and moving to subjective "holistic" admissions. Holistic admissions are essentially subjective and allow affirmative action to flourish.
>
> I am inside the system and can see how it works. For example, in one department, graduate admissions matrices include a DEI flag, that is used to enhance the visibility of applicants with the proper "diverse" backgrounds. The system is heavily weighted to enhance the chances of an applicant that supports a certain conception of diversity.

118.   In response to SB 5228 in 2021, the UW Medical School established the Incentive Scholarships program. In 2023, all recipients of these scholarships identified as URiM (underrepresented in medicine). If these awards were granted based on race rather than factors such as merit or socioeconomic status, or other race-neutral criteria, this practice raises serious concerns about the University's prioritization of superficial diversity metrics over meaningful social justice and equal opportunity.

119.    UW's emphasis on identity categories is further illustrated by its public

promotion of "Diversity and Identity-Based Opportunities" on official university

websites. These practices suggest that UW's diversity framework centers on

racial and ethnic classification, often at the expense of individual merit or broader

measures of disadvantage.

**G.2. Race-based Hiring**

120.    While distinct from undergraduate admissions, UW's faculty hiring practices

provide compelling circumstantial evidence of its institutional and systematic race

preference in decision-making. These policies reveal a university-wide culture

deeply steeped in race-consciousness—one that cannot plausibly separate its

hiring practices from its highly suspect admissions outcomes. UW's widespread

adoption of race-conscious policies in faculty hiring supports the inference of

similar practices in student admissions.

121.    Similar to the 'unstated Affirmative Action' approach advocated by Mr.

Chemerinsky at UC, UW implemented this practice by re-ranking candidates

based on race while maintaining an appearance of neutrality. In 2023, the UW

psychology department's hiring committee re-ranked finalists to prioritize hiring a

Black candidate over a white and an Asian candidate who were originally ranked

first and second, respectively. UW's Complaint Investigation and Resolution

Office (CIRO)'s investigation report concluded that "race was used as a

substantial factor in the selection of the final candidate and the hiring process."

The report, which redacts all the names of those involved, suggests that faculty

members tried to hide the extent to which race was considered, including in the

hiring report. "I advise deleting the statement below as it shows that URM [underrepresented minority] applications were singled out and evaluated differently than non-URM applications (which is not allowed as [redacted] noted)," one email read, according to the report. "My inclination is to hold these meetings only for POC [People of Color] candidates. I'm also mindful that our Provost is now getting anxious about anything that's directed to only some identity groups (i.e., they are getting worried about fallout from the pending Supreme Court affirmative action rulings)," a person wrote in an email. "My read is that they'll get fearful of litigation and overcorrect into colorblindness. Maybe our committee can preemptively think our way around this type of future directive," the faculty member wrote. This case provides a concrete example of how UW prioritized race in hiring, in clear violation of Title VII of the Civil Rights Act and RCW 49.60.400. The incident only came to light probably due to a public records request from John Sailer at the National Association of Scholars. Given the pervasive culture of racial preference, it is reasonable to infer that this was not an isolated occurrence.

122.    As reported by John Sailer, the department created a case study report titled _Promising Practices for Increasing Equity in Faculty Searches_. It contains a set of recommendations, which the department's Diversity Advisory Committee (DAC) treated as unofficial hiring policy. "The policy that our department is prioritizing DEI, operationalized as focusing on increasing hiring of URM candidates, is mentioned in the promising search practices handbook," a hiring committee member wrote in an email. The case study report established the policy of

requiring the "official DAC endorsement of faculty hiring recommendations." It starts with

This case study report summarizes the practices that the Department of Psychology used in the 2020-2021 academic year to conduct faculty searches across three separate research areas and hire five new tenure track faculty members, three of whom are women and all of whom are people of color (BIPOC).

It carefully ranks favored minority groups, specifically "Black/African American, Latinx/Hispanic, or American Indian/Indigenous," above less preferred ones, specifically "Asian American or Middle Eastern American."

Its recommendations include numerous practices that amount to racial engineering. Some of the more troubling and legally questionable examples are as follows:

Visualize your ideal candidates and work backwards from there to word your advertisement. **If you could pick anyone, with an eye towards URM scholars, which current scholars in your field would be the best fit for this job?** How do they describe their work and goals? Consider using similar language to communicate your unit's priorities. (emphasis in original)

Deconstruct how evaluating candidates based on certain characteristics (e.g.,productivity, verbal fluency under pressure, charisma, likeability, visionary leadership) may advantage privileged groups over underrepresented groups.

The prompt [for Diversity Statement] could specify that candidates can write about their own experiences with identity, their DEI-related activities and service, etc.

Disadvantage of this approach [not requiring letters of recommendation]: Potentially overlooking candidates whose letters may have provided valuable additional information (e.g., whether the applicant is URM).

First, **audit previous searches to identify which criteria may be sources of bias -- when were URM candidates dropped, and why?** On which criteria did White candidates, male candidates, etc. tend to receive higher scores? Use this initial audit to guide the creation of a rubric for the present search. One of our searches used this process and realized that "open science" requirements (publicly posting data, hypotheses, and materials to guard against accusations of selectively reporting results or falsifying data) produced biased results. We subsequently dropped open science as an evaluation criterion. Adding the criteria of "diversity leadership" to the Diversity category of the rubric proved to increase our retention of URM candidates at various phases of the creation of lists. (emphasis in original)

**Determine who has disclosed URM identity in your candidate pool.** (emphasis in original)

**Assign someone to check specifically for URM candidates who were dropped at each stage. …** In some searches, dropped URM candidates

were automatically given a second look before moving on. (emphasis in original)

123.    As a self-congratulatory showcase, the case study report's Appendix A lists "UW Psychology Faculty Searches by the Numbers" as follows.

General:

● All of the candidates we made offers to in all areas (across 3 searches) accepted

● 5 total new faculty members (Inequity-- 2; MMM -- 1 + 1 partner; IDS -- 1)

● All BIPOC, 4/5 URM, 3/5 women

Psychology of Inequity search:

● 143 total candidates

● Phone interviews, then fourth cut: final pool reduced to 5 candidates (1 faculty, 2 postdocs, 2 grad students; 3 women, 2 men; all URM)

● Offers made to & accepted by 2 candidates (both URM, one man one woman)

Molecular Mechanisms of the Mind search:

● 165 total candidates

● Final pool of 5 candidates (5 BIPOC, 2/5 URM, 2/5 women)

● Offer made to 1 candidate (man, URM); 1 spousal accommodation (woman, BIPOC)

Integrative Developmental Science search:

● 203 total candidates

1          ● Final pool: 4 candidates (3 women, 1 man; 3 BIPOC, 1 URM)

2          ● Offer made to 1 candidate (woman, URM)

3    Its repeated emphasis on URM (Underrepresented Minority) and BIPOC (Black,

4    Indigenous, and People of Color) status—as well as the percentage of such

5    candidates in the final hiring outcomes—strongly suggests a heavy-handed

6    approach to racial engineering in faculty hiring.

7    124.    The case study report notes that it was created "with funding from UW Natural

8    Sciences Divisional Dean Dr. Daniel Pollack." In 2022, Dean Pollack circulated a

9    set of hiring guidelines and resources, which placed the case study report

10   second in its list of recommended resources, noting that it was "distributed by

11   email."

12   125.    In April 2022, Associate Vice Provost Chadwick Allen hosted a webinar with

13   psychology department faculty member Sapna Cheryan, a member of the

14   Diversity Advisory Committee (DAC). The webinar—a recording of which was

15   acquired by the National Association of Scholars—suggests that Allen played a

16   pivotal role in developing some of the case study report's key recommendations.

17   In the webinar, Cheryan described the case study report in detail, often noting

18   Allen's involvement. When discussing the creation of job advertisements, the

19   case study document recommends that search committees tailor their language

20   to specific scholars. "If you could pick anyone, with an eye towards URM

21   scholars, which current scholars in your field would be the best fit for this job?

22   How do they describe their work and goals? Consider using similar language to

23   communicate your unit's priorities." In the webinar, Cheryan notes that "Chad told

us to, as we were writing our job ad, to think about a list of about ten candidates that we would really love to see in our pool… So we made a list of ten candidates, and then Chad recommended, go to their websites and see how they word their research… we actually just pulled wording, keywords, from the way they described their research." The case study report likewise recommends "deciding who was above threshold for the position and then focusing on the optimal order to make offers… rather than trying to identify the 'lone superstar' among the final candidates." In the webinar, Cheryan notes, "we also, based on some recommendations from Chad, thought about the offer process this time as not so much of a, like, we need to find the superstar best… but really think about who's above threshold and what is the right order to make offers."

126.   After UW's Complaint Investigation and Resolution Office (CIRO) released its investigation report, UW sanctioned the psychology department, including imposing a two-year tenure-track hiring freeze. However, in June 2024, allegations of a "coverup" of widespread "discriminatory hiring" erupted, according to audio acquired by the National Association of Scholars.

127.   In an audio recording of a meeting on March 16, 2023, psychology professor Ione Fine objected to the candidate re-ranking. When she challenged the legality of the action, members of the department involved in the selection process denied that the selection criteria used were illegal. At the meeting, they cited guidance from a senior college administrator, who was advising the faculty on hiring policy. One selection committee member told Fine they took the question to

1    a senior college administrator and he made it "very clear that we are not in a

2    situation where we're being in any way illegal."

3    128.    In a later departmental meeting, where several UW deans were in

4    attendance, Professor Fine declared that "there has been a pattern, a

5    long-standing pattern, of illegal hiring in this university that was tacitly

6    encouraged across the upper and central administration." In remarks delivered

7    over a chorus of objections, Fine unpacked pointed allegations of university

8    administrators violating nondiscrimination law, avoiding accountability, and

9    scapegoating the psychology department for actions that administrators had

10   encouraged. Fine's speech argued that the psychology department's reranking

11   was explicitly encouraged by one high-level administrator, Associate Vice Provost

12   for Faculty Advancement Chadwick Allen, whose job involves facilitating

13   "inclusive faculty searches." In her remarks, Fine accused Mr. Allen of "bullying

14   junior faculty members" on the search committee into reranking the candidates.

15   Other administrators, Fine further alleged, took actions to cover up the

16   university's involvement. Addressing the Dean of the College of Arts and

17   Sciences personally, Fine stated: "You, Dean Harris, deliberately manipulated the

18   CIRO investigation with the goal of deliberately scapegoating the department in

19   order to hide the involvement of upper administration. This strategy was

20   endorsed at the highest levels, including the Board of Regents." Fine also alleged

21   that Harris narrowed the scope of the investigation so that Allen's emails would

22   not be requisitioned. According to Fine, Allen refused to answer questions when

23   he was interviewed for the investigation. Having initially blown the whistle

internally, Fine claimed the university's investigation only began after it received a public records request regarding the search from the National Association of Scholars. "It was only after the freedom of information request came in, and it was clear that the illegal emails of the [diversity advisory committee] would eventually become public, that the central administration decided a CIRO was required," she stated. The speech pointed to a larger pattern at the university, alleging that various dean-level administrators encouraged discriminatory hiring practices. She cited instructions given to faculty by Daniel Pollack, Dean of Natural Sciences, saying he "explicitly told them not to document race-based deliberations in writing."

