1           UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF WASHINGTON

3

| | |
|---|---|
| **Stanley Zhong; Nan Zhong,** individually and as next friend of his **Minor Son,**<br><br>                              Plaintiffs,<br><br>v.<br><br>**The Regents of the University of Washington** in their official capacities**; The University of Washington; Ana Mari Cauce,** in her personal capacity as the former President of the University of Washington; **Robert J. Jones,** in his official capacity as the President of the University of Washington; **Paul Seegert,** in his personal capacity and official capacity as the Director of Admissions at the University of Washington; **Magdalena Balazinska**, in her personal capacity and official capacity as Chair of the Paul G. Allen School of Computer Science & Engineering at the University of Washington; **Tadayoshi Kohno**, in his personal capacity and official capacity as Associate Director of Diversity, Equity, Inclusion & Access for the Paul G. Allen School of Computer Science & Engineering at the University of Washington; **Chloe Dolese Mandeville**, in her personal capacity and official capacity as Assistant Director for Diversity & Access for the Paul G. Allen School of Computer Science & Engineering at the University of Washington; **Other persons John and Jane Does 1-20** acting in concert with those named above,<br><br>                              Defendants. | Case No. 2:25-cv-00348<br><br><br>SECOND AMENDED COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

1    **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

2 **I. INTRODUCTION AND SUMMARY OF CLAIMS**

3    1.  Plaintiffs Stanley Zhong ("Stanley") and Nan Zhong ("Nan"), individually and

4        acting on behalf of his Minor Son ("Minor Son"), bring this civil rights action

5        against the University of Washington ("UW") and the named UW officials

6        (collectively, "Defendants"). Plaintiffs allege that Defendants have engaged in

7        systemic racial discrimination against Asian American applicants in violation of

8        the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil

9        Rights Act of 1964, 42 U.S.C. § 1981, and Washington State law RCW 49.60.400

10       (Initiative 200).

11   2.  This case seeks to enforce the fundamental constitutional guarantee that the

12       State must treat citizens as individuals, not as members of racial groups. For

13       decades, the University of Washington has maintained admissions policies that

14       penalize Asian American applicants based on their race, treating them not as

15       beneficiaries of civil rights protections, but as exceptions to them.

16   3.  While the University utilizes terms such as "holistic review" to describe its

17       process, the practical effect is the consistent penalization of Asian American

18       applicants. In a zero-sum admissions system, the granting of preferential

19       treatment to certain racial groups necessarily imposes a corresponding burden

20       on others. Defendants have institutionalized this burden, requiring Asian

American applicants to meet higher standards of academic and extracurricular achievement than applicants of other races.

4. Plaintiff Stanley Zhong, an exceptionally qualified applicant with technical achievements recognized by industry leaders as equivalent to Ph.D.-level work, was rejected by the University of Washington for undergraduate admission under this discriminatory regime. His younger brother, Minor Son, now faces the imminent threat of the same discriminatory barrier.

5. Plaintiffs do not seek special treatment. They seek only an equal opportunity to compete on the basis of merit, free from racial penalties. Plaintiffs request declaratory and injunctive relief to compel the University to cease its discriminatory practices, along with damages for the injuries sustained.

## II. PARTIES AND STANDING

### A. Plaintiffs

6. Plaintiff Stanley Zhong is a resident of the State of California and a citizen of the United States. He is a second-generation Asian American. Stanley applied for undergraduate admission to the University of Washington for the Fall 2023 term. Despite possessing extraordinary credentials (detailed herein), he was denied admission. He suffered a concrete injury-in-fact: the denial of the opportunity to compete for admission on an equal footing with applicants of other races.

7. Plaintiff Nan Zhong is a resident of the State of California, a first-generation immigrant from China, and a naturalized U.S. citizen. He is the father of Stanley

Zhong and Minor Son. He brings this action in his individual capacity based on direct, concrete injuries he has suffered and will suffer:

- **Pecuniary Injury (Past)**: Nan Zhong paid the non-refundable application fees for Stanley Zhong's application to the University of Washington. Because the admissions process was tainted by unlawful racial discrimination, he did not receive the fair consideration for which he contracted and paid, resulting in a direct financial loss.

- **Pecuniary Injury (Imminent)**: Nan Zhong intends to pay the application fees for his Minor Son's future application. He faces the imminent harm of paying for a similarly discriminatory and fraudulent review process.

- **Parental Standing**: As affirmed by the Second Circuit in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161 (2024), a parent has standing to assert equal protection claims where they suffer harm from a discriminatory policy affecting their children.

8.  Pursuant to Federal Rule of Civil Procedure 17(c), Nan Zhong also appears as the representative and next friend of his Minor Son.

- Minor Son is a resident of the State of California and an Asian American student. He is a junior in high school with a demonstrated record of academic excellence (detailed herein).

- Minor Son intends to apply to the University of Washington for the Fall 2027 term. He faces a credible and imminent threat of being subjected to the same discriminatory admissions policies that rejected his brother.

Under the Supreme Court's holdings in *Gratz v. Bollinger* and

*Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of*

*Jacksonville*, Minor Son has standing to seek prospective injunctive relief

because the discriminatory barrier itself constitutes an ongoing injury that

prevents him from competing on an equal basis.

9.  Plaintiffs Stanley and Nan Zhong have made diligent efforts to retain counsel,
    soliciting representation from dozens of law firms and legal organizations.
    Despite these efforts, the contacted entities either declined representation, failed
    to respond, or were unable to accept the case. Consequently, to prevent the
    expiration of claims and the irreparable harm of ongoing discrimination, Plaintiffs
    are compelled to proceed *pro se*.

**B. Defendants**

10. Defendant University of Washington is a public institution of higher education
    organized under the laws of the State of Washington. It is a recipient of federal
    financial assistance and is therefore subject to Title VI of the Civil Rights Act of
    1964. The University's admissions policies, including the undergraduate
    admissions practices challenged herein, are promulgated and enforced by its
    administration and governing board.

11. Defendant the Regents of the University of Washington are the governing body of
    the University of Washington, responsible for the supervision and control of the
    University. They are sued in their official capacities. The current members of the
    Board of Regents are: Leonard Forsman (Chair), Leonor Fuller (Vice Chair), Zoe

Barsness, Dow Constantine, Apolonio (Polo) Pablo Hernandez, Linden Rhoads, David Schumacher, Denise Stiffarm, Blaine Tamaki, Maggie Walker, and David Zeeck.

12. Defendant Ana Mari Cauce served as the President of the University of Washington during the admissions cycles relevant to Plaintiff Stanley Zhong's application. During her tenure, she exercised final authority over the University's operations and enforcement of admissions policies. Defendant Cauce repeatedly issued public statements opposing the race-neutral mandates of Initiative 200, fostering a culture of noncompliance and institutional commitment to racial preferences. She is sued in her personal capacity for damages.

13. Defendant Robert J. Jones is the current President of the University of Washington (appointed August 2025). He constitutes the final executive decision-maker for the University and has the authority to implement the injunctive relief sought by Plaintiffs. He is sued in his official capacity.

14. Defendant Paul Seegert is the Director of Admissions at the University of Washington. In this capacity, he oversees admissions policies systemwide and exercises ultimate authority over the implementation of the 'holistic review' framework. Defendant Seegert's office approved and enforced the specific evaluation procedures—including the removal of standardized testing and the use of racial proxies—that systematically disadvantaged Asian American applicants. He holds direct supervisory authority over the officials who rejected Stanley's application and those who will adjudicate Minor Son's future application. He is sued in his personal and official capacities.

15. Defendant Magdalena Balazinska is the Director of the Paul G. Allen School of Computer Science & Engineering (the "Allen School") . In this role, she oversees the Allen School's admissions policies and strategic direction. When presented with evidence of the School's explicit 15% racial enrollment targets, Defendant Balazinska covered up the conduct by denying that race was a factor, despite internal documents to the contrary. She is sued in her personal and official capacities.

