The Honorable James L. Robart

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

**Stanley Zhong; Nan Zhong,** individually and as next friend of his **Minor Son,**

    Plaintiffs, Pro Se

    v.

**The Regents of the University of Washington; et al.,**

    Defendants.

Case No. 2:25-cv-00348-JLR

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REQUEST FOR JUDICIAL NOTICE**

Noting Date: May 6, 2026 (per Dkt. 41)

# TABLE OF CONTENTS

I. INTRODUCTION................................................................................................ 1

    A. The SAC Plausibly Alleges Intentional Discrimination.......................................... 1

    B. Defendants' MTD Rests on Multiple Serious Legal Errors..................................... 1

    C. Defendants' RJN Is Overbroad................................................................... 2

II. LEGAL STANDARD............................................................................................ 2

III. ARGUMENT................................................................................................... 3

    A. The SAC Plausibly Alleges Intentional Discrimination.......................................... 3

        1. Defendants improperly demand proof rather than plausibility.......................... 3

        2. The SAC alleges concrete, operational facts, not mere policy disagreement........... 4

        3. Defendants cannot neutralize a racial target by calling it "aspirational"............... 5

        4. "Holistic review" is a proven mechanism for proxy discrimination..................... 5

        5. Selectivity does not defeat discrimination.............................................. 6

        6. UW's 50.2% statistic does not establish the absence of discrimination................. 7

        7. Defendants cannot evade strict scrutiny by declaring racial targets "out of context"...10

        8. The SAC plausibly alleges systemwide discrimination.................................. 11

        9. The SAC plausibly alleges concealment and lack of transparency..................... 11

    B. Additional Legal Errors in Defendants' MTD................................................. 12

        1. Defendants misapplied Arlington Heights.............................................. 12

        2. Defendants misapplied McDonnell Douglas............................................ 14

        3. Defendants' reliance on third-party rejections is logically self-defeating............. 14

        4. Defendants' MTD relies on inapposite and procedurally mismatched authority......... 15

    C. The Court Should Deny or Strictly Limit Defendants' Request for Judicial Notice........... 16

        1. Limits of Judicial Notice and Incorporation by Reference............................. 16

        2. UW Public Materials.................................................................... 17

        3. Third-Party Materials................................................................... 18

        4. Proper Scope of Notice.................................................................. 18

    D. Standing and Representation Issues Do Not Justify Dismissal................................ 19

        1. Stanley has standing..................................................................... 19

        2. Nan has standing........................................................................ 19

        3. Minor Son's alleged injury is imminent, and Johns does not warrant dismissal......... 19

        4. Plaintiffs do not seek injunctive relief "on behalf of" third parties................. 20

    E. The Court Need Not Resolve the Full Scope of Prospective Relief Now....................... 21

    F. Defendants Are Not Immune from Suit........................................................ 21

        1. Defendants' immunity arguments are overbroad and do not warrant dismissal......... 21

        2. Qualified immunity does not apply...................................................... 22

    G. The RCW 49.60.400 Claim Also Survives...................................................... 23

IV. CONCLUSION................................................................................................ 24

## I. INTRODUCTION

Defendants' Motion to Dismiss ("MTD," Dkt. 43) rests on multiple serious legal errors. Most critically, it asks the Court to do what Rule 12 forbids: draw disputed factual inferences in Defendants' favor based on Defendants' own materials, while faulting Plaintiffs for not pleading internal information about admissions  that remains solely within Defendants' possession.

### A. The SAC Plausibly Alleges Intentional Discrimination

Stanley Zhong applied to UW Seattle for Fall 2023. His first-choice major was Computer Science in the Allen School, and his second-choice major was Human Centered Design and Engineering. The SAC alleges that he was extraordinarily qualified yet rejected under an admissions regime that burdened Asian-American applicants through "holistic" review and racial balancing objectives. It alleges, among other things, an "at least 15%" racial target, admissions-related rubric revisions, identity-based evaluative criteria, public denials allegedly inconsistent with internal materials, later removal of key documents, more than two decades of institutional resistance to I-200 from UW's highest leadership, omission of Asian enrollment data from UW's public profile in recent years, and that UW's Asian-American enrollment declined since 2013 even as Washington State's Asian-American population grew. Dkt. 39 ¶¶ 35-51, 61-66, 69-72, 75–78, 103-4, 107. Taken together, those allegations readily state a plausible racial discrimination claim.

### B. Defendants' MTD Rests on Multiple Serious Legal Errors

UW's MTD sidesteps the pleaded facts and instead emphasizes that the Allen School is highly selective, with fewer than 2% of non-Washington resident applicants admitted directly to the Allen School in 2023. Dkt. 43 at 1. The motion then argues that the SAC fails because Plaintiffs do not identify exactly how race was considered, do not allege admissions reviewers knew Stanley's race, and do not plead comparator statistics proving racial balancing. *Id*. at 2, 13-22. That framing misstates both the SAC and Rule 12.

Defendants' MTD misapprehends the Rule 12 pleading standard by demanding proof at the pleading stage and attempting to convert Rule 12 into a no-discovery merits determination. It

asks the Court to view the SAC's allegations in isolation rather than as a whole, to accept Defendants' self-serving interpretation of disputed public materials, and to require Plaintiffs to plead internal admissions facts exclusively within Defendants' possession. That is not the pleading standard.

Defendants' MTD advances a legally untenable interpretation of the Equal Protection Clause by implying that aggregate overrepresentation of a racial group forecloses an individual equal protection claim.

Defendants' suggestion that UW's high selectivity acts as a shield against discrimination claims ignores decades of precedents. Some of the most selective institutions in the country have faced constitutional challenges to their admissions practices—including Harvard (*SFFA*), the University of Texas (*Fisher*), the University of Michigan (*Gratz* and *Grutter*), the University of California (*Bakke*), and the University of Washington itself (*DeFunis*).

Defendants' MTD misapplies *Arlington Heights* and *McDonnell Douglas*, is internally inconsistent, and relies extensively on inapposite and procedurally mismatched authority.

Defendants' MTD should be denied.