129.    It seems UW scapegoated the psychology department for the actions of its leadership. By investigating and sanctioning the psychology department, the university seemed to make an unusual move, strongly rebuffing actions taken in the name of "equity." Fine challenges that narrative, suggesting the university was simply covering up its misdeeds.

130.    In an email to *The College Fix* in September 2024, Professor Fine said, "Unfortunately I think our department wasn't unique in being provided with misleading administrative guidance about what was legal. From discussions with colleagues in other universities, I don't think this issue is unique to UW."

131.    John Sailer at the National Association of Scholars said, "Since I published the story, several professors have told me that it's rampant on their campuses. My previous reporting confirms that it's widespread."

132.    Admissions and hiring are inherently interconnected and inseparable in the context of racial discrimination within educational institutions. Faculty and administrators play a pivotal role in shaping academic standards, mentoring students, and influencing the culture and policies of a university, including admissions criteria and practices. A racially biased hiring process can create and perpetuate a discriminatory culture by fostering an environment where certain racial perspectives are prioritized over objective, merit-based considerations. Racially-motivated hiring policies often have a direct ripple effect on student admissions. When university leadership consistently selects and empowers individuals committed to race-based decision-making, it is hardly surprising that those values also shape admissions policies and the student body. It is implausible that a university can operate one process in a race-conscious manner while keeping the other race-neutral, as both are fundamentally linked in their goals and execution. Therefore, examining both admissions and hiring practices is essential to providing a holistic assessment of whether a university's policies violate constitutional and statutory protections against racial discrimination.

133.    While the Supreme Court's *Grutter* decision in 2003 permitted a limited, time-bound consideration of race in college admissions, no such exception has ever been allowed for hiring. Consequently, if a college intentionally incorporates race into its hiring decisions, it's more than plausible that they do the same for student admissions. UW's faculty-hiring record therefore supplies powerful circumstantial evidence that race remains a defining criterion in UW's

decision-making, including the exclusion of Stanley and imminent exclusion of the Minor Son.

**G.3. DEI and Diversity Statements in Hiring**

134.    Even after the University of California discontinued the mandate of diversity statements in March 2025, UW continues to require diversity (DEI) statements from faculty candidates and considers them as part of hiring, appointment, and promotion processes.

135.    UW's use of diversity statements as an ideological screen provides camouflage for racial preferences, and transforms the university mission from the pursuit of truth to political activism.

136.    As mentioned earlier, at UW, diversity means race. When applicants are required to submit a diversity statement, university reviewers would likely be able to tell the applicants' race, allowing it to be taken into account in violation of federal and state laws.

137.    Professor Cliff Mass shared in his blog, "My department is going through a faculty search right now, and the attestations of fealty to DEI principles by applicants were fulsome and exaggerated. The search committee structure ensures that only "right-thinking" applicants have a chance."

138.    Faculty at elite universities widely acknowledge that expressing race-neutral values—such as advocating for merit or equal treatment—in diversity statements

1  is considered "career suicide." A cottage industry has sprouted nationally to

2  guide applicants in writing these statements.

3  139.    Given that UW is not conducting itself as a bona fide academic institution for

4  student admissions or faculty hiring, any traditional judicial deference afforded to

5  academic institutions should not apply in lawsuits concerning student admissions

6  or faculty hiring at UW.

7  **H.    Statistical    Evidence    That    UW    Discriminates    Against    Asian-American**

8  **Applicants**

9  140.    In addition to Stanley's case, the statistical evidence further reveals the extent

10  of anti-Asian discrimination in UW's admissions.

11  141.    According to the 2020 U.S. Census, Washington's Asian population grew by

12  51.9% over the prior decade, making it the fastest-growing ethnic group in the

13  state. The Asian population increased from 7.2% of the total population in 2010

14  to 9.5% in 2020. Similarly, Asian American Pacific Islander Vote (AAPIV)

15  estimated that the AAPI voter pool in Washington grew by 54% from 2010 to

16  2020. This compares to a 16% change for the statewide eligible voting population

17  over the same period. Given this trend, it is reasonable to infer that the Asian

18  population in Washington has continued to grow at a similar rate beyond 2020.

19  142.    Despite this demographic shift, Asian enrollment at the University of

20  Washington has declined in recent years. In 2013, UW's freshman class of 6,255

21  included 1,794 Asian American students, comprising 28.7% of the class.

22  However, by 2024, Asians accounted for only 23% of UW's total enrollment.

Notably, UW's 2024 entering class profile omitted any mention of Asian enrollment, raising questions about the university's transparency and potential suppression of Asian enrollment.

143.    The gap between Asian population growth and admission rates strongly suggests systemic discrimination. As the Court explained in *Reno v. Bossier Parish School Board*, 520 U.S. 471, 487 (1997), the natural consequences of an action often provide probative evidence of intent. Here, the persistent adverse impact on Asian-American applicants indicates a racially motivated policy, despite UW's denials.

144.    In nearly every case examined by the Plaintiff, whenever the SAT data of the applicants is available, it consistently indicates that Asian-American applicants face significantly higher score thresholds for admission compared to some other racial groups. For example, in 2023, had Cornell University held all applicants to the same SAT score standards, it would have enrolled 7.1% of all African-American SAT-takers nationwide who scored within the top 1400–1600 range, 4.1% of top-scoring Hispanic applicants, 1.9% of top-scoring White applicants, and only 1.0% of top-scoring Asian-American applicants. Only two plausible explanations exist. The first is that top-scoring Black applicants are somehow seven times more likely than their Asian-American counterparts to matriculate at Cornell over peer institutions—a statistical improbability, particularly given that other elite universities also enroll substantial numbers of high-achieving Black students. A similar pattern appears at the University of Michigan, where top-scoring Black applicants are allegedly six times more likely

than their Asian-American counterparts to enroll—a claim that strains credibility. But no one can seriously believe that Cornell and the University of Michigan have somehow cornered the market on talented Black freshmen. The far more straightforward—and credible—explanation is that both Cornell and the University of Michigan have manipulated their admissions standards by race: selectively raising or lowering the bar based on racial identity. In doing so, they have disproportionately admitted lower-scoring applicants of preferred racial groups while systematically denying admission to higher-scoring Asian-American applicants, all in service of engineering a predetermined racial composition.

145.    While SAT scores are not the sole measure of merit, the significant statistical irregularities raise serious concerns as to whether the admissions policies of Cornell University and the University of Michigan comply with legal prohibitions against racial preferences. Unless these institutions can demonstrate that Asian-American applicants were substantially less qualified based on other relevant criteria considered in the admissions process—which they have failed to do—the disparities strongly suggest impermissible racial discrimination.

146.    Against this backdrop, the University of Washington's decision to eliminate SAT score requirements in 2021 takes on deeper significance. While initially justified by the COVID-19 pandemic, UW's continued "test-optional" policy raises serious questions about its underlying motivations. During the years in which UW did collect standardized test data, it almost certainly became aware—like peer institutions such as Cornell and the University of Michigan—that Asian American applicants faced significantly higher admissions thresholds. This likely created a

1    strong institutional incentive to discontinue collecting or publishing SAT scores, in

2    order to conceal these disparities and shield the university from public scrutiny.

3    147.    Moreover, UW does not publish admissions data by race, including SAT score

4    ranges or acceptance rates disaggregated by racial group. Despite this lack of

5    transparency, the racially engineered outcomes remain readily apparent,

6    suggesting that the omission of key data serves to obscure—not

7    eliminate—discriminatory practices in admissions.

8    148.    According to the Education Research & Data Center (ERDC) of the

9    Washington state government, the racial breakdown of Washington public K-12

10   students in 2018 was as follows.

|  | Asian | White | Hispanic | Black | American Indian | TOTAL |
|---|---|---|---|---|---|---|
| Student count | 90,808 | 641,683 | 276,694 | 53,129 | 16,017 | 1,078,331 |
| Percentage | 8.42% | 59.51% | 25.66% | 4.93% | 1.49% | 100.0% |

11   *Table 1: Racial breakdown of Washington public K-12 students in 2018*

12   149.    Assuming that SAT scores in Washington state follow the same distribution as

13   nationwide trends, stark disparities emerge when comparing academic

14   performance with enrollment outcomes by race. The table below summarizes key

15   comparisons across five racial groups for Fall 2024 admissions:

| Race/Ethnicity | Asian | White | Hispanic | Black | American Indian |
|---|---|---|---|---|---|

| % SAT Takers Scoring 1400-1600 | 25% | 6% | 2% | 1% | 1% |
|---|---|---|---|---|---|
| Top Scorers as % of WA SAT Takers | 2.11% | 3.57% | 0.51% | 0.05% | 0.01% |
| UW Enrollment Share | 23% | 33% | 10% | 5% | <1% |

*Table 2: Racial Group Representation Among Top SAT Scorers vs. UW Enrollment*

For example, 25% Asian SAT takers score in the 140-1600 range. Asians account for 8.42% of Washington's K-12 student body and thus roughly 8.42% of all SAT takers in Washington. Therefore Asian top scorers account for 2.11% (25%*8.42%) of the all SAT takers in Washington. It doesn't take a mathematics degree to recognize the profound racial disparities reflected in the table above. These disparities cannot plausibly be explained without invoking broad racial preferences in the admissions process.

150.    Moreover, UW's refusal to collect or publish SAT statistics disaggregated by race—an omission that marks a stark departure from standard procedural transparency—only amplifies suspicion. If UW believes race is not a factor in admissions, then it should have no hesitation in releasing such data. Absent clear evidence that Asian-American applicants are materially less qualified on other non-academic metrics, the only rational inference is that UW uses racial preferences to suppress Asian enrollment.

151.    UW also withholds data on the number of National Merit Scholarship finalists among its admitted students. Disclosure of this information would provide an

1  important benchmark for evaluating the reasonableness of the University's

2  admissions decisions, particularly in light of its rejection of Stanley, a National

3  Merit Scholarship finalist. Transparency regarding the academic profiles of

4  admitted students would reveal whether similarly qualified applicants are being

5  admitted on a consistent basis—or whether discriminatory standards are being

6  applied.

7  152.    Furthermore, existing studies that compare the academic qualifications of

8  admitted students by race fail to fully capture the extent of discrimination against

9  Asian-American applicants. By rejecting exceptionally qualified Asian-American

10  applicants like Stanley, the University artificially narrows the observed academic

11  gap between racial groups in the admitted class. This distortion occurs because

12  eliminating the top-performing Asian-American candidates from the pool

13  suppresses the mean and median academic qualifications of the Asian-American

14  applicant cohort, making the admitted class appear more academically balanced

15  than it truly is.

16  153.    To accurately assess the magnitude of racial discrimination, it is essential to

17  compare the academic records of rejected Asian-American applicants against

18  those of admitted students from other racial groups. However, such an analysis is

19  currently impossible due to UW's lack of public disclosure and the limitations of

20  available admissions data. Plaintiffs intend to pursue this critical information

21  during the discovery phase of this lawsuit.