16. Defendant Tadayoshi Kohno is the Associate Director for Diversity, Equity, Inclusion & Access ("DEIA") at the Allen School. He co-led the creation of the Allen School's 5-Year Strategic Plan for Diversity, Equity, Inclusion, and Access, which explicitly established the 15% enrollment target for specific racial groups. He is sued in his personal and official capacities.

17. Defendant Chloe Dolese Mandeville is the Senior Assistant Director for Student Engagement & Access at the Allen School (formerly Assistant Director for Diversity & Access). She co-led the development of the 5-Year Strategic Plan alongside Defendant Kohno, which codified the 15% racial enrollment target. She is sued in her personal and official capacities.

## III. JURISDICTION AND VENUE

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the Constitution and laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because Plaintiffs seek to redress the deprivation of civil rights under color of state law.

19. The Court has supplemental jurisdiction over Plaintiffs' state-law claims—specifically the claim under RCW 49.60.400—pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims. Plaintiffs further seek declaratory relief under 28 U.S.C. §§ 2201–2202.

20. Venue is proper for Defendants because a substantial part of the events or omissions giving rise to the claim occurred, and will occur, in this judicial district and division. *See* 28 U.S.C. § 1391(b)(2). Venue is additionally proper because at least one of the defendants resides in this judicial district and division and all the defendants associated with UW reside in Washington. *See* 28 U.S.C. § 1391(b)(1).

## IV. FACTUAL ALLEGATIONS

### A. Industry-Wide Pattern of Discrimination Against Asian American Applicants

21. Asian Americans have faced a documented history of systemic exclusion in the United States, ranging from the Chinese Exclusion Act of 1882 to the incarceration of Japanese Americans during World War II. This history of exclusion informs the current landscape, where Asian Americans remain a distinct minority group subject to specific stereotypes and discriminatory barriers.

22. Within the world of college admissions, discrimination against Asian Americans has become the worst-kept secret. A 2016 Inside Higher Ed survey of college admissions directors revealed that 42% of private college admissions officers and 39% of public college officers acknowledged that Asian American applicants are

held to higher standards than students of other races. Studies suggest that privileged, wealthy African American applicants are admitted at significantly higher rates than low-income, underprivileged Asian American applicants with similar academic credentials.

23. Data emerging in the wake of the Supreme Court's ruling in *SFFA v. Harvard* confirms the impact of race-conscious policies on Asian American enrollment. In the first admissions cycle following the decision, Asian American enrollment at elite universities surged: MIT's Asian American enrollment rose from 40% to 47%, while Columbia University saw an increase from 30% to 39%. A similar pattern occurred at Harvard, where the Asian American admit rate rose from 17% in 2014 to 22% in 2016 immediately following the filing of the *SFFA* lawsuit—after having remained flat for years—and climbed to 37% by 2024. These dramatic shifts confirm that Asian American applicants were previously being artificially suppressed to maintain a predetermined racial balance. Furthermore, the magnitude of these changes far exceeds what could be attributed to the limited use of race as a mere "plus factor" under *Grutter v. Bollinger,* revealing that race was instead functioning as a decisive feature of the admissions process.

24. High-ranking administrators at peer institutions subject to legal restrictions similar to Initiative 200 (such as in California and Michigan) have publicly developed and advocated for specific methods to circumvent these bans. Plaintiffs allege that the University of Washington has adopted this industry-standard "playbook," utilizing the same "holistic" mechanisms and "proxies" described below to mask its continued racial balancing.

25. University of California ("UC") Berkeley Law School Dean, Erwin Chemerinsky, explicitly advised using "proxies for race" and admitted to practicing "unstated Affirmative Action" while concealing it, noting, "If I'm ever deposed, I'm going to deny I said this." Similarly, University of Michigan ("UM") General Counsel Timothy Lynch advised administrators to curate emails to prevent faculty from "muddy[ing] the record" with evidence of discriminatory intent.

26. The mechanism for this evasion is "holistic review." As documented by Professor Tim Groseclose, UCLA's switch to "holistic" review was adopted explicitly to increase enrollment of "underrepresented minorities," at the expense of more qualified Asian American applicants.

27. Official audits and studies of UC have confirmed that "holistic review" was operationalized to admit less-qualified students over higher-qualified Asian Americans. Plaintiffs allege UW's 'holistic' process functions similarly.

28. Senior UC administrators actively persecute faculty who advocate for academic excellence over identity politics. This pattern is exemplified by the treatment of Professor Perry Link at UC Riverside, who faced sustained retaliation from 2022 to 2025 for opposing racial preferences. In May 2025—despite an active litigation hold—UC staff entered his office without consent, seized his hard drive and personal items, and destroyed them. To date, no senior administrator has apologized for this conduct.

29. Defendants operate within this same administrative milieu and utilize the same "holistic" frameworks used by UC and UM. The industry-wide knowledge of such

retaliation—exemplified by the seizing of Professor Link's data and personal items—creates a "code of silence" that deters faculty and staff at UW from exposing internal misconduct. This climate of fear explains the absence of whistleblowers in the admissions office, forcing Plaintiffs to rely on statistical inference rather than direct testimony at this stage. Given the statistical anomalies in UW's own enrollment data (detailed in Section IV.H) and the Defendants' refusal to produce disaggregated records, it is reasonable to infer that UW has adopted these industry-standard concealment tactics to evade the restrictions of federal and state laws.

**B. Asian Americans Are Acutely Aware of the Discrimination**

30. As documented in the New York Times and the filings for *SFFA v. Harvard* (see Complaint at 60), it is a recognized phenomenon that Asian American applicants frequently attempt to appear "less Asian" to avoid admissions penalties. This strategic concealment is a direct response to the widespread understanding that elite universities, including the University of Washington, penalize applicants who fit specific racial profiles or stereotypes.

31. Asian American applicants, including Stanley and Minor Son, are often advised by guidance counselors and admissions consultants to downplay their achievements and interests in STEM fields or their involvement in Asian cultural organizations.

32. This knowledge is transmitted through community networks and from older siblings to younger ones. Plaintiff Minor Son has observed his brother's

experience and the broader community discourse, learning that his racial identity is viewed as a liability by university administrators.

33. This environment imposes a cognizable constitutional injury. No student in America should be compelled to obscure their heritage or downplay their authentic achievements out of fear that their racial identity will count against them.

## C. Plaintiff Stanley Zhong's Academic and Extracurricular Record

34. It is against this backdrop that Stanley faced the admissions process. Stanley is not merely a qualified applicant—he is, by any objective measure, among the top college applicants in the country.

35. Stanley Zhong attended Henry M. Gunn High School, ranked #14 in California by U.S. News & World Report and the #1 best public high school in the San Francisco Bay Area according to Niche. Within this competitive setting, Stanley still stood head and shoulders above his peers. He distinguished himself as a National Merit Scholarship finalist. Although Stanley's high school does not publish individual student rankings based on grade point average, he is confirmed to be *at least* within the top 9% of his class, as he qualified for the University of California's "Eligibility in the Local Context" ("ELC"). ELC guarantees admission to a UC campus for California high school students who rank in the top 9% of their class, as determined by their GPA in UC-approved coursework completed in the 10th and 11th grades.

36. He achieved a perfect PSAT score without any preparation and went on to score 1590 out of 1600 on the SAT, after just a few nights of self-study and without any paid tutoring or test prep.

37. Stanley's high school grade point average was 3.97 (unweighted) and 4.42 (weighted).

38. Stanley's excellence extended well beyond the classroom. He took on leadership roles in a variety of academic and volunteer organizations. While still in high school, he co-founded and served as the 2nd president of OpenBrackets, a nonprofit run by high schoolers that delivered free coding lessons to more than 500 students in underserved communities across California, Washington, and Texas. It received positive feedback from Stackoverflow co-founder Mr. Jeff Atwood. For this work, Stanley was awarded the President's Volunteer Service Award at its highest level. He also co-founded and led his school's competitive programming club.