**C. Defendants' RJN Is Overbroad**

Defendants' Request for Judicial Notice ("RJN") seeks more than judicial notice. Defendants ask the Court not merely to recognize the existence of UW webpages and other public materials, but to treat those materials as true and effectively undisputed for purposes of resolving the MTD. Dkt. 44 at 6–9. That is not a proper use of judicial notice or incorporation by reference. At most, the Court may note that UW made certain public statements; it may not accept those statements as conclusive proof of disputed facts or draw inferences from them against Plaintiffs at the pleading stage.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only allege facts sufficient to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At

this stage, the Court accepts well-pleaded factual allegations as true and draws reasonable inferences in Plaintiffs' favor. *Id.* Rule 12(b)(6) tests plausibility, not proof.

Judicial notice and incorporation by reference are narrow doctrines. In appropriate circumstances, they may permit a court to consider the existence of public records or the contents of documents referenced in the complaint. But they do not permit a defendant to use materials outside the pleadings to smuggle in contested factual assertions or to resolve disputed inferences in its favor at the pleading stage. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–1003 (9th Cir. 2018).

## III. ARGUMENT

### A. The SAC Plausibly Alleges Intentional Discrimination

### 1. Defendants improperly demand proof rather than plausibility

Defendants' MTD reflects a fundamental misunderstanding of Rule 12. It repeatedly faults the SAC for failing to "prove" Plaintiffs' claims at the pleading stage. Defendants argue, for example, that Plaintiffs' allegations do not "prove" a secret conspiracy to consider race in admissions decisions, Dkt. 43 at 20; that Plaintiffs cite statistics "in an effort to prove" discrimination, *id.* at 8; and that Plaintiffs treat administrators' statements as "proof" of an unlawful scheme, *id.* at 2.

But Rule 12 does not require proof. At the Rule 12 stage, Plaintiffs need not identify the precise internal mechanism by which discrimination allegedly occurred before discovery; they need only allege facts that, taken together, plausibly support an inference of purposeful discrimination. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510–12 (2002); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977).

This is not a case in which Plaintiffs offer only labels or conclusions. The SAC alleges concrete facts from which discriminatory purpose may be inferred, including an alleged 15% racial target, identity-based scoring criteria, public denials inconsistent with pleaded internal

materials, and selective omissions or removals of public information. The SAC also alleges more than two decades of institutional statements and conduct reflecting dissatisfaction with I-200's race-neutral mandate, which Plaintiffs allege provide context for later admissions-related racial targets and criteria. Under *Arlington Heights*, those allegations must be assessed together, not dismissed because no single allegation, standing alone, already "proves" the entire case.

UW argues that the SAC fails because Plaintiffs do not identify where in UW's admissions procedures race is considered, do not allege reviewers knew Stanley's race, and do not provide statistics proving racial balancing. Dkt. 43 at 2, 13-22. But that is exactly the sort of concealed internal detail a plaintiff ordinarily cannot access before discovery. It is a merits demand dressed up as pleading doctrine. The SAC expressly alleges that critical details about admissions deliberations, read sheets, and the weight given to racial proxies are nonpublic and within Defendants' exclusive control. Dkt. 39 ¶128. Rule 12 does not require Plaintiffs to plead this information with the specificity of an internal audit before discovery. If a defendant could defeat an equal protection complaint simply by concealing the operative admissions data and then insisting that plaintiffs plead the concealed data before discovery, covert discrimination claims would become functionally impossible to litigate.

**2. The SAC alleges concrete, operational facts, not mere policy disagreement**

Plaintiffs do not rely on abstract diversity rhetoric. Instead, the SAC alleges a concrete sequence of operational facts connecting UW's systemic proxy discrimination to Stanley's rejection. Dkt. 39 ¶¶ 69–70, 75–78, 107. Specifically, contemporaneous to Stanley's application, the Allen School:

- Established an express "at least 15%" racial enrollment target for undergraduates;
- Coordinated revisions to admissions-related rubrics and evaluator training;
- Deployed identity-based prompts explicitly asking applicants to discuss their "identities," including "race" and "ethnicity"; and

- Engaged in institutional concealment, evidenced by Defendant Balazinska's public denials, the subsequent removal of the DEIA Plan, and the omission of Asian enrollment statistics from 2024 public reporting.

Defendants cannot sever this systemic framework from the evaluation of Stanley's individual application. As *SFFA* recognizes, highly selective admissions are a zero-sum process. An institutional mandate to achieve a specific racial outcome for a severely limited number of seats inherently alters how the remaining applicant pool is evaluated. Stanley, an objectively exceptional applicant, was rejected in this exact constrained environment through an opaque, discretionary review process while UW withholds the comparator and deliberative materials needed to test whether race affected the decision.

Plaintiffs plausibly allege that race-conscious objectives were operationalized in the same School, during the same period, and in the same limited-seat undergraduate process that rejected Stanley. Under Rule 12 and *Arlington Heights*, pleading this constellation of numerical racial targets, identity-based prompts, and institutional concealment is more than sufficient to unlock discovery.

**3. Defendants cannot neutralize a racial target by calling it "aspirational"**

Defendants may try to recast the Allen School's alleged "at least 15%" racial target as merely aspirational or nonbinding. Even that does not resolve the issue. A university cannot defeat a pleaded discrimination claim merely by re-labeling a racial benchmark as "aspirational." Otherwise, an institution could adopt a *de facto* numerical racial target, publicly announce a somewhat higher target to preserve plausible deniability, and then evade judicial review by insisting the benchmark was not mandatory. The relevant question is not the label Defendants now prefer, but the function the alleged target served in practice—whether it shaped admissions objectives, evaluative criteria, or outcomes. At minimum, that is a factual issue not properly resolved on a motion to dismiss.

**4. "Holistic review" is a proven mechanism for proxy discrimination**

Defendants repeatedly invoke "holistic review" as though the label itself resolves the case. It does not. Plaintiffs' theory is not that holistic review is unlawful in the abstract, but that UW

used a highly discretionary holistic regime—together with racial targets, identity-based prompts, diversity-linked criteria, and racial proxies—to burden Asian-American applicants while preserving deniability. That is precisely the type of mechanism Plaintiffs allege here. Dkt. 39 ¶¶ 69–72, 75, 78.