22  154.    Finally, Plaintiffs have secured the support of expert witnesses from Students

23  for Fair Admissions, who have agreed to conduct a rigorous statistical analysis of

FIRST AMENDED COMPLAINT

1    UW's admissions practices once the necessary data is obtained through

2    discovery.

### I. UW's Holistic Review is a Euphemism for Discrimination

4    155.    In the wake of *SFFA*, the percentage of Asian American students at top

5    universities surged, validating what had long been suspected: elite schools would

6    admit more qualified Asian students once merit was considered instead of race

7    — universities had simply chosen not to. It was only under the glare of legal

8    scrutiny that these institutions retreated from race-based practices they could no

9    longer justify or conceal.

10    156.    Not so at UW. Rather than comply with the Supreme Court's clear ruling that

11    racial balancing violates the Equal Protection Clause and Title VI, UW responded

12    with defiance. Its chosen end-run around constitutional and statutory protections

13    is the ambiguous label of "holistic review." While the term conveys an impression

14    of individualized, thoughtful assessment, in practice it functions as a euphemism

15    for race-conscious and race-balancing admissions. Far from insulating the

16    process from discrimination, "holistic review" invites it by design, replacing

17    objective criteria with subjective discretion behind closed doors.

18    157.    This practice is neither new nor unique to UW. On May 25, 2016, a former

19    Dartmouth admissions officer revealed how so-called "holistic review" permitted

20    admissions committees to hide racial bias behind vague, unaccountable

21    justifications, including racist stereotypes. Asian American applicants, for

22    instance, were often dismissed with coded language such as "yet another

textureless math grind." Such comments underscore how "holistic review" has been routinely weaponized against high-achieving Asian American applicants to preserve racial balancing under the guise of flexibility and nuance.

158.    The University of Washington's continued reliance on both "holistic review" and a "test-optional" admissions policy presents an inherent contradiction that undermines the credibility of its admissions process. A review cannot be meaningfully holistic if it deliberately excludes objective academic measures—particularly standardized test scores that are essential for assessing preparedness in competitive fields such as STEM. By eliminating such data, UW further erodes transparency and invites greater subjectivity, which in turn creates a fertile environment for discriminatory practices, especially against high-achieving Asian-American applicants.

159.    While "test-optional" policies were justifiable during the height of the COVID-19 pandemic, UW's decision to maintain this policy post-pandemic appears strategic, serving to obscure racial disparities and avoid public accountability. This refusal to collect or publish standardized test data not only compromises academic integrity, but also suggests an institutional preference for discretion over fairness. It is telling that leading institutions such as MIT, Dartmouth, Yale, Brown, Harvard, Caltech, Cornell, and the University of Texas at Austin have since reinstated standardized testing—leaving UW increasingly isolated as an "SAT Denier."

160.    In this context, UW's policies merit legal scrutiny—both for their disparate treatment of Asian-American applicants and for the broader question of whether

the university continues to deserve the traditional judicial deference accorded to academic institutions. When an admissions policy appears designed not to promote academic excellence, but to conceal discriminatory outcomes, that deference is no longer warranted.

161.    Even the euphemism "holistic review" implies a thorough, individualized evaluation of each applicant. In practice, however, the University of Washington's admissions process falls far short of that promise. UW requires its application readers to review 8–10 applications per hour—allowing only six to seven minutes per application. Within that brief window, readers are expected to evaluate transcripts, extracurriculars, essays, recommendations, and other materials—amounting to roughly 3,000 words per application. Even if no external research or comparison is required, this would demand reading speeds of 500 words per minute, more than **double** the average reading speed of a college graduate.

162.    This breakneck pace is fundamentally incompatible with any genuine individualized review. Worse, readers must maintain consistency across 69,177 undergraduate applications (UW's 2024 applicant pool), a near-impossible task. By contrast, companies like Google invest **over 10 hours per candidate**, underscoring how superficial UW's process must be.

163.    To compound the problem, UW abolished its SAT/ACT requirement in 2021 under a "test-optional" policy that remains in place today. The removal of the most objective, merit-based datapoint leaves readers more dependent than ever on subjective criteria—a situation ripe for abuse, subjective judgment and

1    plausible deniability. The result is a process that claims to be holistic but in reality

2    relies on snap judgments, inconsistent standards, and unverifiable discretion.

3    164.    This so-called "holistic" review, stripped of its objective anchor, enables UW to

4    lean on racial proxies and stereotypes. On information and belief, self-reported

5    race functions as a convenient proxy for subjective traits such as "fit" or

6    "contribution to campus culture." Instead of conducting individualized

7    assessments, UW uses race—explicitly or implicitly—as a shortcut to assign

8    value to applicants. In doing so, it disguises racial profiling as individualized

9    review. This is not holistic; it is group-based discrimination cloaked in

10    bureaucratic language that serves as an impermissible proxy for race.

11    165.    Indeed, UW appears to have rebranded its race-conscious policies as

12    "holistic" in the aftermath of I-200, not to eliminate racial considerations, but to

13    evade judicial scrutiny. The change in terminology is cosmetic—the

14    discriminatory intent remains. UW's commitment to opaque admissions practices

15    is further evidenced by its refusal to publish SAT score ranges or admission rates

16    by race—a significant departure from accepted transparency norms. These

17    omissions suggest a deliberate effort to conceal racial disparities and support a

18    finding of discriminatory intent under the *Arlington Heights* framework.

19    166.    The result is a process that is neither "holistic" nor individualized. It is a

20    rushed, inconsistent, opaque system that relies on superficial and impermissible

21    self-reported racial categorization to evaluate subjective traits.

167.    When Stanley applied for Fall 2023, the test-optional policy was in force, so applicants' files reached the committee stripped of the one objective measure that might have anchored an honest comparison. Admissions readers—working at a six-minute pace—were left to fill that vacuum with subjective cues and race-linked proxies, the very tools UW had crafted to preserve its preferred race-based demographic engineering. In short, Stanley was judged by a process "holistic" in name only: driven by racial identity rather than by his extraordinary merit.

## J. A Prima Facie Case under the *McDonnell Douglas* Framework

168.    In addition to the analysis under the *Arlington Heights* framework, the circumstances surrounding Stanley Zhong's rejection also support a claim of racial discrimination under the *McDonnell Douglas* burden-shifting framework.

169.    To establish a prima facie case of racial discrimination in admissions under this framework, Plaintiff Stanley Zhong must demonstrate that:

 (1) he is a member of a protected class;

 (2) he was eligible for admission to the University;

 (3) he was denied admission or otherwise treated adversely; and

 (4) similarly situated individuals outside the protected class received more favorable treatment.

Stanley Zhong satisfies each of these elements. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). In *Ames v. Ohio Dep't of Youth Services*, 605 U.S. ___ (2025), the Supreme Court also unanimously reiterated its "instruction to

1    avoid inflexible applications of the prima facie standard. *Teamsters v. United*

2    *States*, 431 U. S. 324, 358. Pp. 4–7."

3    170.    First, Stanley is a member of a protected class—Asian Americans.

4    171.    Second, Stanley applied for admission to the undergraduate Computer

5    Science program and Human Centered Design and Engineering program at

6    University of Washington for the Fall 2023 admissions cycle. He was not merely

7    qualified, but possessed exceptionally rare, objectively verifiable qualifications.

8    His achievements place him in the highest echelon of applicants worldwide.

9    These achievements include, but are not limited to:

10    ● Dominance in High School Coding Competitions:

11        ○ Securing top ranks in multiple prestigious coding contests for his age

12            group, including placing #2 globally (#1 in the United States) in MIT's

13            Battlecode contest.

14    ● Elite Performance in Professional Coding Competitions:

15        ○ Achieving the rank of 427 globally in Google Code Jam, a competition

16            primarily for professional software engineers worldwide.

17        ○ Achieving the rank of 329 globally in Meta (Facebook) Hacker Cup,

18            another competition primarily for professionals worldwide.

19    ● Innovation and Industry Recognition:

20        ○ Developing RabbitSign, a novel and unlimited free e-signing service that

21            gained significant traction. This service was lauded by Amazon Web

22            Services (AWS) in a technical review as "one of the most efficient and

1  secure accounts" they had ever reviewed, and was selected for a case

2  study.

3  ● Ultimate Professional Validation:

4  ○ Being hired by Google at age 18 for a software engineering position (Level

5  4) that requires Ph.D.-level expertise or equivalent industry experience.

6  Collectively, these accomplishments demonstrate that Plaintiff Stanley Zhong's

7  qualifications far exceeded the academic and technical standards required for

8  undergraduate admission to even the most selective university programs.

9  172.    Third, despite his extraordinary qualifications, Stanley was rejected by the

10  undergraduate programs at UW.

11  173.    Fourth, the circumstances surrounding the rejection give rise to a strong

12  inference of racial discrimination. Preliminary investigation, including review of

13  publicly available information such as LinkedIn profiles, has identified non-Asian

14  students admitted to the UW Computer Science program whose documented

15  academic performance, technical skills, and extracurricular achievements appear

16  substantially less distinguished than Stanley's exceptional, internationally

17  recognized accomplishments. For the Fall 2023 enrollment, UW's Computer

18  Science program admitted 569 WA residents and 83 domestic non-residents. It is

19  implausible that all the admitted students possessed qualifications equal to or

20  exceeding Stanley's, even narrowing the scope to non-residents.

21  174.    The rejection of a candidate with Stanley's exceptional credentials by UW

22  gives rise to a plausible inference that race, rather than merit, was a

determinative factor in the admissions decisions. This disparity warrants

discovery into the University's admissions records and decision-making

processes to assess the role of race under the then-prevailing legal framework

and to ensure compliance with current constitutional standards.

## K. UW Officials' Callous Indifference to Plaintiffs' Federally Protected Rights

175.    On January 26, 2025, Nan emailed the Regents of the University of

Washington and President Cauce about Stanley's rejection. No response was

received as of this filing.

176.    The denial of Stanley's applications—combined with UW's complete failure to

even acknowledge the issue—cannot be dismissed as mere random error or just

negligence. Rather, these actions reveal a pattern of systemic bias and reckless

or callous indifference to Plaintiffs' federally protected rights, suggesting malice

toward Stanley and, by extension, other similarly situated Asian-American

applicants.

177.    While it is true that Google's job offer came after UW's rejection—meaning

UW could not have foreseen that Google would recognize Stanley's skills had

already reached the Ph.D. level—the fundamental issue remains: the technical

achievements included in Stanley's UW applications were substantially the same

as those sent to Google. While Google found Stanley's achievements sufficient to

consider him for a Ph.D.-level position, UW, in contrast, deemed him unqualified

for undergraduate admission. This stark contrast underscores a systemic barrier

that profoundly affects Asian-American applicants' experiences in college

admissions. Even when their qualifications reach the Ph.D. level, they may still be denied undergraduate admission. This fosters a pervasive sense of helplessness—the belief that the system is rigged to reject you regardless of your merits—that contributes significantly to the mental health challenges within the Asian-American youth community.