39. Mr. Josh Paley, Stanley's high school Computer Science teacher, has offered to testify as a character witness.

40. Stanley is a self-taught programmer whose extraordinary talent has earned him top honors in some of the world's most competitive coding contests—often outperforming industry professionals.

41. Stanley placed 2nd in Carnegie Mellon's picoCTF cybersecurity challenge and was invited to CMU with expenses paid, took 6th in Stanford's ProCo, and reached the elite Platinum Division of the USA Computing Olympiad. Twice, he

placed 2nd globally (2nd and 1st in the U.S., respectively) in MIT's Battlecode high school division, qualifying for invitations to MIT with expenses paid. (Unfortunately, one of those trips didn't happen due to COVID.) He also ranked among the top 500 globally in both Google Code Jam (427th) and Meta Hacker Cup (329th) —competitions dominated by seasoned software professionals from around the world.

42. His skill was so advanced that in 2019, Google invited him for a full-time software engineer interview, unaware he was only 13 years old; the interview was canceled only after his age came to light because minors can't sign Google's employment agreement.

43. Stanley repeatedly demonstrated extraordinary initiative far beyond his years. After reading an NPR story in April 2020 about state unemployment systems buckling under COVID-related demand due to outdated COBOL infrastructure, Stanley independently taught himself COBOL, published sample code to GitHub, and volunteered his help to the "COBOL Cowboys" featured in the article—earning a personal phone call and words of encouragement from their CEO.

44. Frustrated by the lack of free e-signature tools during the pandemic, in 2021, Stanley launched RabbitSign, the world's only free e-signature service with SOC 2, ISO 27001 and HIPAA compliance included. Built by Stanley on Amazon Web Services, RabbitSign was so secure and well-architected that AWS called it "one of the most efficient and secure" applications they had reviewed and decided to feature it in a case study—a prestigious recognition notoriously difficult to attain,

even for seasoned professionals. Stanley's innovation drew national attention: RabbitSign was spotlighted on *Viewpoint with Dennis Quaid*—a program that has previously interviewed Fortune 500 CEOs and U.S. presidents—for its potential to help reduce healthcare costs through accessible, secure digital tools.

45. Stanley's college application essay, substantially reflected in the *Viewpoint* interview referenced above, recounted his motivation for creating RabbitSign, a free HIPAA-compliant e-signing platform designed to help reduce America's healthcare costs. He described how he overcame repeated rejections to eventually partner with a mission-aligned organization and launch RabbitSign as the first Activism Corporation—an innovative model aimed at tackling corporate greed using free market forces. A nearly identical version of this essay helped advance him from a National Merit Scholarship semifinalist to a finalist.

46. Just before his 18th birthday, Stanley underwent one of the most rigorous and objective evaluations available in the modern labor market: Google's full-time software engineer interview process. Five randomly assigned professionally trained Google engineers assessed Stanley, devoting over ten hours to evaluating his technical skills, communication abilities, and teamwork—precisely the traits elite universities purport to assess through "holistic" admissions.

47. Importantly, the structure of Google's process eliminates any risk of favoritism: interviewers are randomly assigned, shielded from outside influence, and incentivized to avoid inflating evaluations, as doing so could lead to internal compensation disparities.

48. Mr. Dan Bloomberg, a longtime Google employee who served on Google's hiring committees for 18 years, has agreed to testify about Google's interview process.

49. Based solely on their independent assessments, the Google engineers recommended Stanley for an L4 software engineer role, a position typically reserved for candidates with a Ph.D. or equivalent practical experience. Google extended the offer in September 2023, just after Stanley's 18th birthday.

50. Stanley's full-year job performance evaluation in January 2025 confirmed the wisdom of Google's decision: Stanley met all expectations and demonstrated strong potential for continued growth. That Google—an employer with far more applicants than even the most competitive universities—recognized Stanley as qualified for a postdoctoral-level role, while UW deemed him unworthy of undergraduate admission, provides compelling circumstantial evidence of the discriminatory standards UW applies to Asian American applicants.

**D. Stanley Applied on Merit—UW Rejected on Race**

51. For enrollment in Fall 2023, Stanley applied to the undergraduate programs at UW Seattle. His first-choice major was Computer Science in the Allen School at the College of Arts & Science. His second-choice major was Human Centered Design and Engineering in the College of Engineering.

52. Like many Asian American candidates for admission, Stanley naively dared to hope that, despite the well-known barriers facing applicants who look like him, his individual merit might still prevail and UW would look past his race.

53. Unfortunately, like too many Asian American students, he learned that it would not. Despite extraordinary academic credentials, internationally recognized accomplishments, his application to UW was rejected.

54. Stanley's story was cited in a congressional hearing in September 2023, and reported in national news.

55. After Stanley's story first hit the news in October 2023, multiple independent college admissions experts and counselors (unconnected to UW) reviewed Stanley's application materials, including his essay. Tellingly, not one of these experts could identify a legitimate, performance-based reason why Stanley would have been rejected by a school of UW's caliber. Some of them have offered to testify as expert witnesses when this lawsuit proceeds to trial. By all objective indicators, Stanley appeared to be the kind of candidate any top university would eagerly admit. The absence of any apparent, merit-based explanation for this "bizarre" result raises a strong inference that Stanley's race played a role in UW's decision. There is no other plausible explanation.

56. The rejection by UW defies common sense and contradicts expert assessments of his application. As the Supreme Court noted in *Miller v. Johnson*, 515 U.S. 900, 901 (1995), "bizarreness" can serve as "persuasive circumstantial evidence that race for its own sake … was a legislature's dominant and controlling rationale." Similarly, the stark disparity between Stanley's qualifications and the UW campuses' admissions decisions raises serious concerns about the role of race in UW's admissions process. This striking incongruity strongly suggests that UW's admissions policies are being applied in a discriminatory fashion.

57. Stanley was denied the opportunity to compete for admission to UW on equal footing with other applicants on the basis of race or ethnicity due to UW's discriminatory admissions policies and practices.

58. Stanley is ready and able to apply to UW when it ceases its intentional discrimination against Asian Americans.

59. As a result of the unlawful discrimination, Stanley Zhong has suffered significant harm, including but not limited to the loss of educational opportunities, reputational damage, and emotional distress. Plaintiffs seek all available legal and equitable relief to remedy these injuries.

**E. Defendants' Longstanding Institutional Resistance to Race-Neutral Mandates**

60. For decades, UW openly defended and advocated for race-conscious admissions policies as central to its institutional mission. At UW, "diversity" has become a euphemism for racial engineering.

61. In 1998, Washington voters approved Initiative 200 (I-200), prohibiting preferential treatment based on race in public education. Following its passage, then–University President Richard L. McCormick publicly stated: "The recent passage of Initiative 200 has deprived us of a tool that has been useful in promoting diversity for decades." In a subsequent interview, President McCormick stated: "I doubt that we will ever look back at the passage of I-200 as a good thing." He also issued a public statement: *"Administrators and faculty are hard at work **revising University admissions criteria** so that the classes we*

*admit will still **reflect the diversity of our society** … we are committed to doing everything within our power to achieve this result."* (Emphasis added.)

62. On May 17, 1999, UW News reported the results of the first post-I-200 admissions cycle. Offers to Black, Native American, and Hispanic applicants declined, while offers to Asian American applicants increased by 10%. President McCormick expressed dissatisfaction with these results. He stated: "We are very disappointed by this outcome for 1999... The UW is determined to admit a diverse student body, and we will do so through... further **revisions to our admissions policies**. These efforts may take a few years to **produce the kind of results we want**, but we are going to make them work" (Emphasis added).

63. The University continued to advocate for the reintroduction of race-based admissions. On January 24, 2018, UW President Ana Mari Cauce wrote to the Washington State Legislature urging support for Initiative 1000 (I-1000), a measure designed to repeal I-200. She argued that the ban on racial preferences put UW at a competitive disadvantage against universities that could "heavily recruit" based on race.