*SFFA* confirms the point. Harvard likewise defended its process as "holistic," yet the Supreme Court held that label did not insulate race-conscious admissions practices from strict scrutiny. Plaintiffs allege that UW's subjective review process served the same functional role here. Combined with Stanley's unusually strong objective credentials and his rejection in an opaque, discretionary process, those allegations plausibly support the inference that "holistic review" was the vehicle through which race-conscious objectives were implemented.

Defendants argue that the SAC fails because the Allen School "does not consider race when making admissions decisions." Dkt. 43 at 2. But that is simply UW's merits position, not a basis for dismissal at the pleading stage. Defendants likewise argue that the SAC is deficient because it does not allege that admissions officers "know or knew any applicant's race." That argument is both a strawman and an effort to resolve factual disputes prematurely. UW's application itself asks whether an applicant is "Hispanic or Latino," and Stanley answered no. Moreover, in a "holistic" admissions process, race may be inferred through proxies and discretionary criteria, including applicants' names, parental information, zip codes, high school demographics, extracurricular profiles, and application essays. Finally, even if an evaluator were blind to Stanley's race, actively rewarding applicants of favored demographics who *do* disclose their race inherently penalizes him. In a zero-sum admissions process, preferences granted on the basis of race necessarily disadvantage competing applicants.

**5. Selectivity does not defeat discrimination**

UW emphasizes that the Allen School admitted fewer than 2% of non-Washington resident applicants in 2023. Dkt. 43 at 1. But selectivity does not preclude discrimination. Harvard, too, was highly selective, yet the Supreme Court held in *SFFA* that its admissions program unlawfully discriminated against Asian-American applicants. Indeed, selectivity may facilitate

discrimination: a process that admits every applicant leaves no room for unlawful line-drawing, whereas a highly discretionary one can conceal discriminatory criteria more easily.

UW likewise offers no explanation for why a student who won a National Merit Scholarship, ranked among the top competitors in prestigious global coding contests and whose technical record earned a Google L4 (Ph.D.-level) software engineer offer at age 18—and later an "Outstanding Impact" performance rating—was supposedly not qualified enough for its undergraduate program. In a process with limited seats and broad discretion, selectivity does not defeat discrimination; it can make it harder to detect.

Stanley's unusually strong objective credentials do not resolve the case by themselves, but they make an ordinary, nondiscriminatory rejection less self-explanatory and thus strengthen the plausibility of Plaintiffs' broader allegations about the admissions framework.

Rule 12 does not grant practical immunity to elite institutions merely because they reject most applicants.

**6. UW's 50.2% statistic does not establish the absence of discrimination**

Defendants argue that because 50.2% of admitted Allen School applicants in 2023 were Asian American, discrimination is implausible. Dkt. 43 at 2. That does not follow. Aggregate percentages are meaningless without the proper baseline, which here is the qualified Allen applicant pool, not the general population. UW's reliance on the 50.2% figure appears to assume an unstated demographic baseline. But that premise is itself flawed: Asian Americans' share of the general population has no proper role in determining whether UW's admissions process was lawful. If Defendants mean to suggest that 50.2% disproves discrimination because it exceeds some demographic benchmark, they implicitly rely on a racial-proportionality logic the Equal Protection Clause does not tolerate.

Nor does the admission of some Asian-American applicants foreclose the possibility that Stanley himself suffered a racial penalty. Equal protection protects individuals, not groups in the aggregate. A university therefore may not defeat an individual equal-protection claim simply by pointing to favorable aggregate numbers for the plaintiff's racial group as a whole.

*See Chinese American Citizens Alliance of Greater New York v. Adams*, 116 F.4th 161, 179–80 (2d Cir. 2024) (rejecting the view that plaintiffs must show aggregate harm to Asian Americans as a group and holding that injury to individual Asian-American students is sufficient if caused by intentionally discriminatory policy). If anything, UW's own figures underscore the point: its systemwide Asian enrollment is about 23%, far below the Allen School's 50.2%, showing that substantially higher Asian-American representation in particular programs is not anomalous. See Univ. of Wash., *Fast Facts*, Off. of Plan. & Budgeting (reporting Asian student enrollment at approximately 23%). In any event, the constitutional question is not whether 50.2% appears high in the abstract, but whether the SAC plausibly alleges that race, racial proxies, or race-conscious criteria were used against Stanley in a zero-sum admissions process. UW's 50.2% figure does not answer that.

Defendants also mischaracterize Plaintiffs' demographic allegations. Plaintiffs do not allege that growth in Washington's Asian-American population, standing alone, proves discrimination in Allen School admissions. They cite demographic trends as contextual evidence, not as a self-sufficient statistical model. Under *Arlington Heights*, historical background and demographic changes may inform the plausibility of discriminatory purpose when considered alongside other pleaded facts. Defendants' insistence on Allen-School-specific applicant-pool data only underscores Plaintiffs' point: the relevant comparator information is in UW's possession, not Plaintiffs'.

The MIT data cited in the SAC (Dkt. 39 ¶23) illustrates why UW's reliance on a single aggregate percentage is unpersuasive. Before *SFFA*, Asian Americans comprised 40% of MIT's admitted class. After *SFFA* barred the use of race, that figure rose to 47%. Thus, an ostensibly high percentage can still coexist with unlawful racial suppression. UW's 50.2% figure is no different: it reflects the outcome of UW's challenged practices, not a race-neutral baseline. UW also appears to benchmark against general population demographics. But its own motion confirms that its applicant pool is heavily Washington-based. Dkt. 43 at 1, 4. Asian Americans constitute about 9.5% of Washington's population, compared with about 7% nationally. Even on UW's apparent logic, one would expect the percentage of Asian Americans

in UW's student body to exceed that of an institution like MIT, which draws applicants nationally. But that is not the case here. In any event, general demographics are the wrong benchmark. For a highly competitive STEM program, the only meaningful baseline is the qualified applicant pool. Because establishing that baseline requires factual development, UW's 50.2% statistic cannot defeat Plaintiffs' claims at the pleading stage.