178.    Defendants, aware of the legal prohibitions against racial discrimination in university admissions under the Fourteenth Amendment, Title VI, 42 U.S.C. § 1981, and RCW 49.60.400 (Initiative 200), have every incentive to conceal the true nature of their race-conscious decision-making processes. Plaintiffs allege that Defendants acted with deliberate indifference to Plaintiffs' rights, but acknowledge that the precise mechanisms of discrimination—such as how racial balancing was operationalized, who authorized it, and whether specific metrics or targets were used—are likely concealed in non-public communications and internal documents. Defendants are too smart to leave a direct paper trail visible to the public. Courts have long recognized that discriminatory intent is rarely documented overtly, and that plaintiffs must be permitted to use discovery to obtain circumstantial and contextual evidence. See *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977) (permitting intent to be inferred from indirect evidence).

179.    Discovery is essential to uncover these non-public policies, communications, and data. Plaintiffs have alleged sufficient facts to render their claims plausible. The factual development of this case—particularly with respect to the roles of individual defendants, internal deliberations, and race-conscious criteria used in

"holistic" review—must proceed through discovery, as the key evidence lies within the exclusive control of Defendant UW.

**L. Asian Americans Face Hostility**

180.    Public hostility toward Asian-American students asserting their legal rights is well-documented, particularly on college campuses.

181.    Asian Americans who challenge this discrimination do so at great personal risk. On campus, advocating for equal treatment under the law has been perversely rebranded as an attack on civil rights—an Orwellian inversion that suggests those rights belong only to the "right kind" of minority.

182.    At UW, as at many elite colleges, Asian Americans endure a dual-indignity —first, they are subjected to systemic discrimination in the admissions process. Then, should they be lucky enough to reach campus and object to that injustice, they are vilified as opponents of "equity" or "allies" of the oppressors or branded "racist."  This national climate manifests itself at UW and throughout the body of academic institutions. UW condemns discrimination against some groups, but celebrates discrimination against Asian Americans and other groups.

183.    This pervasive social hostility—manifesting in microaggressions and overt hostility—discourages Asian-American students from challenging discriminatory policies, effectively silencing those who have been harmed. It is therefore reasonable to infer that numerous Asian-American applicants, either already harmed by UW's admissions practices or anticipating future discrimination, remain silent due to legitimate concerns about retaliation or social pressure.

**M. Minor Son as a Prospective Applicant Can Only Conclude That He Is Not Welcome at UW**

184.    Minor Son is currently a rising junior in high school and anticipates applying to UW during the 2026-2027 application cycle for fall 2027 enrollment.

185.    Like his brother, Minor Son is talented. Minor Son already demonstrates the academic excellence, intellectual curiosity, and extracurricular achievement that define top college applicants. Although he has not yet taken the PSAT due to his grade level, he expects to do well, just as his older brother Stanley did, based on his advanced coursework and consistent academic performance. Minor Son's current GPA stands at a perfect 4.0 (unweighted), even higher than Stanley's at the same stage, placing him among the very top of his class.

186.    Outside the classroom, Minor Son exhibits a well-rounded and disciplined character. He has been a member of his high school's varsity cross-country team since his freshman year, he is a national-level Rubik's Cube competitor capable of solving the cube in 6.25 seconds during official events, and he has taught himself to juggle five balls. Minor Son has performed on stage at the second largest annual juggling festival in North America.

187.    However, based on Stanley's experience, Minor Son has learned of a consistent pattern in which UW discriminates against Asian American applicants because of their race.

188.    Minor Son is also discouraged and humiliated by repeated and public knowledge of UW's discrimination against Asian Americans in its admissions.

189.    Minor Son has also learned through friendship networks within his community and through publicly available reports that Asian American students who speak up for equal treatment under the law on UW campuses and throughout academia are branded "racists" and ostracized on campus —reinforcing that UW's bias extends beyond admissions into campus culture.

190.    Minor Son is aware of admissions statistics indicating that—even among the most qualified—Asian Americans face significantly lower admission rates without the 'correct' race for UW's race-based admissions process.

191.    Under Article III of the Constitution, as construed by precedents such as *Gratz v. Bollinger* and *Northeastern Fla. Chapter*, an imminent discriminatory barrier (like a university's admissions policy) constitutes a sufficient "injury-in-fact" for standing.

192.    Both because of hard data indicating that the collective experience of Asian Americans at UW is dismal in the admissions pool and also because of his direct experience of his brother's hardship and rejection, Minor Son faces certain harm if he applies to UW. In short, Minor Son has come to view application to UW as an Asian American student, no matter how talented, as a fool's errand. Through its actions, UW has concretely deterred Minor Son from applying for admission in the future. Minor Son is genuinely threatened with the likelihood of being subjected to the same discriminatory admission barrier that hurt Stanley.

193.    Minor Son will be ready and eligible to apply to UW by the time this lawsuit compels the University to cease its intentional discrimination against Asian American applicants.

194.    In sum, while Minor Son is positioned to be a highly competitive applicant to any elite university, he confronts a tangible and immediate risk and harm of race-based discrimination at UW.

195.    Nan acknowledges the holding in *Johns v. County of San Diego*, 114 F.3d 874, 876 (9th Cir. 1997), where the Ninth Circuit stated that "constitutional claims are personal and cannot be asserted vicariously," and emphasized that "[i]t goes without saying that it is not in the interest of minors or incompetents that they be represented by non-attorneys. Where they have claims that require adjudication, they are entitled to trained legal assistance so their rights may be fully protected." That reasoning appears to rest on the assumption that minors have access to legal representation when needed, thereby protecting their interests through the availability of counsel. However, in this case, Plaintiffs have made diligent efforts to retain legal counsel—both paid and pro bono—but no attorney has been willing or able to take the case. Plaintiffs would eagerly accept qualified legal representation if it became available. Indeed, such representation was secured in Plaintiffs' lawsuits against the University of Michigan and Cornell University, where two attorneys agreed to take those matters. Plaintiffs also implored those attorneys to take this case, but understandably, they declined due to limited capacity. Under these exceptional circumstances, if the imminent harm facing Minor Son materializes into actual injury and no attorney is available to represent

him, it would be a profound injustice to bar him from seeking legal redress solely
due to the unavailability of counsel. Such a result would contradict the Ninth
Circuit's stated objective in *Johns*—to protect the rights and interests of
minors—not extinguish them.

**N. Summary of UW's Illegal Use of Race**

196.   In sum, the compelling statistical and anecdotal evidence unequivocally
demonstrates that UW has, and continues to, impermissibly use race as a factor
in its operations. This pattern of unconstitutional conduct is evident across
multiple critical functions:

   a.   Undergraduate Admissions:

      i.   While UW has actively concealed its current undergraduate
           admissions data, the circumstantial evidence is overwhelming.
           Plaintiffs have documented

         1. absurd individual rejection of exceptionally qualified Asian
            American applicant;

         2. profound disparities between standardized test scores and
            student body percentage across racial groups;

         3. substantial gap between Asian population growth and its
            declining percentage in UW enrollment.

ii. These all powerfully indicate the continued, plausible use of race in UW's undergraduate admissions, discriminating against Asian Americans.

b. Graduate School Admissions:

i. Professor Cliff Mass's blog exposes racial preference in graduate admissions.

c. Faculty Hiring:

i. Professor Cliff Mass's blog exposes racial considerations in faculty hiring.

ii. UW's pervasive use of diversity statements as ideological litmus tests confirms a deeply embedded institutional culture of race-consciousness that permeates hiring decisions.

iii. Whistleblower reports exposed re-ranking faculty candidates by race. Documented attempts to explicitly conceal racial intent serves as a direct, unvarnished admission of intent to evade legal prohibitions.

iv. Whistleblower reports also exposed involvement and coverup by senior administrators.

197.    Additionally, senior UW administrators have made repeated public statements expressing a desire and intent to consider race in admissions.

198.   Defendant UW's persistent obfuscation of its admissions data strongly suggests a deliberate attempt to hide ongoing discriminatory practices.

**O. Legal Basis**

199.   In *SFFA v. Harvard*, 600 U.S. 181 (2023), the Supreme Court definitively held that race-based admissions policies violate the Equal Protection Clause.

200.   UW's racially discriminatory admission policies and practices violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

201.   UW's racially discriminatory admissions policies and practices also violate Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination in programs receiving federal financial assistance.

202.   UW's racially discriminatory admissions policies and practices also violate 42 U.S.C. 1981, which prohibits racial discrimination in contracting.

203.   UW's racially discriminatory admissions policies and practices also violate RCW 49.60.400 (Initiative 200), which unequivocally states: "The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." This provision explicitly prohibits both discrimination and preferential treatment on the basis of race.

204.    UW's actions represent a blatant and ongoing disregard for established federal and state law, necessitating judicial intervention to restore meritocracy and equal protection for all applicants, regardless of race.

205.    In *Students for Fair Admissions v. University of Texas Austin, No. 24-50631 (5th Cir. 2025)*, the Fifth Circuit Court of Appeals noted that admissions officers' access to racial data could still potentially allow for racial discrimination, thus maintaining a live controversy.

206.    The use of racial proxies to achieve racial balancing is unconstitutional. In *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 743 (2007), the Supreme Court held that racial balancing is not a compelling state interest and "[r]acial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" Similarly, in *SFFA v. Harvard*, 600 U.S. 181 (2023), the Supreme Court reaffirmed that admissions policies designed to achieve racial diversity by using proxies for race are equally unconstitutional. "[W]hat cannot be done directly cannot be done indirectly."

207.    A state law or policy that discriminates on the basis of race is subject to strict scrutiny, regardless of its intended beneficiaries. See *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995).

208.    As the Supreme Court noted in *SFFA v. Harvard*, "College admissions are zero-sum. A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." The distinction between preferential treatment and adverse impact is illusory—both actions are

inherently racially motivated and inseparable, representing merely different ways of describing the same net discriminatory conduct. In a zero-sum situation, when assessing whether a policy constitutes racial discrimination, courts should focus on the presence of racial intent, regardless of whether that intent manifests as preferential treatment or adverse impact. As the Supreme Court affirmed in *SFFA v. Harvard*, "[W]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows," and the prohibition against racial discrimination is "levelled at the thing, not the name." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325, 18 L.Ed. 356 (1867).

209.   In *CACAGNY*, the Second Circuit Court stated that "Applying Supreme Court precedent, we have generally recognized three types of discriminatory laws: (1) a facially discriminatory law or policy that expressly classifies individuals on the basis of race; (2) a facially neutral law that is enforced in a discriminatory fashion; and (3) a facially neutral law that was adopted with discriminatory intent and resulted in a discriminatory effect. *See Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Hist. Dist. Comm'n,* 768 F.3d 183, 199 (2d Cir. 2014)."

210.   For UW, all three types of discriminatory policies and practices identified by the Second Circuit Court are evident:

a. **Facially discriminatory policies**: Strong evidence shows that UW employs explicitly race-based discriminatory policies–including numerical racial targets–that are directly tied to student admissions.

b. **Discriminatory enforcement**: UW's absurd and incongruous admission outcomes strongly indicate that UW exercises its admissions policies in a discriminatory fashion.

c. **Discriminatory intent and effect:** UW's official statements and its senior administrator have repeatedly expressed a desire and intent to use race in admissions. There is substantial evidence of adverse effects on Asian-American applicants, both individually and collectively. Additionally, UW's faculty hiring practices and graduate admissions are demonstrably racially motivated, resulting in disparate treatment of various racial groups. Moreover, top UW administrators consistently oppose I-200.