64. Following the legislature's passage of I-1000 in April 2019, President Cauce published a statement on June 20, 2019, declaring: "I am on the record supporting this change in the law... I-1000 is not about quotas... It is about leveling the playing field so that we can better compete in admission and hiring."

65. However, after the Supreme Court's decision in *SFFA* actually leveled the playing field, President Cauce was disappointed. She published a statement on August

1, 2023, titled "*Affirmative action ruling won't change our values or our mission.*"
She stated that the ruling "created much disappointment and concern" and
affirmed that UW remained "wholeheartedly committed" to its diversity objectives
despite the prohibition on race-conscious admissions.

66. In an April 2023 interview with Cascade PBS, UW's Vice President for Minority
Affairs and Diversity, Rickey Hall, defined the University's diversity success via
visual inspection of the student body. He stated: "A test for me is when I can look
out and look at Red Square, and in an hour, if I see several African Americans,
that's a pretty good indicator." He also stated that although the percentage of
Black, Latino, and mixed-race students were somewhat in line with the
demographics of Washington high-school graduates, he considered this
inadequate.

67. The macro political environment in Washington State has undoubtedly enabled
and encouraged UW's discriminatory practices in admissions. In January 2022,
Governor Jay Inslee issued Executive Order 22-02, rescinding the prior
Executive Order implementing I-200. The Washington Student Achievement
Council (WSAC), in its 2026 Strategic Action Plan, subsequently declared:
"Ensuring racial equity in our state requires that our higher education system
reflects the diversity of our population." This policy effectively mandates racial
balancing.

**F. Defendants' Policies and Actions for Racial Balancing its Student Body**

68. In addition to its evident motive and intent to engage in racial balancing, the University of Washington also possesses the means and opportunity to manipulate the racial composition of its student body through its current "holistic" admissions process. This framework—lacking transparency, third-party oversight, or enforceable accountability—provides ample discretion to prioritize race behind closed doors while maintaining public deniability. In practice, UW's stated intent is matched by its actions.

**F.1. Allen School DEIA Strategic Plan**

69. In or around September 2021, the Allen School published its *Diversity, Equity, Inclusion, and Access Five-Year Strategic Plan* (the "DEIA Plan"). The DEIA Plan explicitly establishes numerical enrollment targets based on race. Goal O.1 of the DEIA Plan directs the administration to: "Measure the percentage of domestic Black, Hispanic, and American Indian/Alaska Native, Hawaiian/Pacific Islander undergraduates and, **by year 5**, evaluate whether the percentage is **at least 15%** (the UW-Seattle average)." (Emphasis added.) The DEIA Plan also sets a similar target of 12% for the Ph.D. program. The DEIA Plan categorizes these racial percentages not as passive observations, but as operational goals to be achieved on a specific timeline. The DEIA Plan further notes that "The above targets are our current 5-year targets. They are not final targets."

70. To achieve these racial targets, the DEIA Plan directs the Allen School to "[revise] rubrics and training materials for undergraduate current UW admission and transfer admission pathways."

71. The DEIA Plan arbitrarily selects the demographics of the general UW-Seattle campus as the benchmark for the Computer Science department, requiring the Allen School to match or exceed the "UW-Seattle average" of 15% for the specified racial groups. This requirement applies regardless of the distinct applicant pool for Computer Science compared to the university at large.

72. Because achieving these specific racial targets is statistically implausible using strictly race-neutral academic metrics (given the applicant pool disparities detailed in Section IV.H), the 'anti-bias' training necessarily redefines 'bias' as the failure to select a sufficient number of preferred minorities. Thus, the training serves as the operational mechanism to instruct staff on which specific racial preferences must be applied to bridge the gap between meritocratic outcomes and the racial targets.

73. At the time the Allen School adopted these race-based targets in 2021, the University was subject to Washington Initiative 200 (I-200), which prohibits granting preferential treatment to any individual or group on the basis of race. The Allen School adopted and implemented these numerical racial targets and the associated procedural changes despite the existence of I-200.

74. Defendant Tadayoshi Kohno and Defendant Chloe Dolese Mandeville co-led the development of the DEIA Plan in 2020. Following the adoption and

implementation of this Plan—and its race-based enrollment targets—Defendant

Kohno was promoted to Associate Dean of the College of Engineering.

Defendant Dolese Mandeville received the 2023 UW Distinguished Staff Award.

Notably, Defendant Kohno spoke about this Plan with pride.

**F.2. Broadening Participation in Computing Plan**

75. Effective from December 15, 2021, to December 15, 2023, the Allen School also

operate under an official *Departmental Broadening Participation in Computing*

("BPC") Plan. The BPC Plan established specific numerical targets for racial

enrollment, including directives to:

- "Increase the percentage of domestic BHN [Black, Hispanic, Native]

  undergraduates to the UW-Seattle average"; and

- "Increase the percentage of domestic BHN Ph.D. students by 10 percentage

  points" over five years.

To achieve these targets, the BPC Plan authorized recruitment and outreach

initiatives specifically focused on the "BHN" demographic, including targeted

K–12 outreach, summer camps, and partnerships with identity-based

organizations.

**F.3. Public Denial**

76. Defendant Magdalena Balazinska stated in a letter to the Asian American

Coalition for Education (AACE) that "The University of Washington (and thus the

Allen School) does not use race as a factor in admission decisions." This

statement directly contradicts the DEIA Plan and the BPC Plan, which explicitly set racial enrollment targets.

77. As of August 5, 2025, the DEIA Plan (https://www.cs.washington.edu/who-we-are/diversity-equity-inclusion-access/strategic-plan) has been removed from the University website.

**F.4. Allen School's Transfer Admissions Rubric**

78. The Allen School's focus on racial identity extended to other evaluation criteria. The Allen School's Transfer Admissions Rubric for Spring and Fall 2023 solicited applicants to "Tell us about … your identities… This could include but not limited to: race, ethnicity…" The rubric directed evaluators to assign higher scores to applicants who "clearly [demonstrated] how they will contribute to the diversity of the Allen School community."

**F.5. Defendants' Systematic Discriminatory Policies**

79. The Allen School's race-conscious decision-making is not an outlier at UW; rather, it is a manifestation of a University-wide policy. This discriminatory framework is operationalized systematically at every level of the institution, from central administration down to individual colleges and departments.

80. The University's Board of Regents maintains Regent Policy No. 32, which governs undergraduate admissions. The policy directs the University to pursue affirmative action and "a diverse student body, with representatives from all cultural backgrounds" as objectives of its undergraduate admissions process.

1    This policy remains active and unamended despite the passage of Initiative 200

2    and the Supreme Court's decision in *SFFA*.

3    81. The University centrally coordinates its diversity initiatives through the Diversity

4        Blueprint 2022–2026. This document functions as a governing mandate for all

5        University units. The Blueprint explicitly states that the University "must increase"

6        the population of students and faculty from specific racial groups—namely

7        "Indigenous, Black, and People of Color." To achieve this, the Blueprint imposes

8        an "accountability" regime, requiring "leaders at all levels" to implement "new

9        initiatives to achieve these goals."

10   82. The University's 2014 Diversity Blueprint defined "diversity" to include "groups or

11       individuals with differences [in] culture or background, including, but not limited

12       to, race..." A current University website expanded this definition to "groups or

13       individuals from historically underrepresented and underserved populations with

14       different culture or background, including but not limited to, race, …" UW's

15       Department of Global Health explicitly defined diversity to target "traditionally

16       underrepresented groups (e.g. based on race, ethnicity, ...)." UW Information

17       School's Diversity webpage defines equity as "the ongoing practice of identifying

18       and dismantling barriers to ensure fair treatment, access, opportunity, and

19       **outcomes** for all, especially those historically marginalized." (Emphasis added.)