Defendants also cite the SAC's allegation that Asian-American enrollment increased immediately after I-200 as supposed "proof" that UW complies with the law. Dkt. 43 at 16. That argument fails. At most, a post-I-200 increase would suggest that the cessation of overt racial preferences benefited Asian-American applicants—consistent with Plaintiffs' theory, not a refutation of it. It also asks the Court to draw an exculpatory inference from a quarter-century-old demographic trend while ignoring Plaintiffs' allegations that UW later reintroduced race-conscious burdens through proxies and "holistic" review. And in any event, whether UW complied with I-200 in the late 1990s does not answer whether Stanley was subjected to an unlawful race-conscious evaluative framework in 2023. Past compliance does not immunize Defendants from present civil-rights claims.

Nor do *Stout* and *Paige* help Defendants. Those cases address the sufficiency of statistical proof on a developed record, not the plausibility of a complaint before discovery. Plaintiffs do not rely on demographic data as a standalone statistical demonstration, but as one contextual indicator among many.

Defendants' reliance on *Coalition for TJ* is misplaced too. Asian Americans were overrepresented in both *Coalition for TJ* and *SFFA v. Harvard*, yet the outcomes diverged: the Fourth Circuit upheld TJ's admissions policy after the Supreme Court held Harvard's admissions program unconstitutional. In a certiorari dissent joined by Justice Thomas, Justice Alito called the Fourth Circuit's *Coalition for TJ* ruling "indefensible," noting that it "cries out for correction" for effectively allowing "official actors to discriminate against any racial group with impunity as long as that group continues to perform at a higher rate than other groups."

**7. Defendants cannot evade strict scrutiny by declaring racial targets "out of context"**

Defendants repeatedly dismiss the alleged "at least 15%" racial target, Dkt. 39 ¶69, as quoted "out of context," but the context supplied by Defendants' own materials does not negate Plaintiffs' reading as a matter of law. The DEIA Plan places the benchmark under an "Outreach Imperative," but the text still directs the Allen School to measure whether the percentage of specified racial groups at the undergraduate level is "at least 15% (the UW-Seattle average)" by year 5. The DEIA Plan further states: "The above targets are our current 5-year targets. They are not final targets." A racial enrollment target remains a racial enrollment target, regardless of the section heading Defendants put it under. UW cannot "outreach" its way to a 15% undergraduate demographic floor. A benign label cannot sever a numeric racial target from the admissions decisions required to achieve it. Accepting Defendants' theory would create a gaping loophole, allowing universities to evade longstanding prohibitions on numeric racial targets in admissions by embedding them in sections labeled "outreach."

The BPC Plan makes the same objective clearer still. As a stretch goal, it calls for UW to "Increase the percentage of domestic BHN [Black, Hispanic, and/or Native] undergraduates to the UW-Seattle average." That is not framed as an outreach metric, but a target for undergraduate composition itself. Read together, UW's documents do not compel Defendants' benign "outreach only" interpretation. To the contrary, Plaintiffs' reading is strengthened by the fact that this language cuts against Defendants' present litigation position. Contemporary statements reflecting racial-composition targets are more probative of actual institutional objectives than the benign, post hoc interpretation Defendants now offer in support of dismissal. Plaintiffs do not contend that UW would publicly proclaim unlawful discrimination. The point is the opposite: generic public assurances of compliance cannot defeat contemporaneous materials that plausibly suggest a different reality. Were such assurances enough, Defendants' theory would furnish a ready blueprint for insulating covert discrimination from judicial review: publicly deny the practice, keep the operative mechanisms nonpublic, and then invoke those denials to defeat suit at the pleading stage.

Defendants make no attempt to demonstrate that their 15% racial target is "narrowly tailored to further compelling governmental interests." *Grutter*, 539 U.S. at 326. Strict scrutiny turns on substance, not labels. Plaintiffs allege racial benchmarks for undergraduate composition, admissions-related rubric revisions, and identity-based evaluative criteria. Accepted as true, those allegations plausibly place race at the center of the admissions process. At most, Defendants' "out of context" response raises a factual dispute, not a basis for dismissal.

**8. The SAC plausibly alleges systemwide discrimination**

UW repeatedly narrows the case to direct admission to the Allen School. But Stanley applied to UW's undergraduate admission, with Computer Science in the Allen School as his first-choice major and Human Centered Design and Engineering as his second choice. Dkt. 39 ¶51. The SAC also alleges that the Allen School's practices were a manifestation of broader university-wide policy. *Id*. ¶ 79.

Plaintiffs also allege other university conduct probative of institutional approach and intent. Those allegations do not independently resolve the admissions claim, but they provide context for Plaintiffs' theory that the Allen School's practices reflected broader university-wide priorities rather than an isolated anomaly.

Defendants cannot defeat the complaint merely by isolating one subunit and ignoring the broader system Plaintiffs challenge. The Allen School allegations are especially probative, but they are not the only pleaded basis for liability.

**9. The SAC plausibly alleges concealment and lack of transparency**

The SAC plausibly alleges concealment and a lack of transparency. UW does not publish admissions data disaggregated by race, and its 2024 entering-class profile omitted Asian enrollment statistics altogether. Dkt. 39 ¶107. That omission is significant because Defendants fault Plaintiffs for not pleading admissions data that UW itself has withheld from public view, while selectively relying on statistics of its own choosing.

**B. Additional Legal Errors in Defendants' MTD**

**1. Defendants misapplied *Arlington Heights***

Defendants' motion repeatedly disaggregates the SAC into isolated fragments and labels each one insufficient, irrelevant, or "out of context." By isolating each fact and arguing that no single piece independently proves a constitutional violation, Defendants ask this Court to employ an improper "divide and conquer" approach to the evidence.

But *Arlington Heights* requires the opposite approach. Courts are explicitly instructed to examine the "totality of the relevant facts" when evaluating circumstantial evidence of discriminatory intent. Circumstantial evidence is, by its nature, a mosaic. Discriminatory purpose may be inferred from the cumulative pattern of facts, including impact, historical background, sequence of events, departures from normal procedure, and administrative history. Plaintiffs expressly plead that framework. The Court therefore should not evaluate each allegation in isolation, as Defendants urge, but should assess whether the pleaded facts, taken together, plausibly support an inference of discriminatory intent.