These actions constitute violations of the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, 42 U.S.C 1981, and RCW 49.60.400 (Initiative 200).

## P. Rebuttal to Motion to Dismiss

211.    On July 16, 2025, Defendants' counsel filed a Motion to Dismiss (Dkt. #18). As detailed in Section F of this Complaint, a substantial portion of the motion is undermined by newly surfaced evidence of the Allen School's 15% enrollment target for certain non-Asian racial groups—a policy that strongly suggests impermissible racial balancing in direct violation of constitutional and statutory law.

212.    More broadly, the motion is riddled with serious legal and factual flaws, including (1) misunderstanding of constitutional laws, (2) incorrect applications of

legal references, (3) self contradiction, (4) faulty reasoning, (5) misrepresentation
and fact twisting, and (6) evading the core factual issue at the heart of this case.
In addition, the motion misapplies the *Arlington Heights* framework and
misinterprets the burden-shifting analysis set forth in the *McDonnell Douglas*
framework, both of which are essential to properly adjudicating claims of
intentional discrimination.

**P.1. Misunderstanding of Constitutional Laws**

213.    The motion erroneously asserts that Plaintiffs must establish "that out-of-state
Asian Americans are underrepresented in the Allen School" to proceed with their
claims. It further argues for dismissal on the basis that Asian Americans are
"overrepresented" in the Allen School—comprising 51.8% of the student body
compared to 9.5% of the general population. This argument reflects a
fundamental misunderstanding of the Equal Protection Clause of the Fourteenth
Amendment.

214.    The argument that Asian Americans are over-represented in UW's student
body relative to the state's general population does not negate claims of
discrimination. Equal protection requires that individuals be treated as
individuals, not as members of a racial class. See *Miller v. Johnson*, 515 U.S.
900, 911 (1995). The Equal Protection Clause of the Fourteenth Amendment
prohibits states from denying any person "the equal protection of the laws." The
Clause's "central purpose is to prevent the States from purposefully
discriminating between **individuals** on the basis of race." See *Shaw v. Reno*, 509
U.S. 630, 642 (1993). (Emphasis added.) Even if aggregate Asian enrollment

remains relatively high, systemic discrimination may suppress their numbers below what they would be in a race-neutral system. "[I]nvidious discrimination does not become less so because the discrimination accomplished is of a lesser magnitude." See *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 277 (1979). The "law's focus on individuals rather than groups [is] anything but academic." *Bostock* v. *Clayton County*, 590 U.S. 644, 659 (2020). Chief Justice John Roberts unequivocally articulated in *SFFA v. Harvard* that "the student must be treated based on his or her experiences as an individual—not on the basis of race."

215. Further supporting this action, in *Ames v. Ohio Dep't of Youth Services*, 605 U.S. ___ (2025), the Supreme Court unanimously held that Title VII protects "individuals," not groups, and protects "minority and majority" alike. It reaffirmed that "the standard for proving disparate treatment under Title VII does not vary based on whether the plaintiff is a member of a majority group"—a principle that logically extends to Title VI, particularly for groups that may be overrepresented in a college's student body relative to the general population.

216. Further supporting this action, in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161 (2d Cir. 2024), the Second Circuit Court of Appeals unanimously affirmed that an equal protection claim may proceed if "any individual has been negatively affected or harmed by a discriminatory law or policy based on race, even if there is no disparate impact on members of that racial class in the aggregate."

217.    The Second Circuit Court of Appeals further held that a facially neutral policy driven by racial motives violates equal protection, even if aggregate enrollment improves. The ruling states "if discriminatory intent is proven, a negative effect or harm from that discriminatory policy on individual Asian-American students applying to the SHSs [Specialized High Schools] would be sufficient to trigger strict scrutiny review". The court further held that a policy or a program "is not immunized from strict scrutiny because it underperforms in an unconstitutional mission with respect to a targeted racial group in the aggregate." Therefore, policies aiming to reach 15% enrollment for certain racial groups—whether or not the 15% target has been met—are subject to strict scrutiny and won't survive it.

218.    A university policy that amounts to racial balancing is "patently unconstitutional." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Racial balancing seeks to ensure a specified percentage of a racial group within the student body merely due to race or ethnicity. *Id.* Courts have consistently rejected proportional representation as a constitutional justification for race-based admissions. See *Id.* at 343.

219.    Racial balancing is not a compelling interest under the Constitution, and the fact that Asian Americans are a high-performing group does not authorize public institutions to disadvantage individual members of that group to achieve demographic parity. Defendants' argument fails to grasp that such balancing itself is constitutionally impermissible.

220.    Defendants' logic—that Asian Americans cannot be victims of discrimination because they are "overrepresented" at the Allen School relative to their

percentage in the general population—collapses under even minimal scrutiny. If proportional representation were the constitutional standard, then institutions such as the National Football League (NFL) would be presumptively guilty of racial discrimination for having virtually no Asian American players, despite Asian Americans comprising over 7% of the U.S. population.

**P.2. Incorrect Applications of Legal References**

221.    The motion contends that "a plaintiff making a claim of racial discrimination needs much more: a plausible allegation of a race-conscious admissions policy or circumstantial evidence of such," and in support, it cites the factual findings in *SFFA*. But those findings were not made at the pleading stage—they were the product of full discovery and trial. To suggest that Plaintiffs in this case must, at the motion to dismiss stage and without the benefit of discovery, meet the same evidentiary threshold that SFFA reached after years of litigation is an absurd misreading of precedent and the Federal Rules of Civil Procedure.

222.    The motion repeatedly cites the allegations and evidence presented in *SFFA v. Harvard*, implying that Plaintiffs must make nearly identical allegations regarding UW's admissions process to survive a motion to dismiss. This not only confuses the procedural posture of the two cases, but also misstates the legal standards applicable here. Under Rule 8 and *Iqbal/Twombly*, Plaintiffs must plead facts that plausibly suggest entitlement to relief—not prove their case at the outset, particularly not with the level of detail that only discovery can reveal.

223.    Moreover, the core legal questions presented in this case differ meaningfully from *SFFA*. In *SFFA*, Harvard openly acknowledged that it used race as a factor in admissions. The central question was whether that race-conscious policy was constitutional. By contrast, in this case, UW claims that it does *not* use race in admissions at all—despite Plaintiffs having plausibly alleged otherwise, including circumstantial and documentary evidence such as the Allen School's 15% enrollment benchmark for certain racial groups.

224.    Accordingly, this case requires a different evidentiary approach. The fundamental legal question here is not whether UW's admissions policy—if race-conscious—is narrowly tailored under *Grutter* or *SFFA*. The question is whether UW is covertly using race in its admissions process while publicly denying it. That distinction matters. Where a defendant denies the existence of a race-conscious policy, circumstantial evidence and discovery become essential tools for plaintiffs to uncover hidden discrimination. Plaintiffs are not required to meet *SFFA*'s post-discovery evidentiary burden at the pleading stage. They need only plausibly allege discriminatory conduct—something the Complaint more than satisfies.

**P.3. Self Contradiction**

225.    The motion argues that, "most of the Complaint alleges discrimination against Asian-Americans by other universities, with a particular focus on (strangely) the University of California. Compl. ¶¶ 69-83, 85-94. Clearly none of these allegations is relevant to the Plaintiffs' claims against UW." (*Mot. to Dismiss* at 12.) This claim is both disingenuous and internally inconsistent.

226.   First, it is well known—and judicially noticeable—that elite universities across the country have historically employed similar admissions frameworks, often under the label of "holistic review," and that many have used this framework as a vehicle for racial preferences. The Supreme Court recognized this in *SFFA v. Harvard*, where it addressed admissions practices that are widespread in higher education as reflected in the amicus briefs filed by the universities in support of Harvard. Plaintiffs' references to other universities—including the University of California, which has also been banned by state laws to use racial preference for decades—are intended to demonstrate that such race-conscious practices are not isolated anomalies but part of an industry-wide pattern. When multiple universities with similar "holistic" admissions structures and stated commitments to "diversity" exhibit parallel discriminatory outcomes, it is reasonable and relevant to consider those parallels as circumstantial evidence in support of Plaintiffs' claims under *Arlington Heights*.

227.   Second, the motion repeatedly invokes the rejection of Stanley Zhong by other elite universities to justify UW's decision to reject him. If the conduct of other institutions is truly irrelevant, then Defendants should not rely on those rejections to defend their own. Defendants cannot have it both ways—discrediting references to other universities when made by Plaintiffs, while simultaneously invoking those same institutions to validate UW's admissions decisions. This inconsistency underscores the weakness of their argument and the selective reasoning employed in the motion.

228.    In sum, Plaintiffs' references to other universities are not only relevant—they are logically and legally probative in establishing discriminatory patterns and systemic practices, especially at the pleading stage. Defendants' attempt to exclude such context while simultaneously relying on it themselves only further undermines the credibility of their arguments.

**P.4. Faulty Reasoning**

229.    The motion asserts that "an increase in the Asian-American ***population*** of Washington says nothing about the number of competitive Asian-American ***applicants***." That claim defies basic statistical reasoning. A growing population typically correlates with a growing applicant pool, especially for a group like Asian Americans, who consistently outperform academically across multiple metrics. The refusal to acknowledge this basic fact reveals the weakness of Defendants' argument.

230.    The motion asserts that "over 26 years ago, Washington voters approved a ban on the use of race in university admissions and UW's admissions policies have complied with that ban ever since." While the first half of that statement is undisputed—I-200 was indeed enacted in 1998—the second half is conclusory and unsupported. The mere existence of a legal prohibition does not demonstrate compliance. Facial compliance with I-200 does not preclude covert or indirect use of race. Plaintiffs' Amended Complaint alleges with specificity that UW has continued to engage in covert race-based admissions practices in defiance of I-200, consistent with the pattern of "unstated affirmative action"

1  pervasive in elite institutions across the country. Defendants' invocation of I-200

2  as proof of compliance is not dispositive.

3  231.  The evidence presented in this Complaint—including UW's public opposition

4  to I-200, its support for I-1000, its adoption of numerical enrollment targets for

5  specific racial groups at the Allen School, and its sustained resistance to

6  objective metrics like standardized tests—strongly suggests that UW's

7  admissions policies have not in fact complied with the letter or spirit of I-200.

8  Defendants' reliance on I-200's existence as conclusive proof of compliance is

9  legally insufficient, particularly at the pleading stage. See *Village of Arlington*

10  *Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977) (holding that

11  facial neutrality is not dispositive where intent or effect suggests discrimination).

12  232.  Defendants also argue that "the Complaint itself betrays Stanley's allegations

13  in that it discloses Stanley was rejected not just from UW but **sixteen** of the

14  eighteen other undergraduate computer science programs to which he applied."

15  This line of argument, repeated throughout the motion, reflects a fundamental

16  misunderstanding of both the relevant legal standards and the factual context of

17  the Complaint.

18  233.  First, widespread rejection of Asian American applicants by elite universities

19  is precisely the kind of pattern that Plaintiffs allege: a systemic and

20  institutionalized form of anti-Asian discrimination masked by "holistic" review. If a

21  Black applicant during Jim Crow was rejected by nearly every segregated

22  institution, that pattern would not undercut the claim of discrimination—it would

confirm it. Similarly, the consistency of rejection does not negate discrimination; it may instead reflect its scope.