20   83. The College of Engineering's official strategic plan designates DEI as "central to

21       our mission." It sets a goal to "establish ARSR (attract, recruit, **select** and retain)

22       goals... for underrepresented groups." For the 2022–2023 academic year, the

23       College committed to establishing "recruitment, **admissions** and hiring goals."

For 2023–2024, it directed units to "identify and implement best practices for achieving recruitment, **admissions** and hiring goals." (Emphasis added.)

84. The School of Medicine's "Commitment to Diversity" statement declares that the goal of admissions is to "select a regionally representative, inclusive student body… with diverse identities." It explicitly lists "[r]acial or ethnic communities underrepresented in medicine (URiM)" as a background that furthers academic objectives.

85. Policy 1.3 of the School of Medicine's MD Program Policies Handbook declares a "critical need" to increase the number of students from "historically excluded populations currently underrepresented in medicine and the health professions."

86. The Department of Comparative History of Ideas (CHID)'s policy declares that teaching and research must be guided by a commitment to address structures that marginalize "racial... identities." The policy values differences in "ability" and "race".

87. The Department of Anthropology's "Diversity Mission Statement" declares an objective to "collectively reflect the diversity of our society" and specifically targets "US minorities historically underrepresented" for "recruitment, retention and promotion."

88. The Department of History's "Diversity Statement" formally declares that its diversity initiative is a "long-term project that should inform and transform everything we do." Crucially, this transformation is operationalized through a

1  specific mandate to "attract and retain different populations" within its faculty and

2  student body.

3  89. The Department of Sociology defines its core values as a mandate to "redress

4  the exclusion of historically underrepresented groups" and commits to recruiting

5  members from these communities to "redress" this legacy.

6  90. In January 2025, the UW Bothell School of Interdisciplinary Arts & Sciences

7  website states that "[w]e see diversity … includes, but is not limited to, race," and

8  further declared that "[w]e seek to redistribute opportunities and resources to

9  foster equity and social justice." Its diversity plan aims to "increase representation

10  of (1) populations under-represented within academia" while "mirroring the

11  shifting demographics of our region." As of December 14, 2025, this language

12  has been removed from the UW website.

13  91. On March 14, 2025, the U.S. Department of Education's Office for Civil Rights

14  (OCR) announced an enforcement initiative regarding "race-exclusionary

15  practices." The University of Washington is listed as a subject of investigation

16  under this initiative.

17 **G. Additional Institutional Practices Illustrating Admissions Framework**

18  **G.1. Race-based Graduate Admissions and Scholarships**

19  92. In April 2024, UW Professor Cliff Mass reported that graduate admissions

20  matrices in certain departments now include a "DEI flag" while dropping objective

21  measures such as the SAT and GRE exams. This flag is used to enhance the

visibility of applicants based on their identity, heavily weighting the system to favor diversity over objective metrics.

93. The Department of Computer Science maintains an "opt-in email list for undergraduates to share opportunities and resources available to those who identify with groups that are underrepresented in computing."

94. In 2021, in response to SB 5228, the UW Medical School established the Incentive Scholarships program. In 2023, 100% of the recipients of these scholarships identified as "Underrepresented in Medicine" (URiM), indicating that the University is utilizing race and identity as a primary qualification for financial aid eligibility.

**G.2. Faculty Hiring Policies Relevant to Institutional Admissions Culture**

95. **Nexus Between Hiring and Admissions:** Plaintiffs acknowledge that faculty employment is governed by distinct legal standards (e.g., Title VII) compared to undergraduate admissions. Crucially, unlike in higher education where the Supreme Court previously tolerated a temporary exception for race-conscious admissions, the Court has never carved out an exception for race-conscious hiring. Thus, the University's willingness to violate the even stricter prohibitions in the employment context—where no "diversity" defense has ever existed—demonstrates an unchecked institutional commitment to racial engineering that Plaintiffs allege permeates its admissions office as well.

96. Defendants operationalize racial preferences through financial coercion. The "Provost's Faculty Recruitment Initiative" offers "supplemental funds" to

1    departments specifically to incentivize hires that "enhance the unit's diversity

2    profile," effectively placing a financial bounty on race-based hiring decisions.

3    97. In 2020-21, UW's Psychology Department produced a report titled *Promising*

4    *Practices for Increasing Equity in Faculty Searches*, funded by Dean Daniel

5    Pollack. The report detailed how the department achieved a 100% "BIPOC"

6    hiring rate by prioritizing "Black... or Latinx" candidates. It explicitly recommended

7    "working backwards" from pre-selected URM candidates to tailor job

8    descriptions, as directed by Associate Vice Provost Chadwick Allen, and

9    assigning staff to track why URM candidates were dropped at each stage.

10    98. In 2023, the Psychology Department hiring committee initially ranked a White

11    candidate first and an Asian candidate second, but subsequently re-ranked the

12    finalists to prioritize a Black candidate. A subsequent investigation by UW's

13    Complaint Investigation and Resolution Office (CIRO) concluded that "race was

14    used as a substantial factor in the selection of the final candidate." The incident

15    only came to light due to a public records request.

16    99. Internal emails revealed a clear "consciousness of guilt." One faculty member

17    advised "deleting the statement... as it shows that URM applications were singled

18    out and evaluated differently". Another suggested the committee "preemptively

19    think our way around" legal risks.

20    100.    In a subsequent meeting attended by several Deans, Psychology Professor

21    Ione Fine alleged that the re-ranking was explicitly encouraged by Associate Vice

22    Provost Chadwick Allen. Professor Fine stated: "There has been a pattern, a

23    long-standing pattern, of illegal hiring in this university that was tacitly

24    encouraged across the upper and central administration." Professor Fine

accused Mr. Allen of "bullying junior faculty members" into reranking the candidates. She alleged that Dean Daniel Pollack "explicitly told [faculty] not to document race-based deliberations in writing." She further alleged that Dean Harris manipulated the CIRO investigation to scapegoat the department and "to hide the involvement of upper administration … at the highest levels, including the Board of Regents", by narrowing the CIRO investigation's scope to exclude Associate Vice Provost Allen's emails. Allen refused to answer questions when he was interviewed for the investigation.

101.   Despite the discontinuation of mandatory diversity statements at peer institutions, the University of Washington continues to require them (e.g. Department of Statistics job opening, September 2025). These statements function as an ideological screening tool, allowing the University to proxy for race during the vetting process.

102.   Professor Cliff Mass shared in his blog, "My department is going through a faculty search right now, and the attestations of fealty to DEI principles by applicants were fulsome and exaggerated. The search committee structure ensures that only 'right-thinking' applicants have a chance."

## H. Statistical Disparities Indicating Suppression of Asian American Enrollment

103.   According to the 2020 U.S. Census, Washington's Asian population grew by 51.9% between 2010 and 2020, making it the fastest-growing ethnic group in the state. Asian American Pacific Islander Vote (AAPIV) estimated that the AAPI voter pool in Washington grew by 54% during the same period, compared to a 16% change for the statewide eligible voting population.

104.    Despite this demographic shift, Asian enrollment at the University of Washington has declined in relative terms. In 2013, UW's freshman class included 1,794 Asian American students, comprising 28.7% of the class. By 2024, Asians accounted for only 23% of UW's total enrollment.

105.    Data from the Washington Education Research & Data Center (ERDC) and national SAT trends reveals a substantial disparity between the pool of high-scoring applicants and UW enrollment. Based on 2018 ERDC data and national SAT performance distributions, Asian students comprise approximately 8.42% of Washington's K-12 population but account for a disproportionate share of top test scorers. Nationally, 25% of Asian SAT takers score in the top range between 1400–1600, compared to 6% of White students, 2% of Hispanic students, and 1% of Black students. Applying these national rates to Washington demographics, Asian top scorers represent approximately 2.11% (25%*8.42%) of all the SAT takers in Washington. White top scorers represent 3.57%, Hispanic top scorers 0.51%, and Black top scorers 0.05%. However, Asian, Hispanic and Black enrollments at UW are 23%, 10% and 5%, respectively, suggesting Asian enrollment is suppressed relative to their representation among the top scorers.