Defendants dismiss contextual allegations as too remote, already corrected, or tied to other departments. But Plaintiffs offer those materials as context, not as standalone claims. Their weight may be disputed, but that is no basis at Rule 12 to exclude them from the overall plausibility analysis. The psychology-hiring episode illustrates the point. Defendants invoke an older pleading to claim "swift corrective action," while the SAC alleges that upper administration—including the Board of Regents, Associate Vice Provost Allen, Dean Pollack, and Dean Harris—encouraged or concealed the conduct. Dkt. 39 ¶100. That is a factual dispute, not a basis for dismissal. The episode is especially probative because, unlike student admissions, faculty hiring has never been subject to any Supreme Court-recognized race-based exception.

Defendants also overstate the significance of their "facially neutral policy" authorities. Plaintiffs do not contend that every facially neutral policy adopted in the name of diversity is unlawful by itself. Rather, Plaintiffs allege that facially neutral criteria and discretionary review mechanisms were used as instruments of race-conscious decisionmaking. That is why

*Arlington Heights* matters here. Thus, even if test-optional policies, holistic review, or outreach measures may be lawful in the abstract, they do not defeat a complaint that plausibly alleges those tools were used to advance race-conscious admissions objectives in practice.

*Boston Parent Coalition* is inapposite because it evaluated the evidentiary merits of a facially neutral policy, not the Rule 12 pleading-stage plausibility of an admissions system operating under an express racial target.

Defendants' attack on the test-optional allegations again misstates Plaintiffs' theory. A facially neutral policy may still be unlawful if used to advance race-conscious objectives. Plaintiffs do not allege that frustration with I-200 mechanically caused UW to abandon testing two decades later, or that test-optional admissions alone establish a standalone disparate-impact claim. They allege that UW's longstanding resistance to race-neutral constraints provides relevant historical background under *Arlington Heights*, and that when the pandemic created an opportunity to alter admissions criteria, UW plausibly used that facially neutral shift as one component of a broader admissions framework that also included an express 15% racial target, admissions-related rubric revisions, identity-based evaluative criteria, contradictory public statements, and concealment-related allegations. Tellingly, UW maintains this test-optional policy today, years after the COVID-19 pandemic. At this stage, the question is not whether Defendants can posit a lawful rationale, but whether Plaintiffs' contrary inference is plausible. It is.

When the SAC's allegations are considered as *Arlington Heights* requires—cumulatively, not atomistically—the picture is this: an institution with a documented 15% racial enrollment target, whose leadership has publicly resisted race-neutral mandates for over two decades, that adopted a test-optional policy that suppresses the statistical footprint of racial preferences, that uses holistic criteria functioning as racial proxies, and that rejected a demonstrably exceptional Asian-American applicant whose credentials were independently validated by Google's hiring process. No single allegation needs to carry the entire weight of the claim. Together, they present a plausible and coherent account of intentional discrimination that requires discovery to

resolve. Defendants cannot evade federal civil rights laws by demanding the Court examine the brushstrokes while ignoring the painting.

### 2. Defendants misapplied *McDonnell Douglas*

Defendants' MTD fundamentally misapplies *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), by treating an evidentiary framework as a rigid pleading rule. By demanding that Plaintiffs plead exact comparators or definitively establish pretext, Defendants attempt to force a summary-judgment analysis at the Rule 12(b)(6) stage, before any discovery has occurred.

That is contrary to settled law. As the Supreme Court unanimously held in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002), the "*prima facie* case under *McDonnell Douglas*, however, is an evidentiary standard, not a pleading requirement." At this stage, Plaintiffs need not prove their case; they need only allege sufficient facts to render their claims plausible.

That error is especially stark here. UW has never addressed whether any of the 83 non-Asian, out-of-state admits had qualifications equal to or lesser than Stanley's. Yet that comparative information is in UW's exclusive possession. Plaintiffs had no prefiling mechanism to compel production of those applicants' identities, files, or credentials. UW cannot demand that Plaintiffs produce information UW alone controls as a condition of access to the discovery that would produce it—that is a Catch-22 that *Swierkiewicz* was designed to prevent.

Nor does the SAC need an internal memorandum explicitly directing the "use of race against Asian applicants" to be plausible. Plaintiffs' theory is circumstantial. The question at this stage is not whether Plaintiffs have already proven discriminatory intent, but whether the pleaded facts permit a reasonable inference of discriminatory purpose and discriminatory administration of facially neutral criteria. They do.

### 3. Defendants' reliance on third-party rejections is logically self-defeating

UW argues that other institutions' admissions practices are irrelevant (Dkt. 43 at 22), yet also relies on Stanley's rejection by other universities to argue that UW did not discriminate. Dkt. 43 at 15. UW cannot have it both ways. Furthermore, given Stanley's alleged qualifications, repeated rejection by institutions using similar discretionary 'holistic review'

frameworks does not prove a lack of merit. Rather, it supports the inference that similar race-conscious criteria or proxies were operating across multiple universities. Sixteen colleges' rejections of Stanley can reflect the scope of anti-Asian discrimination, not lack thereof. At the pleading stage, the Court must draw reasonable inferences in Plaintiffs' favor.

**4. Defendants' MTD relies on inapposite and procedurally mismatched authority**

Throughout their Motion, Defendants misstate the applicable pleading standard by relying on authorities that arose at summary judgment and importing those evidentiary burdens into Rule 12(b)(6). *Stout, Moran, Weiss, Steven*, and *McCarthy* were all decided at summary judgment, bolstering Plaintiffs' argument that they are entitled to discovery.

Defendants likewise overread *Stewart v. Texas Tech University Health Sciences Center* as setting a minimum statistical showing required to survive dismissal. It does no such thing. And in any event, *Stewart* involved a setting where race-disaggregated admissions data were publicly available. Here, by contrast, Plaintiffs allege that UW stopped publishing disaggregated Asian-American enrollment data, making the absence of the statistics Defendants demand attributable to UW's own control over the relevant information.