234.    Second, Defendants attempt to justify the rejection on the basis of selectivity, implying that Stanley Zhong simply fell short due to the competitiveness of admissions. But elite institutions, precisely because they are selective, are where discrimination is most likely to manifest—when there are far more qualified applicants than available slots, universities have both the motive and the opportunity to engineer class composition based on race. The Supreme Court has recognized this dynamic. See *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978).

235.    By ignoring the cultural, historical, and statistical context documented in the Complaint, Defendants' motion relies on conclusory denials and mischaracterizations that cannot defeat well-pleaded claims at this stage.

**P.5. Misrepresentation and Fact Twisting**

236.    Defendants argue that "Plaintiffs ask this Court to take college admissions decisions out of the hands of universities and put them in the lap of the judiciary." This is a misrepresentation of the Complaint. Plaintiffs do not ask the Court to *substitute its own admissions criteria*, but rather to determine whether UW's policies and practices *violated the law*, particularly the Equal Protection Clause, Title VI, and I-200. That is the judiciary's core constitutional role. If Defendants' logic were accepted, the line of landmark college admissions cases—including *DeFunis v. Odegaard*, *Bakke*, *Hopwood*, *Smith v. UW*, *Grutter*, *Gratz*, *Fisher I*,

*Fisher II*, and *SFFA v. Harvard/UNC*—could never have been decided. The very premise of those cases was that courts have both the authority and obligation to evaluate whether universities are complying with anti-discrimination laws.

237.    The motion claims that "Plaintiffs point to statistics they claim show that Asian-Americans are underrepresented at UW." This is plainly false. Plaintiffs *explicitly acknowledge* that Asian Americans are overrepresented relative to their share of the state population, but point out a disturbing trend: even as the Asian American population in Washington increases, their enrollment share at UW *declines*. Far from proving nondiscrimination, the disparity between applicant qualifications and admissions outcomes—coupled with UW's refusal to publish disaggregated data—raises significant constitutional concerns. See *Arlington Heights*.

238.    Defendants assert that the allegations involving UW's Psychology Department "suggest precisely the opposite of their claims," claiming the university took racial discrimination seriously. In reality, whistleblower reports—cited in this Amended Complaint—allege that UW's top administrators were aware of the racially discriminatory program while it was occurring, funded it, and later scapegoated the department only after outside groups obtained documents via public records requests. Defendants' spin on these events is contradicted by the record and fails to rebut the plausible inference of institutional complicity in unlawful racial preferences.

239.    The motion's interpretation of President Cauce's statement that the SFFA ruling "won't change our values or our mission" is disingenuous. If UW's values

truly aligned with equal treatment regardless of race, President Cauce would have celebrated the Court's decision, not expressed "disappointment and concern." Her remarks, coupled with UW's prior public opposition to I-200 and support for I-1000, indicate precisely the opposite: a desire to preserve racial preferences under the guise of "diversity." A simple test proves the point: if President Cauce were to publicly embrace race-blind, merit-based admissions today, her continued leadership would be politically untenable at UW. This is not neutrality—it is institutional resistance.

240.    Defendants assert that Plaintiffs fail to explain why Stanley's rejection is "bizarre," citing a lack of comparative basis. That assertion is refuted by the Complaint itself. Stanley is a National Merit Scholar, placed first nationally in MIT's Battlecode high school division, passed Google's PhD-level interview, and built "one of the most efficient and secure" applications on AWS and was selected as a case study. These achievements represent the highest level of pre-collegiate accomplishment. The claim that Plaintiffs offer "no basis for comparison" is simply false and suggests opposing counsel did not read the Complaint carefully.

241.    The motion argues that signs of discrimination against in-state applicants are irrelevant to Stanley as an out-of-state applicant. This is illogical. Discrimination is not bound by residency status; if UW engages in racial balancing, there is no reason to believe that only in-state applicants are affected. If anything, non-resident slots are more discretionary—and thus more susceptible to manipulation.

242.    The motion criticizes Plaintiffs for failing to place Stanley's rejection in the context of applicants with competitive profiles—yet it is UW that refuses to disclose that very data. This presents a textbook catch-22: Defendants withhold information about the qualifications of admitted students, then fault Plaintiffs for not making direct comparisons. But at the motion to dismiss stage, Plaintiffs are not required to prove their case—they need only plead sufficient facts to support a plausible inference of illegality. The Amended Complaint easily satisfies that standard. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

**P.6. Evading Core Factual Issues**

243.    When purporting to present admissions statistics for UW's Allen School, Defendants' motion offers only raw admission rates—not applicant qualifications disaggregated by race. But admission rates alone do not speak to the central question in this case: whether UW applied different standards to applicants of different racial backgrounds. The motion entirely sidesteps the factual core: Were all non-Asian applicants admitted over Stanley more qualified?

244.    To answer that question, one must examine whether each of those admitted possessed achievements equivalent to *all* of the following: (1) passing Google's Ph.D.-level interview, (2) placing first nationally in MIT's Battlecode high school division, (3) placing second in Carnegie Mellon's picoCTF cybersecurity challenge, (4) advancing to the USACO Platinum Division, (5) ranking in the top 500 globally in both Google Code Jam and Meta Hacker Cup, (6) creating the world's only unlimited free HIPAA-compliant e-signing service, (7) building an AWS application selected for a case study as "one of the most efficient and

secure accounts" ever reviewed, and (8) receiving unsolicited media attention for socially significant work.

245.    Under the *McDonnell Douglas* framework, such evidence strongly supports a prima facie case of discrimination. But even without legal formalism, common sense supplies the answer: it is highly implausible that every non-Asian admitted to the Allen School surpassed or even matched these accomplishments. The motion avoids this comparison entirely—perhaps because it undermines their position.

246.    Instead, the motion offers a glib dismissal: "the fact that one applicant from California who is Asian-American was rejected from a program where only 83 nonresident applicants from across the entire country were admitted does not, without more, state a claim for racial discrimination." That assertion willfully ignores the extraordinary record of the applicant at issue. Pretending that Stanley is just "one applicant from California" conveniently erases the remarkable achievements that make his rejection not only implausible, but legally and constitutionally suspect.

**P.7. Misinterpretation of the *Arlington Heights* Framework**

247.    The motion dismisses Plaintiffs for "selectively refer[ring] to the portions of UW's website they consider helpful to their claims," as if it were suspicious that Plaintiffs rely on public-facing material. But given UW's institutional sophistication and legal resources, do Defendants seriously contend that a university intent on violating anti-discrimination laws would openly advertise it on its homepage?

Universities today deploy entire legal and communications teams to sanitize public materials precisely to avoid legal exposure. The idea that discriminatory intent would be openly declared reflects either profound naiveté or strategic misdirection. It is not just unsurprising—it is inevitable—that direct admissions of unlawful racial intent are absent from UW's website.

248.    More importantly, the motion fails to even mention the governing standard for evaluating discriminatory motive: the *Arlington Heights* framework. Under *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977), Plaintiffs need not present direct admissions of unlawful intent. Discriminatory motive can be inferred from *circumstantial evidence*, including (1) the historical background of the decision, (2) the specific sequence of events leading up to it, (3) departures from normal procedural sequences, and (4) the legislative or administrative history. The Supreme Court explicitly recognized that "racially discriminatory intent or purpose may often be inferred from the totality of the relevant facts," including context and patterns. Id. at 266.

249.    By ignoring the *Arlington Heights* standard and demanding direct proof of intent at the pleading stage, the motion misstates the applicable legal standard. Plaintiffs have in fact identified extensive circumstantial evidence of discriminatory motive, including UW's longstanding opposition to I-200, its embrace of I-1000, its post-*SFFA* defiance, the 15% racial target at the Allen School, the suppression of standardized testing data, and the opacity of its so-called "holistic" admissions process. These facts, taken together, satisfy the

1  *plausibility* threshold and more than justify discovery under the *Arlington Heights*

2  framework.

3  250.    When a plaintiff relies on the *Arlington Heights* method to establish intent, "the

4  plaintiff need provide very little such evidence ... to raise a genuine issue of fact

5  ...; any indication of discriminatory motive ... may suffice to raise a question that

6  can only be resolved by a fact-finder." *Pac. Shores Props.*, 730 F.3d at 1159

7  (citations omitted).

8  251.    The type of direct evidence of discriminatory intent does not require "a virtual

9  admission of illegality." *Venters*, 123 F.3d at 973. For example, direct evidence

10  need not take the form of an admission where the defendant states "I'm [taking

11  this adverse action] because you're in a protected group." *Sheehan v. Donlen*

12  *Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999); see *Venters*, 123 F.3d at 973. The

13  court in *Venters* explained that "the evidence need not be this obvious to qualify

14  as direct evidence." *Id*. And the Sheehan court explained why: because such a

15  requirement "would cripple enforcement of the ... discrimination laws." *Sheehan*,

16  173 F.3d at 1044.

17  252.    Even isolated comments may constitute direct evidence of discrimination if

18  they are "contemporaneous with the [adverse action] or causally related to the

19  [adverse action] decision making process." *Kennedy v. Schoenberg, Fisher &*

20  *Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998) (citations omitted).

21  253.    While disparate impact is not the only factor in an *Arlington Heights* case,

22  "showing disproportionate impact, even if not overwhelming impact, suffices to

establish one of the circumstances evidencing discriminatory intent." *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).

254.    Using the *Arlington Heights* method of proving intent, the court analyzes whether discriminatory purpose motivated a recipient's actions by examining factors such as statistics demonstrating a "clear pattern unexplainable on grounds other than race." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 266 (1977).

255.    In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), a case brought under the "pattern or practice" provision of Title VII, the Court stated that "statistics showing racial or ethnic imbalance are probative … because such imbalance is often a telltale sign of purposeful discrimination." *Id.* at 339 n.20. Accordingly, statistical evidence of a sufficiently "gross disparity" between the affected population and the general population may establish an inference of intentional discrimination. *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute *prima facie* proof of a pattern or practice of discrimination.").

256.    In *Comm. Concerning Community Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009), the Ninth Circuit Court of Appeals stated that "proof of disproportionate impact on an identifiable group, such as evidence of 'gross statistical disparities,' can satisfy the intent requirement where it tends to show that some invidious or discriminatory purpose underlies the policy." The profound disparities between standardized test scores and the racial distribution of UW

student body, and the gap between Asian population growth and its declining

percentage in UW enrollment, all strongly suggests "gross statistical disparities."

257.    As the Supreme Court explained in *Columbus Board of Education v. Penick*,

443 U.S. 449, 464–65 (1979), "[a]ctions having foreseeable and anticipated

disparate impact are relevant evidence to prove the ultimate fact, forbidden

purpose. . . . [T]he foreseeable effects standard [may be] utilized as one of the

several kinds of proofs from which an inference of segregative intent may be

properly drawn. . . . Adherence to a particular policy or practice, with full

knowledge of the predictable effects of such adherence . . . is one factor among

many others which may be considered by a court in determining whether an

inference of segregative intent should be drawn." In light of the well-documented

racial disparities in SAT scores, the foreseeable impact of UW's "test-optional"

policy further supports an inference of racial intent.