106.    In 2021, the University eliminated SAT/ACT requirements. While initially attributed to the COVID-19 pandemic, the University has maintained this policy indefinitely. This removal of objective standardized metrics prevents public analysis of score disparities between admitted racial groups.

107.    The University does not publish admissions data disaggregated by race, nor does it release SAT score ranges or acceptance rates by racial group—a

significant departure from accepted transparency norms. The University's 2024 entering class profile omitted Asian enrollment statistics entirely.

108.    The University does not disclose the number of National Merit Scholarship finalists among its admitted students, concealing whether similarly qualified applicants are being admitted on a consistent basis across racial lines.

109.    The divergence between the rapidly growing, high-achieving Asian American applicant pool and the declining Asian American enrollment share at UW raises a strong inference of artificial suppression. As the Supreme Court noted in *Reno v. Bossier Parish School Board*, the natural consequences of an action often provide probative evidence of intent. The sustained adverse impact on Asian American applicants suggests that the "holistic" admissions process is functioning as a mechanism to cap Asian enrollment, just as the admissions data in *SFFA v. Harvard* revealed.

110.    Plaintiffs have secured the support of expert witnesses for Students for Fair Admissions, who have agreed to conduct a rigorous statistical analysis of UW's admissions practices once the admissions data is obtained through discovery.

## I. "Holistic Review" as a Pretext for Race-Based Balancing

111.    Following the Supreme Court's decision in *SFFA*, many peer institutions saw a surge in Asian American enrollment as merit-based criteria replaced racial balancing. The University of Washington, however, has maintained its racial enrollment targets by hiding behind the label of "holistic review." While the term

implies a thorough, individualized assessment, the operational reality of UW's admissions process makes such a review highly implausible.

112.    The University requires its application readers to review approximately 8–10 applications per hour. This allows for only six to seven minutes per applicant. In this brief window, a reader must evaluate transcripts, extracurricular activities, essays, and recommendations—a file often exceeding 3,000 words.

113.    To process this volume of information in six minutes would require reading speeds approaching 500 words per minute—double the average for a college graduate—while simultaneously synthesizing complex qualitative data. Across an applicant pool of 69,177 (Fall 2024), this breakneck pace necessitates the use of heuristics and shortcuts. In the absence of objective metrics, these shortcuts create a heightened risk of relying on racial proxies and stereotypes.

114.    This cursory review stands in stark contrast to the hiring practices of major employers in the region, such as Google, which invest ten or more hours per candidate to assess merit. That is about 100 times more than UW. UW's process claims to be "holistic" but lacks the time allocation required to be anything other than superficial.

115.    In 2021, the University abolished its SAT/ACT requirement, citing the COVID-19 pandemic. While peer institutions including MIT, Dartmouth, Yale, Brown, Harvard, Caltech, Cornell, and the University of Texas at Austin have since reinstated standardized testing to ensure academic preparedness and fairness, UW has refused to do so.

116.    The continued suspension of standardized testing serves to eliminate the most objective, verifiable data point in an admissions file. Without test scores, there is no objective anchor to counter-balance subjective bias or to expose disparities in academic standards between racial groups. This policy allows the University to reject high-achieving Asian American applicants without creating a statistical paper trail of "high-score rejections."

117.    Tellingly, "holistic review" is a legal term of art long used by universities openly engaged in race conscious admissions. The use of subjective "holistic" criteria to mask anti-Asian bias is a documented historical practice. As revealed in *SFFA*, and corroborating statements from former admissions officers at peer institutions, vague criteria like "personality" or "fit" have routinely been used to dismiss Asian American applicants with derogatory stereotypes such as "textureless math grind." By removing test scores and relying entirely on a six-minute subjective review, UW has optimized its system to facilitate exactly this kind of unverifiable discrimination.

118.    When Stanley Zhong applied for the Fall 2023 term, this "test-optional," high-speed review system was in full effect. His application—stripped of the standardized test scores that objectively demonstrated his superiority to the average admit—was subjected to a rapid, subjective assessment. This process allowed admissions officers to bypass his objective merit and reject him based on unverifiable "holistic" factors, consistent with the University's broader goal of racial engineering.

## J. Elements of *Prima Facie* Discrimination Under *McDonnell Douglas*

119.    The facts surrounding Stanley Zhong's rejection establish a *prima facie* case of racial discrimination under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and reaffirmed in *Ames v. Ohio Dep't of Youth Services,* 605 U.S. ___ (2025). Stanley satisfies all four elements required to shift the burden to the University to explain its decision.

120.    **Protected Class (Element 1)**: Stanley is a member of a protected class (Asian American).

121.    **Qualified for Admission (Element 2)**: Stanley applied for admission to the University's Computer Science and Human Centered Design and Engineering programs for the Fall 2023 cycle. He was objectively highly qualified for admission. His academic credentials, including a 3.97 unweighted GPA (4.42 weighted), a 1590 SAT score, the status as a National Merit Scholarship Finalist, numerous national and global coding competition awards, and the highest level of Presidential Volunteer Service Award, placed him in the highest tier of the applicant pool. His technical achievements—including creating a free e-signing service praised by experts, and securing employment as a full-time Ph.D.-level software engineer at Google at age 18—exceeded the standard qualifications for undergraduate admission.

122.    **Adverse Action (Element 3)**: Despite these objectively superior qualifications, the University rejected Stanley's undergraduate application.

123.    **Comparator Evidence (Element 4)**: Similarly situated individuals outside of Stanley's protected class received more favorable treatment. For the Fall 2023 enrollment cycle, the University's Computer Science program admitted 569 Washington residents and 83 domestic non-residents. On information and belief, Defendants admitted non-Asian applicants with academic and technical credentials substantially inferior to Stanley's, consistent with the statistical disparities detailed in Section IV.H.

**K. Defendants' Deliberate Indifference to Plaintiffs' Constitutional Rights**

124.    On January 26, 2025, Plaintiff Nan Zhong sent an email to the Regents of the University of Washington and President Cauce formally notifying them of the irregularities in Stanley's rejection. As of the filing of this Complaint, they have failed to respond or acknowledge this correspondence.

125.    The application materials Stanley submitted to the University of Washington contained a similar technical portfolio that was subsequently reviewed by Google.

126.    The contrast in assessment is absolute. Google reviewed these technical achievements and determined they demonstrated competence equivalent to an L4 Software Engineer—a level requiring a Ph.D. or equivalent practical experience. The University of Washington reviewed the achievements and determined they did not qualify Stanley for undergraduate admission.

127.    Defendants are aware of the strict legal prohibitions against racial discrimination under the Fourteenth Amendment, Title VI, 42 U.S.C. § 1981, and

RCW 49.60.400. Consequently, Defendants have an incentive to conceal the specific mechanics of their race-conscious decision-making.

128.   On information and belief, the specific evidence regarding how racial balancing was operationalized—including internal deliberations, "read sheets," and the precise weight given to racial proxies in the "holistic" review of Stanley's application—is contained in non-public communications and internal documents currently within the exclusive control of the Defendants.

## L. Hostile Climate and Chilling Effect

129.   Asian American students who challenge racial preferences on college campuses face documented social hostility and reputational risk. In the prevailing campus climate, advocacy for race-neutral admissions is frequently characterized as opposition to civil rights or "equity."

130.   Asian American students face a distinctive burden: they are subject to adverse action in the admissions process based on their race, yet are simultaneously discouraged from seeking redress. The institutional messaging across universities, which equates "anti-racism" with the support of race-conscious policies, effectively brands dissenters as "racist."

131.   This environment creates a coercive effect that discourages Asian American applicants and students from asserting their legal rights. It is reasonable to infer that numerous prospective and current students, having been harmed by the University's admissions practices, remain silent due to a legitimate fear of social retaliation, academic professional ostracization, or labeling.