Defendants' reliance on *Grady v. Wyatt* and *Doe v. New York University* is misplaced. *Grady* involved a prisoner's bare, conclusory allegations against prison officials. *Doe v. New York University* offered only generalized speculation that some unidentified preference must have occurred. Here, Plaintiffs allege concrete admission practices, all tied to Stanley's rejection in a highly discretionary process. That is materially different from *Grady v. Wyatt* or *Doe v. New York University*.

Defendants' reliance on *Raso, Duffy, Seibels, Billish, Sussman,* and *Coalition for Economic Equity* also misses the point. Plaintiffs do not allege that outreach alone is unlawful. They allege a specific racial enrollment target and related admission practices. Those cases address outreach; they do not answer the allegation presented here.

Defendants cite *Quinteros,* an unpublished Ninth Circuit memorandum disposition. Such dispositions are nonprecedential, and published authority such as *Iqbal* and *Twombly* makes *Quinteros* unnecessary.

Defendants invert the judicial role when they argue that Plaintiffs seek to "take college admissions decisions out of the hands of universities and put them in the lap of the judiciary." Dkt. 43 at 3. Plaintiffs do not ask this Court to run admissions. They ask the Court to do what courts have long done in equal-protection cases: enforce constitutional and statutory limits when a public university is plausibly alleged to have impermissibly used race in admissions. Taken seriously, Defendants' argument would mean that *DeFunis*, *Bakke*, *Grutter*, *Gratz*, *Fisher I*, *Fisher II*, and *SFFA* should never have been decided as they were. Judicial review of allegedly discriminatory admissions practices is not judicial takeover; it is the rule of law.

**C. The Court Should Deny or Strictly Limit Defendants' Request for Judicial Notice**

**1. Limits of Judicial Notice and Incorporation by Reference**

Defendants' Request for Judicial Notice ("RJN") seeks far more than judicial notice. It does not merely ask the Court to notice the existence of UW webpages, plans, and public materials. Rather, Defendants ask the Court to treat those materials as substantively true and effectively undisputed for purposes of resolving the Motion to Dismiss. That is not a proper use of either Federal Rule of Evidence 201 or the incorporation-by-reference doctrine. Under Rule 201, judicial notice is limited to adjudicative facts that are "not subject to reasonable dispute" because they are either generally known or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

Plaintiffs do not dispute that certain webpages, policy documents, news releases, and public statements existed and contained particular language on particular dates. But existence is not truth. The central issue in this case is whether UW's public pronouncements matched its actual conduct. The SAC alleges they did not. It alleges, among other things, that the Allen School's DEIA Plan included a racial enrollment target of "at least 15%," that Defendant Balazinska publicly denied the use of race in admissions, that the DEIA Plan was later removed from public view, and that UW's 2024 entering-class profile omitted Asian enrollment statistics altogether. Those allegations illustrate exactly why UW's public-facing materials cannot be treated as conclusive proof of what UW actually did behind closed doors.

Defendants' RJN does not simply ask the Court to recognize that certain materials exist. It asks the Court to "assume they are true" for purposes of the Motion to Dismiss and insists that Plaintiffs "cannot reasonably dispute the facts contained therein." That request is improper. The Ninth Circuit has held that although a court may take judicial notice of matters of public record, it "cannot take judicial notice of disputed facts contained in such public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); accord *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

The DEIA and BPC plans illustrate the problem: Defendants ask the Court to accept their "outreach only" interpretation as conclusive even though the filed text itself frames these racial benchmarks as targets for undergraduate composition with a timeline.

Defendants' repeated invocation of "cherry-picking" is not a substitute for identifying an actual misquotation or distortion. What Defendants call omitted "context" is, in substance, their own merits gloss on disputed materials. Rule 12 does not permit dismissal on that basis.

Nor does incorporation by reference carry the weight Defendants place on it. The doctrine may prevent selective quotation or mischaracterization of a document, but it does not allow Defendants to import extra materials and use them to displace Plaintiffs' plausible reading. As *Khoja* cautioned, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." 899 F.3d at 1003.

**2. UW Public Materials**

An additional temporal defect undermines Defendants' reliance on UW webpages concerning holistic review, admissions criteria, and diversity planning. Defendants repeatedly try to resolve disputed historical facts from the 2023 admissions cycle by citing website screenshots captured in 2026. Rule 12 does not permit that.

For example, Defendants rely on Exhibit 12—a current webpage—to assert as a conclusive historical fact that "any applicant wishing to enter the College of Engineering must select it as their first-choice major." Dkt. 43 at 6. But the December 18, 2022 archived version said something narrower: it advised applicants interested in engineering, other than computer engineering, to list an engineering major first in order to be automatically considered for

"Direct to College" admission. Defendants thus overread a current webpage and manufacture a case-specific historical fact about how Stanley's application was processed in 2023. That disputed inference cannot be resolved against Plaintiffs on a motion to dismiss.

Exhibit 10, UW's Civil Rights Compliance Office webpage, suffers from a similar defect. The available Wayback Machine captures do not reflect this page appearing in the archive until **months after** this suit was filed. Post hoc webpage captures, especially those published during active litigation, cannot be judicially noticed to establish historical adjudicative facts at the pleading stage.

### 3. Third-Party Materials

Defendants' third-party exhibits are also inappropriate for substantive judicial notice. Their RJN includes items such as rankings, fact sheets, congressional testimony, and a newspaper article. Plaintiffs do not dispute that the Court may notice such materials for the limited fact that they were published or that certain statements were made. But Defendants cannot use those materials to establish the truth of disputed assertions within them or to displace Plaintiffs' plausible inferences at the pleading stage. The Ninth Circuit has drawn that distinction expressly: courts may take judicial notice of publications introduced to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010).

### 4. Proper Scope of Notice

Nor does the McKenna Declaration (Dkt. 45) alter that result. Authentication is not the issue; Defendants' improper substantive use of the exhibits is. The problem is Defendants' attempted use of those materials as adjudicative truth. A ranking, fact sheet, testimony, or newspaper article may show what was published or said; it does not establish the truth of disputed assertions within it.