258.    *FBI v. Fikre*, 601 U.S. 234 (2024) held that the presumption of good faith for

government actors is no longer good law. Specifically, *Fikre* held that the

requirement of proving that voluntary cessation is permanent "holds for

governmental defendants no less than for private ones," *id*. at 241.

**P.8. Misinterpretation of the *McDonnell Douglas* Framework**

259.    The motion misstates the *McDonnell Douglas* framework and its applicability

to college admissions. It lists four elements for establishing a prima facie case of

discrimination—namely "(1) the plaintiff is a member of a protected class, (2) the

defendant's place of business is a place of public accommodation, (3) the plaintiff

was treated differently than similarly situated individuals outside the plaintiff's protected class, and (4) the plaintiff's protected status was a substantial factor in causing the discrimination." However, this formulation is not consistent with how the *McDonnell Douglas* burden-shifting framework is typically applied in admissions-related discrimination claims. Plaintiffs' application of the correct framework is presented in Section J of this Complaint.

260.    The motion further claims that "Plaintiffs present neither and instead attempt to rely on a single anecdote (Stanley's rejection)". That assertion is both legally and factually flawed. First, the rejection of a single applicant can suffice to establish a prima facie case under *McDonnell Douglas*, so long as it is accompanied by evidence that the applicant was well-qualified and that less-qualified individuals outside the protected class were admitted. Plaintiffs have pled exactly that. Second, while Defendants cite *Stewart v. Texas Tech Univ. Health Sciences Center*, they omit the key contextual difference: in *Stewart*, the plaintiff could rely on internal data showing disparities in GPAs and MCAT scores by race. But at UW—and across elite institutions—such data is aggressively concealed. Elite universities have fought tooth-and-nail to block access to disaggregated admissions data, precisely to shield their practices from legal scrutiny. It would be both unjust and contrary to public policy to require Plaintiffs to present data that Defendants systematically withhold. In *Stewart v. Texas Tech*, the court denied a motion to dismiss where the plaintiff identified racial disparities in admissions statistics and was personally rejected despite superior metrics. Like in *Stewart*, Plaintiffs allege that Stanley was rejected while

1    lower-qualified students of other races were admitted, and the surrounding

2    policies reflect a preference structure inconsistent with equal protection.

3    261.    Nonetheless, Plaintiffs have conducted deductive analysis based on publicly

4    available information—including SAT performance by race, UW's student body

5    composition, and the known qualifications of Stanley Zhong. That analysis

6    reveals deep and unexplained disparities that point strongly toward

7    discrimination. Further, while statistics may be one way to demonstrate

8    discrimination, it is not the only way. The *McDonnell Douglas* framework provides

9    a path forward through comparative and circumstantial evidence even where full

10   statistical datasets are unavailable.

11   262.    Plaintiffs have clearly pled (1) that Stanley belongs to a protected class (Asian

12   American), (2) that he was exceptionally qualified, (3) that he was rejected

13   despite those qualifications, and (4) that UW admitted less-qualified applicants of

14   other races. This is sufficient to satisfy the prima facie showing under *McDonnell*

15   *Douglas* and to survive a motion to dismiss.

16   **Q. Defendants' Questionable Litigation Conduct**

17   263.    Virtually all legal precedents concerning discrimination in college admissions

18   have addressed policies and practices at the institutional level, rather than within

19   individual departments or schools. However, the repeated references to the Allen

20   School in Defendants' Motion to Dismiss prompted Plaintiffs to investigate

21   potential discrimination specifically within the Allen School. Via a Google search

22   (See an example in Exhibit 3) on July 19, 2025, Plaintiffs discovered the Allen

School's 15% target on the website of the Asian American Coalition for Education (AACE). When Plaintiffs noticed the UW document that AACE linked to was removed from UW's website, Plaintiffs asked AACE for the original document. In a response on July 19, AACE sent Plaintiffs the screenshot in Exhibit 1 and indicated that they "don't have the full text."

264.     On July 23, 2025, Plaintiff Nan Zhong emailed UW's legal counsel, informing them of Plaintiffs' intent to file a First Amended Complaint incorporating this newly discovered evidence, and attached the screenshot excerpt from AACE as part of that communication.

265.     On July 31, 2025, UW counsel Mr. Marc Shapiro sent the following email to Plaintiffs.

Nan and Stanley,

We write in response to your July 23, 2025, email in which you relayed that you intend to allege in your amended complaint that the Allen School has a "15% enrollment target for certain racial groups."  The screenshot you provided, which we understand to be an excerpt from a 2021 document, does not support that characterization.   That is even more so when viewed in the context of the entire 2021 document, which we presume you have.

In fact, the very language you have highlighted was identified in a letter to the University of Washington by Mr. Yukong Zhao, the President of the Asian American Coalition for Education, with whom we understand you have had prior interactions.  As the University explained to Mr. Zhao in its

January 2024 reply letter, the University and the Allen School do "not use race as a factor in admission decisions, and we do not use racial quotas." The University further explained that the statement you identify merely reflects that the Allen School "measure[d] the demographics … and observe[d] how those demographics compare with the UW-Seattle average."  As the University noted, "[t]he Department of Education has affirmed that institutions may collect demographic information," as long as the information does not influence admissions decisions.  And, as the University explained, the Allen School does not use this information in its admissions decisions.  We have attached the letter to Mr. Zhao for your convenience.

We wanted to raise this issue in order to remind you of your obligations as a pro se litigant under Rule 11 of the Federal Rules of Civil Procedure.  Rule 11 requires that "[e]very pleading, written motion, and other paper must be signed by at least one attorney of record… or by a party personally if the party is unrepresented" and makes plain that, "[b]y presenting to the court a [signed] pleading… or other paper…[,] an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances… the factual contentions have evidentiary support…."  Rule 11, and the penalties it provides for, applies equally to attorneys and pro se litigants.

We do not believe your allegation—that the Allen School has a 15% enrollment target for certain racial groups—is a correct characterization of

1    the document, particularly in light of further correspondence and follow-on

2    (in)action by AACE.  Nor do we think any comparable characterization is

3    accurate.  As the University's 2024 letter to Mr. Zhao demonstrates, the

4    statement on which you base your allegation very clearly does not provide

5    any evidentiary support for your allegation.

6    We are sending this email as a courtesy and trust that you will proceed in

7    conformity with your obligations.

8    Regards,

9    Marc

10    266.    In an email response on July 31, 2025, Plaintiffs refuted Mr. Shapiro's

11    characterization that the screenshot suggests only a passive observation, and

12    requested a copy of the complete document.

13    267.    In a follow-up email dated August 1, 2025, Plaintiffs clarified to UW counsel

14    that the AACE only provided the screenshot, and again requested UW counsel

15    provide a copy of the full document. On August 5, 2025, Plaintiffs reiterated this

16    request. In a response on August 25, UW counsel refused to produce the full

17    document, as indicated in their reply email, reproduced below.

18    Nan and Stanley,

19    We previously reached out and provided you context in response to your

20    email as a courtesy.  As we have relayed, a litigant is required to file a

21    complaint based on a good faith, Rule 11 belief that his allegations are true.

The allegations must not be speculative or based on conjecture.  Our initial motion to dismiss demonstrated the absence of any plausible basis in your original complaint and its contention that Stanley's denial of admission from the Allen School was predicated upon his status as an Asian American.

The course of litigation here suggests that you are utilizing the litigation process to backfill unsubstantiated allegations.  To that end, we are concerned that you intended to amend your complaint all along and strategically waited to see our motion to dismiss before doing so.   Such delayed disclosure, particularly if strategic, is troubling.  And your response to our courtesy email is equally disconcerting.  Though you admitted you do not have the full document, you expressed an unreserved and unqualified position that it supports your position.

We have no discovery obligations at this juncture, and the litigation conduct to date does not suggest that disclosures will, as we had hoped, lead to productive conversations with the goal of truth-seeking, but rather will be used to fuel and backfill the unsubstantiated belief that drove the filing of this litigation in the first place.

To be clear, we will abide by all discovery and preservation obligations.  We are not, however, obligated to produce this document at this time.  That you are continuing to press forward based on a screenshot without further documentary context remains deeply disturbing, particularly where, as we understand, the AACE itself—which you claim is the source of this

1    screenshot—took no further steps based on the University of Washington's

2    reply to its letter.

3    268.    Defendants' assertion that their actions are race-neutral is directly

4    undermined by their own conduct in this litigation. After threatening Plaintiffs with

5    Rule 11 sanctions for alleging the existence of a racial enrollment target,

6    Defendants' counsel represented that "the entire 2021 document" would disprove

7    Plaintiffs' claim. Yet when Plaintiffs subsequently requested this supposedly

8    exculpatory document, Defendants refused to produce it. This Court should draw

9    an adverse inference from that refusal. A party who possesses evidence that

10   would exonerate them has every incentive to disclose it. Their refusal to do so

11   strongly suggests that the document is not exculpatory, but inculpatory—and that

12   Defendants' stated justifications are pretextual. Such conduct further supports

13   Plaintiffs' claim that race was a motivating factor in the admissions decisions at

14   issue.

15   269.    While Defendants' counsel accused Plaintiffs of speculation, they themselves

16   engaged in speculation by asserting—without evidence—that Plaintiffs "intended

17   to amend [their] complaint all along and strategically waited to see [Defendants']

18   motion to dismiss before doing so." In reality, Plaintiff Nan Zhong only became

19   aware of the 15% enrollment target at the Allen School on July 19, 2025, after

20   discovering a reference to AACE's letter to UW in a Google search. This

21   prompted Nan to email AACE that same day to request further information. (See

22   Exhibit 4.) Although Nan and AACE had previously exchanged emails, AACE

23   had not previously disclosed or mentioned their letter to UW, nor had they

provided the relevant screenshot until after Nan's July 19 inquiry. This timeline directly contradicts Defendants' speculation.

270.    While AACE took no further action after receiving UW's reply, that fact carries little significance in this litigation. AACE did not have access to the broader evidentiary context that Plaintiffs now present in this Amended Complaint, which collectively establish a far more robust case of intentional discrimination.

## V. CLAIMS FOR RELIEF

## COUNT I - Violation of the Equal Protection Clause, U.S. Const. Amend. XIV (Against the Individual Defendants at UW in their Official and Personal Capacities)

271.    Plaintiffs reallege and incorporate by reference the allegations set forth above. Taken together, the facts presented form a consistent, disturbing pattern of intentional racial discrimination—one that culminated in the rejection of Stanley Zhong and the discouragement of his brother Minor Son, not because they lack merit, but because they do not fit the racial profile Defendant UW wants to engineer.

272.    Plaintiffs bring this claim under 42 U.S.C. § 1983 to vindicate rights secured by the Equal Protection Clause of the Fourteenth Amendment.

273.    The equal protection clause of the Fourteenth Amendment prohibits state actors from denying individuals equal protection of the laws, including through the use of race as a motivating factor in government decision-making.