**M. Imminent Injury and Standing of Plaintiff Minor Son**

132.    Plaintiff Minor Son is currently a junior in high school. He anticipates applying to the University of Washington during the Fall in 2026, and has recently received recruiting materials from UW inviting him to apply.

133.    Minor Son possesses objectively superlative academic credentials. In October 2025, he scored in the top one percent of all U.S. test takers on the PSAT without any paid tutoring or test prep, qualifying as a National Merit Scholarship Semifinalist. He maintains a perfect 4.0 unweighted GPA, placing him at the very top of his class.

134.    Minor Son demonstrates the "well-rounded" character ostensibly valued by the University.

135.    A member of the Varsity Cross Country team since freshman year, he won the team MVP award in November 2025 and qualified for the State Championship, ending a seven-year hiatus for his high school at the state level.

136.    He is a national-level Rubik's Cube competitor, capable of solving the cube in 6.25 seconds during official events. He also taught himself to juggle five balls, and performed on stage at the second largest annual juggling festival in North America.

137.    Despite his qualifications, Minor Son faces a concrete and imminent injury. He is aware of the rejection of his brother, Stanley, and the statistical evidence indicating that the University penalizes Asian American applicants. The existence

1    of a discriminatory barrier constitutes an injury-in-fact because it prevents a

2    plaintiff from competing on an equal footing.

3    138.    Minor Son views an application to the University as a "fool's errand" due to his

4    race. The University's conduct has concretely deterred him, creating a risk that

5    he will not apply solely to avoid the humiliation of a race-based rejection. He is

6    further deterred by the hostile campus climate, where Asian American students

7    who oppose racial discrimination are frequently stigmatized.

8    139.    Minor Son is ready and able to apply to the University once the discriminatory

9    barriers are removed.

10    140.    Plaintiff Nan Zhong acknowledges the Ninth Circuit's holding in *Johns v.*

11    *County of San Diego*, 114 F.3d 874 (9th Cir. 1997), regarding the representation

12    of minors by non-attorney parents. However, Plaintiffs submit that the *Johns* rule

13    is intended to protect the rights of the minor, not to extinguish them. Plaintiffs

14    have made diligent efforts to retain counsel for this matter, as they successfully

15    did in parallel litigation against the University of California, the University of

16    Michigan, and Cornell University. Despite these efforts, no attorney has yet been

17    willing or able to take this specific case. To bar Minor Son from seeking redress

18    for an imminent constitutional violation solely due to the unavailability of counsel

19    would result in a profound injustice and deny him the very protection *Johns* seeks

20    to ensure. Plaintiffs continue to actively seek counsel and are proceeding *pro se*

21    to prevent the expiration of claims and the occurrence of imminent and

22    irreparable harm.

**N. Summary of Factual Allegations**

141.  The foregoing facts demonstrate that the University of Washington utilizes race as a factor in its operations across multiple functional areas. This conduct is evidenced by the following specific allegations:

142.  Undergraduate Admissions:

- **Individual Disparities**: The rejection of Plaintiff Stanley Zhong, despite technical qualifications evaluated by Google as equivalent to a Ph.D. level engineer, raises a strong inference that objective merit was subordinated to other factors.
- **Statistical Anomalies**: The Asian American population in Washington grew by over 50% between 2010 and 2020, yet Asian American enrollment at UW declined from 28.7% (2013) to 23% (2024).
- **Score Disparities**: 25% Asian American SAT takers score in the top-tier (1400–1600), yet their enrollment numbers at UW do not reflect this demographic concentration of academic merit.

143.  Graduate Admissions:

- **Use of "DEI Flags"**: As reported by Professor Cliff Mass, graduate admissions matrices in certain departments utilize "DEI flags" to weight applicants based on identity.
- **Restricted Scholarships**: The School of Medicine's "Incentive Scholarships" were awarded exclusively (100%) to students identifying as "Underrepresented in Medicine" in 2023.

144.    Faculty Hiring:

- **Re-Ranking Candidates**: The Psychology Department explicitly re-ranked finalists to prioritize a Black candidate over a higher-ranked White candidate and Asian candidate.
- **Concealment of Intent**: Internal emails revealed faculty members advising the deletion of records to hide that URM applications were singled out and evaluated differently.
- **Coverup**: Whistleblower reports also exposed involvement and coverup by senior administrators.
- **Ideological Screening**: The University continues to require "Diversity Statements" for faculty positions, using them as a screening tool for racial and ideological alignment.

145.    Administrative Intent:

- **Public Statements**: Senior administrators, including President Ana Mari Cauce, have publicly expressed "disappointment" with legal rulings prohibiting racial preferences and have advocated for the repeal of Initiative 200.
- **Data Suppression**: The University has eliminated standardized testing requirements and refuses to release admissions data disaggregated by race, preventing public scrutiny of the disparities detailed above.

146.    Plaintiffs allege that the admissions policies challenged herein are part of a broader institutional framework. Plaintiffs do not seek adjudication of all such

1    practices at this stage and reserve the right to seek leave to amend following

2    discovery.

## V. CLAIMS FOR RELIEF

**COUNT I Violation of the Equal Protection Clause of the Fourteenth Amendment (42 U.S.C. § 1983) (Against All Individual Defendants in their Official and Personal Capacities)**

147.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

148.    The equal protection clause of the Fourteenth Amendment prohibits state actors from denying individuals equal protection of the laws, including through the use of race as a motivating factor in government decision-making.

149.    Defendants, acting under color of state law as officers and administrators of the University of Washington, have deprived Plaintiffs of rights, privileges, and immunities secured by the Constitution.

150.    Defendants' policy of engineering the student body to match the demographics of the "UW-Seattle average" or the "state population" constitutes racial balancing. Any government classification based on race is subject to strict scrutiny. To survive, the classification must be narrowly tailored to achieve a compelling governmental interest. The Supreme Court held that "racial balancing" and "diversity" are not compelling governmental interests.

151.    Defendants failed to consider race-neutral alternatives and instead actively removed race-neutral metrics (SAT/ACT) to increase reliance on subjective,

1    race-conscious discretion. Defendants' use of race is not limited in time, but is

2    entrenched in "five-year plans" and administrative mandates that seek

3    permanent demographic parity.

4    152.    As detailed in the Factual Allegations, Defendants acted with discriminatory

5    intent under the *Arlington Heights* framework:

6        a. **Impact:** The policy bears more heavily on Asian Americans (declining

7           enrollment despite growing population).

8        b. **Historical Background:** Defendants have a documented history of

9           hostility toward race-neutral laws (I-200) and have explicitly sought to use

10          racial preferences.

11       c. **Departures from Procedure:** Defendants manipulated established

12          procedures, such as the removal of SAT requirements and the "re-ranking"

13          of faculty candidates, to achieve racial results.

14       d. **Legislative/Administrative History:** Public statements by University

15          leadership express disappointment with race-neutral outcomes and a

16          commitment to racial engineering.

17   153.    As detailed in the Factual Allegations, Defendants treated Stanley less

18   favorably than similarly situated individuals outside the protected class.

19   154.    As a direct and proximate result of Defendants' unconstitutional conduct,

20   Plaintiffs have suffered and continue to suffer injury, including the denial of

21   admission, the denial of the opportunity to compete on an equal footing, and the

22   violation of their constitutional rights.

155.    Plaintiffs are entitled to a declaratory judgment and a permanent injunction
because there is no plain, adequate, or speedy remedy at law to prevent
Defendants from continuing to use admissions policies and practices that
discriminate on the basis of race or ethnicity in violation of the Fourteenth
Amendment, and because the harm Plaintiffs will otherwise continue to suffer is
irreparable.

156.    Defendants acted with reckless or callous indifference to Plaintiffs' rights
under the Equal Protection Clause. Accordingly, Plaintiffs seek punitive damages
against the Individual Defendants to deter such unconstitutional conduct.