Tellingly, the McKenna Declaration omits the source URLs and retrieval dates for Exhibits 17 and 19, the DEIA and BPC plans. That omission is not trivial. Without those details, Defendants cannot show with precision when those materials appeared or disappeared on UW's website, or whether the exhibits correspond to the relevant admissions period. Those

gaps further confirm that the exhibits are not a proper basis for resolving disputed historical facts on a motion to dismiss.

Accordingly, the Court should deny the RJN to the extent Defendants seek judicial notice or incorporation by reference for the truth of disputed matters. At most, the Court should take limited notice of the existence of certain public materials and the fact that certain statements were made, while declining to use those materials to resolve contested facts or draw inferences against Plaintiffs at the pleading stage.

**D. Standing and Representation Issues Do Not Justify Dismissal**

**1. Stanley has standing**

Stanley plainly alleges concrete injury. He applied to UW, sought admission to UW Seattle with the Allen School as his first-choice major, and was denied. Dkt. 39 ¶¶ 6, 51. That is enough for Article III standing. Any dispute about later damages or mitigation does not erase the injury itself.

**2. Nan has standing**

Defendants err in asserting that Nan Zhong alleges no direct injury. The SAC alleges that Nan personally paid application fees in connection with the challenged admissions process and thus suffered a direct economic injury traceable to that process. *Rynasko v. N.Y. Univ.*, 63 F.4th 186, 194 n.7 (2d Cir. 2023) is inapposite. It involved a parent of an **adult student** seeking tuition-related recovery for educational services allegedly not provided during the COVID-19 pandemic. Nan alleges something different: that he personally paid application fees into the challenged admissions process on behalf of his child while the child was still a **minor**. At minimum, *Rynasko* does not foreclose Nan's separately pleaded financial injury, even if the Court later concludes that only Stanley may pursue certain equal-protection remedies based on denial of admission.

**3. Minor Son's alleged injury is imminent, and *Johns* does not warrant dismissal**

UW says Plaintiffs ask the Court to "ignore *Johns* and give [Nan] special treatment." Dkt. 43 at 10. That overstates Plaintiffs' position. Minor Son's alleged injury is imminent and concrete, not speculative: the SAC alleges he is currently a junior in high school, intends to

apply to UW, and has received recruiting materials from UW inviting him to apply. Dkt. 39 ¶132. UW is thus actively soliciting him into a process Plaintiffs allege is discriminatory.

Plaintiffs do not ask the Court to ignore *Johns v. County of San Diego*, 114 F.3d 874 (9th Cir. 1997). In fact, they ask the Court to adhere to its emphasis that the rule exists to **protect the minor**, while accounting for the extraordinary circumstances here. Minor Son faces imminent harm from the challenged admissions regime, and Plaintiffs have made extensive but unsuccessful efforts to retain counsel. In a parallel racial-discrimination case against the University of California, retained counsel ultimately withdrew in August 2025 after expressing fear that taking the case would subject him to death threats.

In the interest of justice, the Court should permit Minor Son's claims to proceed at least to preserve his imminent request for prospective relief. Rule 17(c) directs the Court to enter such orders as are proper to protect a minor, and rigid application of the no-*pro-se*-representation rule here would **extinguish** rather than protect those rights.

**4. Plaintiffs do not seek injunctive relief "on behalf of" third parties**

UW argues that "none of these pro se plaintiffs may seek the injunctive relief they request because pro se plaintiffs may not seek injunctive relief on behalf of third parties." Dkt. 43 at 1, 12. That misstates the issue. Plaintiffs do not purport to represent other applicants; they seek prospective relief necessary to redress their own injuries from an allegedly unlawful admissions regime. The fact that such relief may incidentally benefit others does not convert Plaintiffs into representatives of nonparties. At most, any concern goes to tailoring the remedy, not dismissing the claim.

UW's position would mean that no pro se litigant could ever obtain prospective relief against an unconstitutional policy whenever compliance would also benefit others. That is not the law.

Defendants' cases are inapposite. Neither *Essah* nor *King* holds that a plaintiff seeking necessary personal injunctive relief loses standing merely because enjoining the unlawful policy incidentally protects others.

**E. The Court Need Not Resolve the Full Scope of Prospective Relief Now**

Defendants' objections to specific forms of requested injunctive relief are premature. Plaintiffs need not establish at the pleading stage that every formulation of requested relief will ultimately be entered exactly as pleaded. If the Court later concludes that certain proposed terms—such as restrictions framed around holistic review or the timing of demographic data collection—require narrowing or refinement, the appropriate remedy is tailoring, not dismissal. *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (injunctive relief must be tailored to the violation proved). The underlying question now is whether Plaintiffs plausibly allege unlawful race-conscious decisionmaking. They do.

At minimum, Stanley seeks redress for his own completed injury. Defendants do not explain why any dispute over the eventual scope of injunctive relief requires dismissal now, rather than narrower tailoring if Plaintiffs prevail on the merits.

**F. Defendants Are Not Immune from Suit**

**1. Defendants' immunity arguments are overbroad and do not warrant dismissal**

First, sovereign immunity does not bar Count II under Title VI. Defendants' reliance on *Hall v. Hawaii*, 791 F.2d 759, 761 (9th Cir. 1986), is misplaced because Congress, in 1986, expressly provided that a State "shall not be immune under the Eleventh Amendment" from suit in federal court for violations of Title VI. 42 U.S.C. § 2000d-7. Because UW accepts federal financial assistance, Count II may proceed against UW.

Second, Plaintiffs seek prospective injunctive relief against the individual Defendants in their official capacities to halt ongoing violations of federal law. That relief remains available under *Ex parte Young*, notwithstanding any bar on official-capacity damages. Defendants therefore cannot convert the unavailability of official-capacity damages into blanket immunity from suit on Plaintiffs' claims for prospective federal relief.