274.    The discriminatory intent of Defendant UW can be inferred from a constellation of evidentiary factors, including: (1) the demonstrable statistical evidence of disparate impact on Asian Americans in admissions; (2) their historical track record of open desire to suppress Asian Americans in admissions; (3) the sequence of events demonstrating their resolute opposition to legal mandates to evaluate admissions candidates without regard to racial preference; and (4) their deviations from regular procedures or substantive norms of racial equality and evaluation of academic candidates on the basis of merit regardless of race.

275.    As a public institution, Defendant UW's admissions policies and practices violate the Equal Protection Clause of the Fourteenth Amendment by intentionally discriminating against Asian-American applicants, including Stanley, on the basis of race.

276.    Defendant UW's acts and omissions were motivated by malicious and oppressive motives, and involved reckless or callous indifference to Plaintiffs' constitutionally protected rights. Their conduct was undertaken in the face of the known, perceived risk that their actions violated federal or state law.

277.    As a result of the illegal discrimination by Defendant UW, Plaintiffs have suffered direct and indirect damages in an amount to be determined at trial.

278.    Plaintiffs have been and will continue to be injured or face imminent harm by Defendant UW's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

279.    Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendant UW from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and because the harm Plaintiffs will otherwise continue to suffer is irreparable. Defendant UW acted with callous indifference to Plaintiffs' rights under the Equal Protection Clause. Accordingly, Plaintiffs seek punitive damages to deter such unconstitutional conduct.

280.    Plaintiffs seek this relief under 42 U.S.C. § 1983 and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908).

281.    Plaintiffs seek this relief only against the individual defendants at UW, and not against the institutional defendants.

**COUNT II - Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) (against the University of Washington)**

282.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

283.    Plaintiffs bring this claim under Title VI of the Civil Rights Act of 1964, which prohibits any program or activity receiving federal financial assistance from subjecting individuals to discrimination on the basis of race.

284.    UW receives substantial federal funding and is therefore subject to the requirements of Title VI.

285.    Although Title VI does not, by its terms, incorporate constitutional standards, the Supreme Court has made clear that a Title VI claim for racial discrimination in admissions is coextensive with a claim under the Equal Protection Clause.

286.    For the reasons set forth earlier in this complaint, Plaintiffs allege that UW intentionally discriminated against Asian-American applicants, including Stanley and Minor Son, on the basis of race, in direct violation of Title VI.

287.    As a result of the illegal discrimination by Defendant UW, Plaintiffs have suffered direct and indirect damages in an amount to be determined at trial.

288.    Plaintiffs have been and will continue to be injured or face imminent harm by Defendant UW's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

289.    Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendant UW from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

290.    Plaintiffs seek this relief under Title VI, 42 U.S.C. § 1983, and any other law that might supply a cause of action for the requested relief, including the

Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908).

291.   Plaintiffs seek this relief only against the institutional defendants UW and not the individual defendants.

**COUNT III - Violation of 42 U.S.C. § 1981**

**(Against the Individual Defendants at UW in their Official and Personal Capacities)**

292.   Plaintiffs reallege and incorporate by reference the allegations set forth above.

293.   42 U.S.C. § 1981(a) guarantees individuals the same right to make and enforce contracts without regard to race. This includes the right to enter into contracts for educational services at public universities. UW is a public institution bound by this statutory obligation.

294.   42 U.S.C. § 1981(a) protects whites (and Asians) on the same terms that it protects "underrepresented" racial minorities. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295 (1976) ("[T]he Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.").

295.   Stanley and Minor Son are members of a protected class, namely Asian Americans by race and national origin.

296.   Stanley and Minor Son are objectively qualified for admissions to UW.

297.   Stanley was objectively evaluated by Google as possessing Ph.D.-level qualifications.

298.   Minor Son, though still in high school, has already demonstrated academic excellence, intellectual maturity, and exceptional extracurricular involvement that place him on track to be a top-tier college applicant. He maintains a perfect 4.0 GPA, outpacing Stanley at the same stage, and exhibits advanced cognitive abilities—including multiple six-second Rubik's Cube solves in official competition, five ball juggling on stage at national festival, varsity athletic performance, and deep engagement with intellectual pursuits.

299.   Stanley was rejected from UW despite the fact that his credentials placed him in the top echelon of applicants, not only by UW's standards but by the highest standards of academic institutions nationwide.

300.   Many similarly situated, non-Asian applicants were accepted despite having inferior credentials whereas Stanley was rejected.

301.   Defendant UW's race-based admission standards have discouraged and preemptively prevented Minor Son from contracting with UW.

302.   Defendant UW's decision to deny Stanley admission was not made in a vacuum. As detailed in the preceding sections of this complaint, Defendant UW has repeatedly affirmed its commitment to racially balancing its student body, has publicly expressed opposition to I-200, and has continued to rely on "holistic review" as a smokescreen for race-based admissions even after the Supreme Court's ruling in *SFFA v. Harvard*.

303.    The stark statistical disparities in admission rates by race, Defendant UW's long and well-documented history of defending race-based preferences, and its resistance to race-neutral alternatives provide overwhelming circumstantial evidence that Stanley's race was the but-for cause of his rejection. Had he not been Asian American, his application would have received materially different treatment. That is precisely what § 1981 forbids.

304.    Accordingly, Defendant UW violated 42 U.S.C. § 1981 by discriminating against Asian Americans, and Plaintiffs seek all appropriate legal and equitable remedies.

305.    As a result of Defendant UW's discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, financial loss, and reputational damage.

306.    Plaintiffs have been and will continue to be injured or face imminent harm by Defendant UW's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

307.    Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendant UW from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of 42 U.S.C. § 1981 and because the harm Plaintiffs will otherwise continue to suffer is irreparable. Defendant UW acted with callous indifference to Plaintiffs' federally protected rights. Accordingly, Plaintiffs seek punitive damages to deter such illegal conduct.

308.    Plaintiffs seek this relief under 42 U.S.C. § 1983, as well as the implied right of action that the Supreme Court has recognized to enforce 42 U.S.C. § 1981(a), and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908). *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975) and *Runyon v. McCrary*, 427 U.S. 160 (1976).

309.    Plaintiffs seek this relief only against the individual defendants at UW, and not against the institutional defendants.

310.    The text of 42 U.S.C. § 1981(a) makes no exceptions for "compelling state interests," "student-body diversity," or race-based affirmative-action programs. It prohibits all forms of racial discrimination in contracting—regardless of whether that racial discrimination is independently prohibited by the Equal Protection Clause.

## COUNT IV - Violation of RCW 49.60.400

## (Against UW And All Individual Defendants at UW in Their Official and Personal Capacities)

311.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

312.    RCW 49.60.400 prohibits racial discrimination in public education. UW's discriminatory admissions policies and practices violate this provision by denying

1    Asian-American applicants, including Stanley, equal access to public educational

2    opportunities.

3    313.    Defendant UW here has acted under the color of state law.

4    314.    Defendant UW's continued use of race as a factor in undergraduate

5    admissions, however obscured by euphemism or cloaked in "holistic" rhetoric, is

6    a direct violation of RCW 49.60.400.

7    315.    Defendant UW's own public statements and internal materials confirm that

8    race continues to play a determinative role in its operations. Defendant UW has

9    resisted race-neutral alternatives and has openly declared opposition to I-200.

10    316.    Stanley and Minor Son are denied equal consideration for admission to UW

11    because of their race.

12    317.    That is precisely the kind of discriminatory and preferential treatment that

13    RCW 49.60.400 forbids. Defendant UW's conduct constitutes a plain and

14    ongoing violation of RCW 49.60.400. Plaintiffs seek all appropriate legal and

15    equitable remedies.

16    318.    As a result of Defendant UW's discriminatory policies and practices, Plaintiffs

17    have suffered harm, including the loss of educational opportunities, emotional

18    distress, financial loss, and reputational damage.

19    319.    Plaintiffs have been and will continue to be injured or face imminent harm by

20    Defendant UW's ongoing discriminatory admissions policies, which deny them an

21    equal opportunity to compete for admission based on race or ethnicity.

320. Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendant UW from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of RCW 49.60.400 and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief pursuant to 42 U.S.C. §§ 1983, 1988, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Fourteenth Amendment, and RCW 49.60.400. Plaintiffs respectfully request that this Court:

321. Declaratory and Injunctive Relief

    a. Declare that Defendant UW's student admissions and faculty hiring policies and practices violate:

        i. The Fourteenth Amendment to the U.S. Constitution,

        ii. Title VI of the Civil Rights Act of 1964,

        iii. 42 U.S.C. § 1981, and

        iv. RCW 49.60.400 (I-200).

    b. Issue a permanent injunction prohibiting Defendant UW from using race, ethnicity, or proxies thereof in admissions decisions or recruitment practices.

    c. Issue a permanent injunction requiring Defendant UW to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission.

       d. Issue an injunction prohibiting Defendant UW from retaining or reinstating personnel found personally liable without remedial controls in place.

322. Oversight & Mandatory Training

       a. Upon a finding of ongoing noncompliance, appoint a court monitor to oversee all decisions relating to Defendant UW's student admissions to ensure that these decisions are free from racial discrimination of any sort;

       b. Require annual I-200 training for all UW personnel involved in admissions or hiring.

       c. Require all trained personnel to explicitly acknowledge that violating I-200 or failing to report violations may result in disciplinary action, including termination.

323. Award Monetary Damages & Attorney's Fees

       a. Award to Plaintiffs nominal damages in the amount of $1.

       b. Award to Plaintiffs compensatory damages in an amount equal to the application fee.

       c. Award to Plaintiffs punitive damages from liable individual defendants in their personal capacity in an amount to be determined at trial.

       d. Award reasonable attorneys' fees and costs incurred in this action under 42 U.S.C. § 1988. While Plaintiffs currently appear pro se, they expressly reserve the right to recover any documented legal expenditures should they retain counsel or incur other recoverable costs.

       e. Grant such other and further relief as this Court deems just and proper.

**VII. JURY DEMAND**

Pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

---

I declare under penalty of perjury that the allegations in the complaint are true.

Respectfully submitted,

/s/ Stanley Zhong

Stanley Zhong (Pro Se)

211 Hope St #390755

Mountain View, CA 94039

/s/ Nan Zhong

Nan Zhong (Pro Se)

211 Hope St #390755

Mountain View, CA 94039

nanzhong1@gmail.com

**Dated:** August 6, 2025

1          # EXHIBIT 1

2          **UW A**LLEN **S**CHOOL'S **15% E**NROLLMENT **T**ARGET FOR **C**ERTAIN **R**ACIAL **G**ROUPS



3          **Each year:** Measure the

# EXHIBIT 2

### UW Allen School's 5-year Strategic Plan Removed as of August 3, 2025

https://www.cs.washington.edu/who-we-are/diversity-equity-inclusion-access/strategic-plan



1

# EXHIBIT 3

2

## EXAMPLE GOOGLE SEARCH LEADING TO AACE'S LETTER TO UW



3

# EXHIBIT 4

1

2 EXCHANGE WITH **AACE** REGARDING **UW** INITIATED ON JULY **19, 2025**



3
4
5
6 The link of "mentioned" in the email is
7 https://asianamericanforeducation.org/en/university-of-washington-to-stop-illegal-racial-
8 quotas-in-admissions/