157.    Defendants are not entitled to qualified immunity because their conduct
violated clearly established constitutional rights of which a reasonable official
would have known. Specifically, the prohibition against using rigid racial quotas
(such as the "15%" targets alleged herein) or mechanical racial balancing was
clearly established by Supreme Court precedent long before the *SFFA* decision
(see *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978); *Gratz v. Bollinger*,
539 U.S. 244 (2003)). Furthermore, Defendants' deliberate efforts to conceal
their conduct—including the deletion of the quoted "DEIA Plan" from the UW
website and the instruction to "delete the statement" regarding racial
re-ranking—demonstrate a subjective consciousness of guilt that precludes any
claim of "reasonable mistake."

158.    Plaintiffs seek this relief under 42 U.S.C. § 1983 and any other law that might
supply a cause of action for the requested relief, including the Declaratory

Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908).

**COUNT II Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*.) (Against Defendant University of Washington and its Regents as its Governing Body)**

159.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

160.    Title VI of the Civil Rights Act of 1964 prohibits any program or activity receiving federal financial assistance from subjecting individuals to discrimination on the basis of race.

161.    Defendant University of Washington is a recipient of federal financial assistance within the meaning of Title VI and is therefore prohibited from discriminating on the basis of race.

162.    The standard for a violation of Title VI is coextensive with the Equal Protection Clause of the Fourteenth Amendment. Because Defendants' conduct violates the Equal Protection Clause (as set forth in Count I), it constitutes a per se violation of Title VI.

163.    Defendants have engaged in a pattern and practice of intentional discrimination against Asian American applicants in undergraduate admissions, graduate admissions, and hiring. This discrimination is systemic, knowing, and ratified by the highest levels of the University administration.

164.    Plaintiffs have been and will continue to be injured or face imminent harm by Defendants' ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

165.    Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendants from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964, and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

## COUNT III Violation of 42 U.S.C. § 1981 (Race Discrimination in Contracting) (Against All Defendants)

166.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

167.    42 U.S.C. § 1981(a) guarantees that all persons within the jurisdiction of the United States shall have the same right "to make and enforce contracts... as is enjoyed by white citizens."

168.    42 U.S.C. § 1981(a) protects whites (and Asians) on the same terms that it protects "underrepresented" racial minorities. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295 (1976) ("[T]he Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.").

169.    The relationship between a university and an applicant is contractual in nature. Plaintiffs paid an application fee and submitted materials in exchange for the University's promise to evaluate said application fairly and in accordance with its stated policies and the law.

170.    Defendants intentionally impaired Plaintiffs' right to make and enforce this contract on the basis of race. By subjecting Asian American applicants to higher standards, and race-based "holistic" scrutiny, Defendants prevented Plaintiffs from entering into the contractual relationship of enrollment on the same terms as similarly situated non-Asian applicants.

171.    This discrimination was intentional, purposeful, and motivated by racial animus or a desire to engineer a specific racial balance, in violation of § 1981.

172.    As a result of Defendants' discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, financial loss, and reputational damage.

173.    Plaintiffs have been and will continue to be injured or face imminent harm by Defendants' ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

174.    Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendants from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of 42 U.S.C. § 1981, and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

175.    Defendants acted with reckless or callous indifference to Plaintiffs' rights under the Equal Protection Clause. Accordingly, Plaintiffs seek punitive damages against the Individual Defendants to deter such unconstitutional conduct.

176.    The right to be free from intentional racial discrimination in contracting is a clearly established right protected by 42 U.S.C. § 1981. At the time of the events in question, no reasonable official could have believed that imposing racial targets or using "holistic" review as a pretext to cap Asian American enrollment was lawful. The existence of Washington State Initiative 200 (RCW 49.60.400), which has prohibited such preferences for over 25 years, further serves as notice to Defendants that their conduct was prohibited, rendering any claim of "good faith" objectively unreasonable.

177.    Plaintiffs seek this relief under 42 U.S.C. § 1983, as well as the implied right of action that the Supreme Court has recognized to enforce 42 U.S.C. § 1981(a), and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908). *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975) and *Runyon v. McCrary*, 427 U.S. 160 (1976).

178.    The text of 42 U.S.C. § 1981(a) makes no exceptions for "compelling state interests," "student-body diversity," or race-based affirmative-action programs. It prohibits all forms of racial discrimination in contracting—regardless of whether that racial discrimination is independently prohibited by the Equal Protection Clause.

**COUNT IV Violation of the Washington State Civil Rights Act (RCW 49.60.400 / Initiative 200) (Against All Defendants)**

179.    Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

180.    RCW 49.60.400 (enacted as Initiative 200) provides: "The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."

181.    This statute provides broader protection than federal law by explicitly prohibiting "preferential treatment" regardless of any purported "compelling interest" in diversity.

182.    Defendants' own public statements and internal materials confirm that race continues to play a determinative role in its operations. Defendants have resisted race-neutral alternatives and have openly declared opposition to I-200.

183.    Defendants have violated RCW 49.60.400 by:

   a.    Establishing numerical enrollment targets (e.g., "at least 15%") for specific racial groups.

   b.    Granting preferential treatment to underrepresented minority applicants in the "holistic" review process to achieve these targets.

   c.    Discriminating against Asian American applicants by capping their enrollment relative to their qualifications. Establishing scholarship programs (Incentive Scholarships) that are exclusive to "Underrepresented in Medicine" groups.

184. These actions constitute a knowing and willful violation of state law.

185. Plaintiffs have been and will continue to be injured or face imminent harm by Defendants' ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

186. Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendant UW from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of RCW 49.60.400, and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant the following relief:

A. **Declaratory Judgment:** A declaration that the Defendants' admissions policies and practices—including the use of "holistic review" as a pretext for racial balancing, the use of racial enrollment targets, and the "test-optional" policy as a shield for discrimination—violate the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act, 42 U.S.C. § 1981, and RCW 49.60.400.

B. **Permanent Injunction:** An order permanently enjoining Defendants, their officers, agents, associates, employees, and all persons in active concert or participation with them from: 1. Considering or using race as a factor in student admissions; 2. Using "holistic review" processes that fail to maintain objective, verifiable records of

evaluation; 3. Collecting data on the race or ethnicity of applicants prior to the

finalization of admission decisions; and 4. Pursuing or enforcing racial targets.

C. **Specific Performance / Injunctive Relief for Plaintiffs:** 1. An order directing

Defendants to re-evaluate the application of Stanley Zhong under a strictly race-neutral

standard, free from the discriminatory procedures identified herein. 2. An order

prohibiting Defendants from discriminating against Plaintiff Minor Son in future

admissions cycles.

D. **Discovery & Data Disclosure:** An order compelling Defendants to produce all

internal admissions data, including "read sheets," internal correspondence regarding

racial targets, and SAT/ACT scores of admitted students disaggregated by race, to

allow for a full accounting of the discrimination.

E**. Nominal Damages:** An award of nominal damages for the violation of Plaintiffs'

constitutional and statutory rights.

F. **Compensatory Damages:** An award of compensatory damages to Plaintiffs for the

denial of their constitutional rights, emotional distress, and lost educational and

professional opportunities, in an amount to be determined at trial.

G. **Punitive Damages:** An award of punitive damages against the Individual

Defendants in their individual capacities for their callous, reckless, and willful

indifference to Plaintiffs' federally protected rights, in an amount to be determined at

trial.

H. **Attorneys' Fees and Costs:** An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and RCW 49.60.030(2).

I. **Other Relief:** Such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED** Plaintiffs hereby demand a trial by jury on all issues so triable.

---

I declare under penalty of perjury that the allegations in the complaint are true.

Respectfully submitted,

/s/ Stanley Zhong

Stanley Zhong (Pro Se)

211 Hope St #390755

Mountain View, CA 94039

/s/ Nan Zhong

Nan Zhong (Pro Se)

211 Hope St #390755

Mountain View, CA 94039

nanzhong1@gmail.com

**Dated:** December 19, 2025