Third, Count III should not be dismissed on the theory that § 1981 rights are categorically unavailable against state actors. The governing rule is narrower. Under *Jett* and the Ninth Circuit's *en banc* decision in *Yoshikawa v. Seguirant*, § 1981 creates substantive rights but does not itself provide an implied cause of action against state actors; those rights must instead be

enforced through 42 U.S.C. § 1983. Thus, to the extent Count III is asserted against state actors, the issue is the proper remedial vehicle, not the absence of a cognizable federal claim.

Fourth, sovereign immunity does not bar personal-capacity claims against the individual Defendants under § 1983. Accordingly, to the extent Plaintiffs allege that individual Defendants, acting under color of state law, intentionally impaired rights secured by § 1981, the proper course is to allow those claims to proceed through § 1983 rather than dismiss the substance of the claim outright. *Yoshikawa* confirms that repleading through § 1983 is the appropriate remedy. At minimum, if the Court concludes that Count III must proceed through § 1983 rather than as a freestanding § 1981 claim against state actors, Plaintiffs request leave to amend Count III accordingly rather than dismiss it with prejudice.

Fifth, Defendants' state-law immunity argument is likewise partial at most. Even if certain state-law claims against UW or against state officials in their official capacities are barred in federal court, that would affect only those claims or remedies. It would not bar Count II under Title VI, Plaintiffs' claims for prospective federal relief against the individual Defendants in their official capacities, or Plaintiffs' properly pleaded personal-capacity federal claims.

Accordingly, even if accepted in part, Defendants' immunity argument would not justify dismissal of the action. At most, it would require claim-by-claim and defendant-by-defendant narrowing.

**2. Qualified immunity does not apply**

Defendants argue that qualified immunity bars the personal-capacity claims because Plaintiffs' theory depends on "a change in law heralded by *SFFA*." Dkt. 43 at 23. That premise is false. Plaintiffs do not seek to impose liability based on a new rule announced in 2023. They allege conduct that was already unlawful under longstanding federal precedent and Washington state law: race-conscious admissions targets, admissions-related rubric revisions, identity-based evaluative criteria, contradictory public statements, concealment-related allegations, and use of facially neutral mechanisms to reach racial targets while preserving deniability.

The alleged 15% racial target does not become unlawful only because of *SFFA*. Numerical race-based admissions targets and quotas were impermissible under *Bakke* and remained

impermissible even under *Grutter* or *Gratz*, decades before Stanley applied. And Washington state law has prohibited race-based preferences in public university admissions since I-200 took effect in 1998. There is no meaningful gap in that timeline: no version of applicable law between 1978 and 2026 permitted the kind of numerical race-based admissions targets that the SAC alleges.

Nor would dismissal of the RCW 49.60.400 claim on forum-immunity grounds eliminate the statute's significance to qualified immunity. Plaintiffs do not rely on RCW 49.60.400 to define the federal constitutional right. They rely on it as additional evidence that reasonable Washington officials had fair warning that race-based preferences in public education were unlawful. Thus, even if the standalone state-law claim cannot proceed in federal court, the statute remains probative of notice and of the objective unreasonableness of the conduct alleged.

Defendants therefore cannot recast this case as an attempt to apply *SFFA* retroactively.

In any event, qualified immunity is especially inappropriate at this stage because Defendants' argument depends on disputed factual characterizations of the pleaded conduct. Determining qualified immunity on a motion to dismiss "raises special problems for legal decision making," and where the dispositive dispute concerns what Defendants actually did, dismissal on qualified-immunity grounds is premature. *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018).

**G. The RCW 49.60.400 Claim Also Survives**

Defendants' merits argument against the RCW 49.60.400 claim assumes the very point in dispute. The mere existence of a state-law prohibition on racial preferences does not establish UW's compliance with it. Because the SAC alleges that UW's actual admissions practices violated that prohibition, Defendants do not defeat Count IV on the merits.

Count IV arises from the same nucleus of operative facts as Plaintiffs' federal claims. It challenges the same admissions policies, practices, and alleged race-conscious criteria, and thus would ordinarily fall within the Court's supplemental jurisdiction. See 28 U.S.C. § 1367(a). Even if Defendants are correct that Eleventh Amendment principles limit this Court's

ability to adjudicate some or all of that state-law claim against UW or official-capacity defendants, however, that is a forum-and-remedy issue, not a defect in the substance of Plaintiffs' pleading.

At most, Defendants' Eleventh Amendment argument affects whether part of Count IV may proceed in this forum against particular defendants in particular capacities. It is not a merits defense, and it provides no basis to dismiss Plaintiffs' federal claims.

## IV. CONCLUSION

This case presents the very information and power asymmetry that federal civil-rights litigation is designed to pierce: a powerful public institution seeking to extinguish constitutional claims brought by pro se plaintiffs at the pleading stage while withholding the very documents needed to prove them.

The SAC plausibly alleges that UW's admissions system operated pursuant to race-conscious objectives and evaluative criteria that burdened Asian-American applicants, including Stanley Zhong.

Defendants' dismissal theory is circular: Plaintiffs supposedly cannot infer discrimination without UW's internal admissions data, yet cannot access that data because they have not already pleaded it. Rule 12 does not countenance that Catch-22.

Nor may UW bypass the pleading standard by asking the Court to treat its current public webpages as conclusive fact.

Finally, Defendants attempt to justify dismissal by invoking UW's high selectivity, aggregate Asian-American enrollment statistics, and the opacity of "holistic review." Harvard advanced materially similar defenses in *SFFA*, and the Supreme Court rejected them. Those arguments do not support dismissal here.

The Court should deny Defendants' motion to dismiss.

Dated: April 15, 2026

Respectfully submitted,

/s/ Stanley Zhong

Stanley Zhong (Pro Se)

211 Hope St #390755

Mountain View, CA 94039

/s/ Nan Zhong

Nan Zhong (Pro Se)

211 Hope St #390755

Mountain View, CA 94039

nanzhong1@gmail.com

I certify that this memorandum contains 7,935 words, in compliance with the Local Civil

Rules.

Dated: April 15, 2026

/s/ Nan Zhong

Nan Zhong (Pro Se)

DECLARATION OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: April 15, 2026

/s/ Nan Zhong

Nan Zhong (Pro Se)