The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

STANLEY ZHONG, et al.,

*Plaintiff*,

*v.*

THE UNIVERSITY OF WASHINGTON BOARD OF REGENTS, et al.,

*Defendants*.

Case No. 2:25-cv-00348-JLR

DEFENDANTS' ANSWER TO SECOND AMENDED COMPLAINT

Defendants The Regents of the University of Washington, The University of Washington (the "University"), Ana Mari Cauce, Robert J. Jones, Paul Seegert, Magdalena Balazinska, Tadayoshi Kohno, and Chloe Dolese Mandeville (collectively, "Defendants") submit this Answer to the Second Amended Complaint filed by Plaintiffs Stanley Zhong and Nan Zhong, individually and as next friend of his Minor Son (collectively, "Plaintiffs"), in the above-captioned matter.

**ANSWER**

Defendants reserve the right to amend this Answer based on information made available through discovery or further investigation. Unless specifically admitted below, Defendants deny each and every allegation, claim, and prayer for relief contained in the Second Amended Complaint. Additionally, Defendants deny that any of the headings therein state facts or allegations to which a response is required. To the extent a response is required, Defendants deny any facts set forth in the headings. Further answering the specific allegations in the Second Amended Complaint, Defendants state:



ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

## I. INTRODUCTION AND SUMMARY OF CLAIMS

1. Plaintiffs Stanley Zhong ("Stanley") and Nan Zhong ("Nan"), individually and acting on behalf of his Minor Son ("Minor Son"), bring this civil rights action against the University of Washington ("UW") and the named UW officials (collectively, "Defendants"). Plaintiffs allege that Defendants have engaged in systemic racial discrimination against Asian American applicants in violation of the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Washington State law RCW 49.60.400 (Initiative 200).

**RESPONSE:** Paragraph 1 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 1.

2. This case seeks to enforce the fundamental constitutional guarantee that the State must treat citizens as individuals, not as members of racial groups. For decades, the University of Washington has maintained admissions policies that penalize Asian American applicants based on their race, treating them not as beneficiaries of civil rights protections, but as exceptions to them.

**RESPONSE:** Paragraph 2 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 2.

3. While the University utilizes terms such as "holistic review" to describe its process, the practical effect is the consistent penalization of Asian American applicants. In a zero-sum admissions system, the granting of preferential treatment to certain racial groups necessarily imposes a corresponding burden on others. Defendants have institutionalized this burden, requiring Asian American applicants to meet higher standards of academic and extracurricular achievement than applicants of other races.

**RESPONSE:** Defendants admit the University of Washington employs a holistic review process. Defendants deny the remaining allegations in Paragraph 3.

4. Plaintiff Stanley Zhong, an exceptionally qualified applicant with technical achievements recognized by industry leaders as equivalent to Ph.D.-level work, was rejected by the University of Washington for undergraduate admission under this discriminatory regime.

His younger brother, Minor Son, now faces the imminent threat of the same discriminatory barrier.

**RESPONSE:** Defendants admit that Plaintiff Stanley Zhong was denied admission to the Paul G. Allen School for Computer Science and Engineering at the University of Washington (the "Allen School"). Plaintiff Minor Son's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Minor Son is required. Defendants otherwise deny the allegations in Paragraph 4.

5. Plaintiffs do not seek special treatment. They seek only an equal opportunity to compete on the basis of merit, free from racial penalties. Plaintiffs request declaratory and injunctive relief to compel the University to cease its discriminatory practices, along with damages for the injuries sustained.

**RESPONSE:** Defendants lack knowledge and information sufficient to determine the motivations behind Plaintiffs' lawsuit. Paragraph 5 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 5.

## II. PARTIES AND STANDING

### A. Plaintiffs

6. Plaintiff Stanley Zhong is a resident of the State of California and a citizen of the United States. He is a second-generation Asian American. Stanley applied for undergraduate admission to the University of Washington for the Fall 2023 term. Despite possessing extraordinary credentials (detailed herein), he was denied admission. He suffered a concrete injury-in-fact: the denial of the opportunity to compete for admission on an equal footing with applicants of other races.

**RESPONSE:** Defendants admit that Plaintiff Stanley Zhong applied for admission to the Allen School for the Fall 2023 Term and was not admitted. Defendants lack knowledge and information sufficient to determine Plaintiff Stanley Zhong's residence, citizenship status, and heritage. Paragraph 6 contains characterizations and legal

conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 6.

7. Plaintiff Nan Zhong is a resident of the State of California, a first-generation immigrant from China, and a naturalized U.S. citizen. He is the father of Stanley Zhong and Minor Son. He brings this action in his individual capacity based on direct, concrete injuries he has suffered and will suffer:

- **Pecuniary Injury (Past)**: Nan Zhong paid the non-refundable application fees for Stanley Zhong's application to the University of Washington. Because the admissions process was tainted by unlawful racial discrimination, he did not receive the fair consideration for which he contracted and paid, resulting in a direct financial loss.
- **Pecuniary Injury (Imminent)**: Nan Zhong intends to pay the application fees for his Minor Son's future application. He faces the imminent harm of paying for a similarly discriminatory and fraudulent review process.
- **Parental Standing**: As affirmed by the Second Circuit in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161 (2024), a parent has standing to assert equal protection claims where they suffer harm from a discriminatory policy affecting their children.

**RESPONSE:** Plaintiff Nan Zhong's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Nan Zhong is required. Paragraph 7 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 7.

8. Pursuant to Federal Rule of Civil Procedure 17(c), Nan Zhong also appears as the representative and next friend of his Minor Son.

- Minor Son is a resident of the State of California and an Asian American student. He is a junior in high school with a demonstrated record of academic excellence (detailed herein).
- Minor Son intends to apply to the University of Washington for the Fall 2027

term. He faces a credible and imminent threat of being subjected to the same discriminatory admissions policies that rejected his brother. Under the Supreme Court's holdings in *Gratz v. Bollinger* and *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, Minor Son has standing to seek prospective injunctive relief because the discriminatory barrier itself constitutes an ongoing injury that prevents him from competing on an equal basis.

**RESPONSE:** Plaintiff Nan Zhong's and Plaintiff Minor Son's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Nan Zhong or Minor Son is required. Paragraph 8 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 8.

9. Plaintiffs Stanley and Nan Zhong have made diligent efforts to retain counsel, soliciting representation from dozens of law firms and legal organizations. Despite these efforts, the contacted entities either declined representation, failed to respond, or were unable to accept the case. Consequently, to prevent the expiration of claims and the irreparable harm of ongoing discrimination, Plaintiffs are compelled to proceed pro se.

**RESPONSE:** Plaintiff Nan Zhong's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Nan Zhong is required. Defendants lack knowledge and information sufficient to determine Plaintiffs' efforts to retain counsel. Paragraph 9 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 9.

**B. <u>Defendants</u>**

10. Defendant University of Washington is a public institution of higher education organized under the laws of the State of Washington. It is a recipient of federal financial assistance and is therefore subject to Title VI of the Civil Rights Act of 1964. The University's admissions policies, including the undergraduate admissions practices challenged herein, are promulgated and enforced by its administration and governing board.

**RESPONSE:** Defendants admit that the University of Washington is a public institution of higher education organized under the laws of the State of Washington. Defendants admit that the University of Washington is a recipient of federal financial assistance. Defendants admit that the University of Washington has admissions policies, including undergraduate admissions policies, that are promulgated by various individuals and bodies at the University of Washington. Defendants otherwise deny the allegations in Paragraph 10.

11. Defendant the Regents of the University of Washington are the governing body of the University of Washington, responsible for the supervision and control of the University. They are sued in their official capacities. The current members of the Board of Regents are: Leonard Forsman (Chair), Leonor Fuller (Vice Chair), Zoe Barsness, Dow Constantine, Apolonio (Polo) Pablo Hernandez, Linden Rhoads, David Schumacher, Denise Stiffarm, Blaine Tamaki, Maggie Walker, and David Zeeck.

**RESPONSE:** Defendants admit the Board of Regents of the University of Washington governs and stewards the University of Washington. Defendants admit that the current members of the Board of Regents are Chair Leonard Forsman, Vice Chair Leonor Fuller, Zoe Barsness, Dow Constantine, Apolonio Pablo Hernandez, Linden Rhoads, David Schumacher, Denise Stiffarm, Blaine Tamaki, Maggie Walker, and David Zeeck. Defendants otherwise deny the allegations in Paragraph 11.

12. Defendant Ana Mari Cauce served as the President of the University of Washington during the admissions cycles relevant to Plaintiff Stanley Zhong's application. During her tenure, she exercised final authority over the University's operations and enforcement of admissions policies. Defendant Cauce repeatedly issued public statements opposing the race-neutral mandates of Initiative 200, fostering a culture of noncompliance and institutional commitment to racial preferences. She is sued in her personal capacity for damages.

**RESPONSE:** Defendants admit that Ana Mari Cauce served as the President of the University of Washington from 2015 to 2025. Defendants otherwise deny the allegations in Paragraph 12.

13. Defendant Robert J. Jones is the current President of the University of

Washington (appointed August 2025). He constitutes the final executive decision-maker for the University and has the authority to implement the injunctive relief sought by Plaintiffs. He is sued in his official capacity.

**RESPONSE:** Defendants admit that Robert J. Jones is the current President of the University of Washington and became the President in August 2025. Defendants otherwise deny the allegations in Paragraph 13.

14. Defendant Paul Seegert is the Director of Admissions at the University of Washington. In this capacity, he oversees admissions policies systemwide and exercises ultimate authority over the implementation of the 'holistic review' framework. Defendant Seegert's office approved and enforced the specific evaluation procedures—including the removal of standardized testing and the use of racial proxies—that systematically disadvantaged Asian American applicants. He holds direct supervisory authority over the officials who rejected Stanley's application and those who will adjudicate Minor Son's future application. He is sued in his personal and official capacities.

**RESPONSE:** Defendants admit that Paul Seegert is the Director of Admissions at the University of Washington and oversees the Office of Admissions. Defendants otherwise deny the allegations in Paragraph 14.

15. Defendant Magdalena Balazinska is the Director of the Paul G. Allen School of Computer Science & Engineering (the "Allen School"). In this role, she oversees the Allen School's admissions policies and strategic direction. When presented with evidence of the School's explicit 15% racial enrollment targets, Defendant Balazinska covered up the conduct by denying that race was a factor, despite internal documents to the contrary. She is sued in her personal and official capacities.

**RESPONSE:** Defendants admit that Magdalena Balazinska was previously the Director of the Allen School. Defendants otherwise deny the allegations in Paragraph 15.

16. Defendant Tadayoshi Kohno is the Associate Director for Diversity, Equity, Inclusion & Access ("DEIA") at the Allen School. He co-led the creation of the Allen School's 5-Year Strategic Plan for Diversity, Equity, Inclusion, and Access, which explicitly established

the 15% enrollment target for specific racial groups. He is sued in his personal and official capacities.

**RESPONSE:** Defendants admit that Tadayoshi Kohno was previously the Associate Director for Diversity, Equity, Inclusion & Access at the Allen School. Defendants otherwise deny the allegations in Paragraph 16.

17. Defendant Chloe Dolese Mandeville is the Senior Assistant Director for Student Engagement & Access at the Allen School (formerly Assistant Director for Diversity & Access). She co-led the development of the 5-Year Strategic Plan alongside Defendant Kohno, which codified the 15% racial enrollment target. She is sued in her personal and official capacities.

**RESPONSE:** Defendants admit that Chloe Dolese Mandeville is the Senior Assistant Director for Student Engagement & Access at the Allen School. Defendants otherwise deny the allegations in Paragraph 17.

## III. JURISDICTION AND VENUE

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the Constitution and laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because Plaintiffs seek to redress the deprivation of civil rights under color of state law.

**RESPONSE:** Paragraph 18 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 18.

19. The Court has supplemental jurisdiction over Plaintiffs' state-law claims—specifically the claim under RCW 49.60.400—pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims. Plaintiffs further seek declaratory relief under 28 U.S.C. §§ 2201–2202.

**RESPONSE:** The Court has dismissed all of Plaintiffs' claims based on Washington State law from this case. *See* ECF No. 50. Paragraph 19 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 19.


ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

20. Venue is proper for Defendants because a substantial part of the events or omissions giving rise to the claim occurred, and will occur, in this judicial district and division. See 28 U.S.C. § 1391(b)(2). Venue is additionally proper because at least one of the defendants resides in this judicial district and division and all the defendants associated with UW reside in Washington. See 28 U.S.C. § 1391(b)(1).

**RESPONSE:** Paragraph 20 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 20.

## IV. FACTUAL ALLEGATIONS

### A. Industry-Wide Pattern of Discrimination Against Asian American Applicants

21. Asian Americans have faced a documented history of systemic exclusion in the United States, ranging from the Chinese Exclusion Act of 1882 to the incarceration of Japanese Americans during World War II. This history of exclusion informs the current landscape, where Asian Americans remain a distinct minority group subject to specific stereotypes and discriminatory barriers.

**RESPONSE:** Defendants admit the Chinese Exclusion Act of 1882 and Public Law 77-503 were federal laws that were once in force. Paragraph 21 otherwise contains subjective characterizations and legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 21.

22. Within the world of college admissions, discrimination against Asian Americans has become the worst-kept secret. A 2016 Inside Higher Ed survey of college admissions directors revealed that 42% of private college admissions officers and 39% of public college officers acknowledged that Asian American applicants are held to higher standards than students of other races. Studies suggest that privileged, wealthy African American applicants are admitted at significantly higher rates than low-income, underprivileged Asian American applicants with similar academic credentials.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the studies cited in Paragraph 22 and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 22.

23. Data emerging in the wake of the Supreme Court's ruling in *SFFA v. Harvard* confirms the impact of race-conscious policies on Asian American enrollment. In the first admissions cycle following the decision, Asian American enrollment at elite universities surged: MIT's Asian American enrollment rose from 40% to 47%, while Columbia University saw an increase from 30% to 39%. A similar pattern occurred at Harvard, where the Asian American admit rate rose from 17% in 2014 to 22% in 2016 immediately following the filing of the SFFA lawsuit—after having remained flat for years—and climbed to 37% by 2024. These dramatic shifts confirm that Asian American applicants were previously being artificially suppressed to maintain a predetermined racial balance. Furthermore, the magnitude of these changes far exceeds what could be attributed to the limited use of race as a mere "plus factor" under *Grutter v. Bollinger*, revealing that race was instead functioning as a decisive feature of the admissions process.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the statistics cited in Paragraph 23 and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 23.

24. High-ranking administrators at peer institutions subject to legal restrictions similar to Initiative 200 (such as in California and Michigan) have publicly developed and advocated for specific methods to circumvent these bans. Plaintiffs allege that the University of Washington has adopted this industry-standard "playbook," utilizing the same "holistic mechanisms" and "proxies" described below to mask its continued racial balancing.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the quotations and statements cited in Paragraph 24 and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 24.

25. University of California ("UC") Berkeley Law School Dean, Erwin Chemerinsky, explicitly advised using "proxies for race" and admitted to practicing "unstated

Affirmative Action" while concealing it, noting, "If I'm ever deposed, I'm going to deny I said this." Similarly, University of Michigan ("UM") General Counsel Timothy Lynch advised administrators to curate emails to prevent faculty from "muddy[ing] the record" with evidence of discriminatory intent.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 25 and therefore deny those allegations.

26. The mechanism for this evasion is "holistic review." As documented by Professor Tim Groseclose, UCLA's switch to "holistic" review was adopted explicitly to increase enrollment of "underrepresented minorities," at the expense of more qualified Asian American applicants.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 26 and therefore deny those allegations.

27. Official audits and studies of UC have confirmed that "holistic review" was operationalized to admit less-qualified students over higher-qualified Asian Americans. Plaintiffs allege UW's 'holistic' process functions similarly.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the characterization of another university's admissions process in Paragraph 27 and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 27.

28. Senior UC administrators actively persecute faculty who advocate for academic excellence over identity politics. This pattern is exemplified by the treatment of Professor Perry Link at UC Riverside, who faced sustained retaliation from 2022 to 2025 for opposing racial preferences. In May 2025—despite an active litigation hold—UC staff entered his office without consent, seized his hard drive and personal items, and destroyed them. To date, no senior administrator has apologized for this conduct.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 28 and therefore deny those allegations.

29. Defendants operate within this same administrative milieu and utilize the same "holistic" frameworks used by UC and UM. The industry-wide knowledge of such retaliation—exemplified by the seizing of Professor Link's data and personal items—creates a "code of silence" that deters faculty and staff at UW from exposing internal misconduct. This climate of fear explains the absence of whistleblowers in the admissions office, forcing Plaintiffs to rely on statistical inference rather than direct testimony at this stage. Given the statistical anomalies in UW's own enrollment data (detailed in Section IV.H) and the Defendants' refusal to produce disaggregated records, it is reasonable to infer that UW has adopted these industry-standard concealment tactics to evade the restrictions of federal and state laws.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 29 that do not concern Defendants and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 29.

**B. <u>Asian Americans Are Acutely Aware of the Discrimination</u>**

30. As documented in the New York Times and the filings for SFFA v. Harvard (see Complaint at 60), it is a recognized phenomenon that Asian American applicants frequently attempt to appear "less Asian" to avoid admissions penalties. This strategic concealment is a direct response to the widespread understanding that elite universities, including the University of Washington, penalize applicants who fit specific racial profiles or stereotypes.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 30 that do not concern Defendants and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 30.

31. Asian American applicants, including Stanley and Minor Son, are often advised by guidance counselors and admissions consultants to downplay their achievements and interests in STEM fields or their involvement in Asian cultural organizations.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 31 and therefore deny those allegations.

32. This knowledge is transmitted through community networks and from older siblings to younger ones. Plaintiff Minor Son has observed his brother's experience and the broader community discourse, learning that his racial identity is viewed as a liability by university administrators.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 32 and therefore deny those allegations.

33. This environment imposes a cognizable constitutional injury. No student in America should be compelled to obscure their heritage or downplay their authentic achievements out of fear that their racial identity will count against them.

**RESPONSE:** Paragraph 33 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 33.

**C. <u>Plaintiff Stanley Zhong's Academic and Extracurricular Record</u>**

34. It is against this backdrop that Stanley faced the admissions process. Stanley is not merely a qualified applicant—he is, by any objective measure, among the top college applicants in the country.

**RESPONSE:** Defendants deny the allegations in Paragraph 34.

35. Stanley Zhong attended Henry M. Gunn High School, ranked #14 in California by U.S. News & World Report and the #1 best public high school in the San Francisco Bay Area according to Niche. Within this competitive setting, Stanley still stood head and shoulders above his peers. He distinguished himself as a National Merit Scholarship finalist. Although Stanley's high school does not publish individual student rankings based on grade point average, he is confirmed to be at least within the top 9% of his class, as he qualified for the University of California's "Eligibility in the Local Context" ("ELC"). ELC guarantees admission to a UC campus for California high school students who rank in the top 9% of their class, as determined by their GPA in UC-approved coursework completed in the 10th and 11th grades.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 35 and therefore deny those allegations.

36. He achieved a perfect PSAT score without any preparation and went on to score

1590 out of 1600 on the SAT, after just a few nights of self-study and without any paid tutoring or test prep.

**RESPONSE:** Defendants admit Plaintiff Stanley Zhong reported a score of 1590 out of 1600 on the SAT. Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 36 that do not concern Defendants and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 36.

37. Stanley's high school grade point average was 3.97 (unweighted) and 4.42 (weighted).

**RESPONSE:** Defendants admit Plaintiff Stanley Zhong reported a weighted high school grade point average of 4.42. Defendants otherwise deny the allegations in Paragraph 37.

38. Stanley's excellence extended well beyond the classroom. He took on leadership roles in a variety of academic and volunteer organizations. While still in high school, he co-founded and served as the 2nd president of OpenBrackets, a nonprofit run by high schoolers that delivered free coding lessons to more than 500 students in underserved communities across California, Washington, and Texas. It received positive feedback from Stackoverflow co-founder Mr. Jeff Atwood. For this work, Stanley was awarded the President's Volunteer Service Award at its highest level. He also co-founded and led his school's competitive programming club.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 38 and therefore deny those allegations.

39. Mr. Josh Paley, Stanley's high school Computer Science teacher, has offered to testify as a character witness.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 39 and therefore deny those allegations.

40. Stanley is a self-taught programmer whose extraordinary talent has earned him top honors in some of the world's most competitive coding contests—often outperforming industry professionals.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 40 and therefore deny those allegations.

41. Stanley placed 2nd in Carnegie Mellon's picoCTF cybersecurity challenge and was invited to CMU with expenses paid, took 6th in Stanford's ProCo, and reached the elite Platinum Division of the USA Computing Olympiad. Twice, he placed 2nd globally (2nd and 1st in the U.S., respectively) in MIT's Battlecode high school division, qualifying for invitations to MIT with expenses paid. (Unfortunately, one of those trips didn't happen due to COVID.) He also ranked among the top 500 globally in both Google Code Jam (427th) and Meta Hacker Cup (329th)—competitions dominated by seasoned software professionals from around the world.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 41 and therefore deny those allegations.

42. His skill was so advanced that in 2019, Google invited him for a full-time software engineer interview, unaware he was only 13 years old; the interview was canceled only after his age came to light because minors can't sign Google's employment agreement.

**RESPONSE:** Defendants lack knowledge and information to determine the veracity of the allegations in Paragraph 42.

43. Stanley repeatedly demonstrated extraordinary initiative far beyond his years. After reading an NPR story in April 2020 about state unemployment systems buckling under COVID-related demand due to outdated COBOL infrastructure, Stanley independently taught himself COBOL, published sample code to GitHub, and volunteered his help to the "COBOL Cowboys" featured in the article—earning a personal phone call and words of encouragement from their CEO.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 43 and therefore deny those allegations.

44. Frustrated by the lack of free e-signature tools during the pandemic, in 2021, Stanley launched RabbitSign, the world's only free e-signature service with SOC 2, ISO 27001 and HIPAA compliance included. Built by Stanley on Amazon Web Services, RabbitSign was

so secure and well-architected that AWS called it "one of the most efficient and secure" applications they had reviewed and decided to feature it in a case study—a prestigious recognition notoriously difficult to attain, even for seasoned professionals. Stanley's innovation drew national attention: RabbitSign was spotlighted on Viewpoint with Dennis Quaid—a program that has previously interviewed Fortune 500 CEOs and U.S. presidents—for its potential to help reduce healthcare costs through accessible, secure digital tools.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 44 and therefore deny those allegations.

45. Stanley's college application essay, substantially reflected in the Viewpoint interview referenced above, recounted his motivation for creating RabbitSign, a free HIPAA-compliant e-signing platform designed to help reduce America's healthcare costs. He described how he overcame repeated rejections to eventually partner with a mission-aligned organization and launch RabbitSign as the first Activism Corporation—an innovative model aimed at tackling corporate greed using free market forces. A nearly identical version of this essay helped advance him from a National Merit Scholarship semifinalist to a finalist.

**RESPONSE:** To the extent Paragraph 45 makes allegations about the contents of Plaintiff Stanley Zhong's application essay to the University of Washington, the application essay speaks for itself, and no response is required regarding its contents. Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 45 that do not concern Defendants and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 45.

46. Just before his 18th birthday, Stanley underwent one of the most rigorous and objective evaluations available in the modern labor market: Google's full-time software engineer interview process. Five randomly assigned professionally trained Google engineers assessed Stanley, devoting over ten hours to evaluating his technical skills, communication abilities, and teamwork—precisely the traits elite universities purport to assess through "holistic" admissions.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 46 and therefore deny those allegations.

47. Importantly, the structure of Google's process eliminates any risk of favoritism: interviewers are randomly assigned, shielded from outside influence, and incentivized to avoid inflating evaluations, as doing so could lead to internal compensation disparities.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 47 and therefore deny those allegations.

48. Mr. Dan Bloomberg, a longtime Google employee who served on Google's hiring committees for 18 years, has agreed to testify about Google's interview process.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 48 and therefore deny those allegations.

49. Based solely on their independent assessments, the Google engineers recommended Stanley for an L4 software engineer role, a position typically reserved for candidates with a Ph.D. or equivalent practical experience. Google extended the offer in September 2023, just after Stanley's 18th birthday.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 49 and therefore deny those allegations.

50. Stanley's full-year job performance evaluation in January 2025 confirmed the wisdom of Google's decision: Stanley met all expectations and demonstrated strong potential for continued growth. That Google—an employer with far more applicants than even the most competitive universities—recognized Stanley as qualified for a postdoctoral-level role, while UW deemed him unworthy of undergraduate admission, provides compelling circumstantial evidence of the discriminatory standards UW applies to Asian American applicants.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 50 that do not concern Defendants and therefore deny those allegations. Paragraph 50 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 50.



ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

**D. Stanley Applied on Merit—UW Rejected on Race**

51. For enrollment in Fall 2023, Stanley applied to the undergraduate programs at UW Seattle. His first-choice major was Computer Science in the Allen School at the College of Arts & Science. His second-choice major was Human Centered Design and Engineering in the College of Engineering.

**RESPONSE:** Defendants admit that Plaintiff Stanley Zhong applied to the Allen School for enrollment in Fall 2023. Plaintiff Stanley Zhong's application speaks for itself, and no response is required. Defendants admit Plaintiff Stanley Zhong's application listed "Computer science" in the Allen School as "First-choice major" and "Human centered design and engineering" in the College of Engineering as "Second-choice major." Defendants otherwise deny the allegations in Paragraph 51.

52. Like many Asian American candidates for admission, Stanley naively dared to hope that, despite the well-known barriers facing applicants who look like him, his individual merit might still prevail and UW would look past his race.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 52 and therefore deny those allegations.

53. Unfortunately, like too many Asian American students, he learned that it would not. Despite extraordinary academic credentials, internationally recognized accomplishments, his application to UW was rejected.

**RESPONSE:** Defendants admit that Plaintiff Stanley Zhong was not admitted to the Allen School. Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 53 that do not concern Defendants and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 53.

54. Stanley's story was cited in a congressional hearing in September 2023, and reported in national news.

**RESPONSE:** Defendants admit that a September 2023 congressional hearing and certain national news outlets referenced Plaintiff Stanley Zhong.

55. After Stanley's story first hit the news in October 2023, multiple independent college admissions experts and counselors (unconnected to UW) reviewed Stanley's application materials, including his essay. Tellingly, not one of these experts could identify a legitimate, performance-based reason why Stanley would have been rejected by a school of UW's caliber. Some of them have offered to testify as expert witnesses when this lawsuit proceeds to trial. By all objective indicators, Stanley appeared to be the kind of candidate any top university would eagerly admit. The absence of any apparent, merit-based explanation for this "bizarre" result raises a strong inference that Stanley's race played a role in UW's decision. There is no other plausible explanation.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 55 that do not concern Defendants and therefore deny those allegations. Paragraph 55 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 55.

56. The rejection by UW defies common sense and contradicts expert assessments of his application. As the Supreme Court noted in *Miller v. Johnson*, 515 U.S. 900, 901 (1995), "bizarreness" can serve as "persuasive circumstantial evidence that race for its own sake … was a legislature's dominant and controlling rationale." Similarly, the stark disparity between Stanley's qualifications and the UW campuses' admissions decisions raises serious concerns about the role of race in UW's admissions process. This striking incongruity strongly suggests that UW's admissions policies are being applied in a discriminatory fashion.

**RESPONSE:** Paragraph 56 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 56.

57. Stanley was denied the opportunity to compete for admission to UW on equal footing with other applicants on the basis of race or ethnicity due to UW's discriminatory admissions policies and practices.

**RESPONSE:** Defendants deny the allegations in Paragraph 57.

58. Stanley is ready and able to apply to UW when it ceases its intentional discrimination against Asian Americans.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 58 that do not concern Defendants and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 58.

59. As a result of the unlawful discrimination, Stanley Zhong has suffered significant harm, including but not limited to the loss of educational opportunities, reputational damage, and emotional distress. Plaintiffs seek all available legal and equitable relief to remedy these injuries.

**RESPONSE:** Paragraph 59 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 59.

**E. <u>Defendants' Longstanding Institutional Resistance to Race-Neutral Mandates</u>**

60. For decades, UW openly defended and advocated for race-conscious admissions policies as central to its institutional mission. At UW, "diversity" has become a euphemism for racial engineering.

**RESPONSE:** Defendants deny the allegations in Paragraph 60.

61. In 1998, Washington voters approved Initiative 200 (I-200), prohibiting preferential treatment based on race in public education. Following its passage, then–University President Richard L. McCormick publicly stated: "The recent passage of Initiative 200 has deprived us of a tool that has been useful in promoting diversity for decades." In a subsequent interview, President McCormick stated: "I doubt that we will ever look back at the passage of I-200 as a good thing." He also issued a public statement: "*Administrators and faculty are hard at work* ***revising University admissions criteria*** *so that the classes we admit will still* ***reflect the diversity of our society*** … *we are committed to doing everything within our power to achieve this result*." (Emphasis added.)

**RESPONSE:** Defendants admit that Washington voters approved I-200 in 1998. Statements from Richard L. McCormick quoted in Paragraph 61 speak for themselves,

and no response is required. Paragraph 61 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 61.

62. On May 17, 1999, UW News reported the results of the first post-I-200 admissions cycle. Offers to Black, Native American, and Hispanic applicants declined, while offers to Asian American applicants increased by 10%. President McCormick expressed dissatisfaction with these results. He stated: "We are very disappointed by this outcome for 1999…. The UW is determined to admit a diverse student body, and we will do so through... further **revisions to our admissions policies**. These efforts may take a few years to **produce the kind of results we want**, but we are going to make them work." (Emphasis added).

**RESPONSE:** The content of the May 17, 1999 UW News report cited in Paragraph 62 speaks for itself, and no response is required. Statements from Richard L. McCormick quoted in Paragraph 62 speak for themselves, and no response is required. Defendants otherwise deny the allegations in Paragraph 62.

63. The University continued to advocate for the reintroduction of race-based admissions. On January 24, 2018, UW President Ana Mari Cauce wrote to the Washington State Legislature urging support for Initiative 1000 (I-1000), a measure designed to repeal I-200. She argued that the ban on racial preferences put UW at a competitive disadvantage against universities that could "heavily recruit" based on race.

**RESPONSE:** Statements Ana Mari Cauce made to the Washington State Legislature speak for themselves, and no response is required. Defendants otherwise deny the allegations in Paragraph 63.

64. Following the legislature's passage of I-1000 in April 2019, President Cauce published a statement on June 20, 2019, declaring: "I am on the record supporting this change in the law... I-1000 is not about quotas... It is about leveling the playing field so that we can better compete in admission and hiring."

**RESPONSE:** Statements from Ana Mari Cauce quoted in Paragraph 64 speak for themselves, and no response is required. Defendants otherwise deny the allegations in Paragraph 64.

65. However, after the Supreme Court's decision in SFFA actually leveled the playing field, President Cauce was disappointed. She published a statement on August 1, 2023, titled "Affirmative action ruling won't change our values or our mission." She stated that the ruling "created much disappointment and concern" and affirmed that UW remained "wholeheartedly committed" to its diversity objectives despite the prohibition on race-conscious admissions.

**RESPONSE:** Statements from Ana Mari Cauce quoted in Paragraph 65 speak for themselves, and no response is required. Paragraph 65 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 65.

66. In an April 2023 interview with Cascade PBS, UW's Vice President for Minority Affairs and Diversity, Rickey Hall, defined the University's diversity success via visual inspection of the student body. He stated: "A test for me is when I can look out and look at Red Square, and in an hour, if I see several African Americans, that's a pretty good indicator." He also stated that although the percentage of Black, Latino, and mixed-race students were somewhat in line with the demographics of Washington high-school graduates, he considered this inadequate.

**RESPONSE:** Statements from Rickey Hall in Paragraph 66 speak for themselves, and no response is required. Defendants otherwise deny the allegations in Paragraph 66.

67. The macro political environment in Washington State has undoubtedly enabled and encouraged UW's discriminatory practices in admissions. In January 2022, Governor Jay Inslee issued Executive Order 22-02, rescinding the prior Executive Order implementing I-200. The Washington Student Achievement Council (WSAC), in its 2026 Strategic Action Plan, subsequently declared: "Ensuring racial equity in our state requires that our higher education system reflects the diversity of our population." This policy effectively mandates racial balancing.

**RESPONSE:** Defendants admit Governor Jay Inslee issued Executive Order 22-02 in January 2022. Statements in the 2026 WSAC Strategic Action Plan speak for

themselves, and no response is required. Paragraph 67 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 67.

**F. <u>Defendants' Policies and Actions for Racial Balancing its Student Body</u>**

68. In addition to its evident motive and intent to engage in racial balancing, the University of Washington also possesses the means and opportunity to manipulate the racial composition of its student body through its current "holistic" admissions process. This framework—lacking transparency, third-party oversight, or enforceable accountability—provides ample discretion to prioritize race behind closed doors while maintaining public deniability. In practice, UW's stated intent is matched by its actions.

**RESPONSE:** Paragraph 68 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 68.

**<u>F.1. Allen School DEIA Strategic Plan</u>**

69. In or around September 2021, the Allen School published its Diversity, Equity, Inclusion, and Access Five-Year Strategic Plan (the "DEIA Plan"). The DEIA Plan explicitly establishes numerical enrollment targets based on race. Goal O.1 of the DEIA Plan directs the administration to: "Measure the percentage of domestic Black, Hispanic, and American Indian/Alaska Native, Hawaiian/Pacific Islander undergraduates and, by year 5, evaluate whether the percentage is at least 15% (the UW-Seattle average)." (Emphasis added.) The DEIA Plan also sets a similar target of 12% for the Ph.D. program. The DEIA Plan categorizes these racial percentages not as passive observations, but as operational goals to be achieved on a specific timeline. The DEIA Plan further notes that "The above targets are our current 5-year targets. They are not final targets."

**RESPONSE:** The DEIA Plan speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 69.

70. To achieve these racial targets, the DEIA Plan directs the Allen School to "[revise] rubrics and training materials for undergraduate current UW admission and transfer admission pathways."

**RESPONSE:** The DEIA Plan speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 70.

71. The DEIA Plan arbitrarily selects the demographics of the general UW-Seattle campus as the benchmark for the Computer Science department, requiring the Allen School to match or exceed the "UW-Seattle average" of 15% for the specified racial groups. This requirement applies regardless of the distinct applicant pool for Computer Science compared to the university at large.

**RESPONSE:** The DEIA Plan speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 71.

72. Because achieving these specific racial targets is statistically implausible using strictly race-neutral academic metrics (given the applicant pool disparities detailed in Section IV.H), the 'anti-bias' training necessarily redefines 'bias' as the failure to select a sufficient number of preferred minorities. Thus, the training serves as the operational mechanism to instruct staff on which specific racial preferences must be applied to bridge the gap between meritocratic outcomes and the racial targets.

**RESPONSE:** Defendants deny the allegations in Paragraph 72.

73. At the time the Allen School adopted these race-based targets in 2021, the University was subject to Washington Initiative 200 (I-200), which prohibits granting preferential treatment to any individual or group on the basis of race. The Allen School adopted and implemented these numerical racial targets and the associated procedural changes despite the existence of I-200.

**RESPONSE:** Defendants admit that the University was subject to I-200 in 2021. Defendants otherwise deny the allegations in Paragraph 73.

74. Defendant Tadayoshi Kohno and Defendant Chloe Dolese Mandeville co-led the development of the DEIA Plan in 2020. Following the adoption and implementation of this Plan—and its race-based enrollment targets—Defendant Kohno was promoted to Associate Dean of the College of Engineering. Defendant Dolese Mandeville received the 2023 UW Distinguished Staff Award. Notably, Defendant Kohno spoke about this Plan with pride.

**RESPONSE:** Defendants admit that Defendant Tadayoshi Kohno was appointed the Associate Dean for Faculty Success in the College of Engineering in November 2023. Defendants admit that Defendant Chloe Dolese Mandeville received the 2023 UW Distinguished Staff Award. Defendants otherwise deny the allegations in Paragraph 74.

**F.2. Broadening Participation in Computing Plan**

75. Effective from December 15, 2021, to December 15, 2023, the Allen School also operated under an official Departmental Broadening Participation in Computing ("BPC") Plan. The BPC Plan established specific numerical targets for racial enrollment, including directives to:

- "Increase the percentage of domestic BHN [Black, Hispanic, Native] undergraduates to the UW-Seattle average"; and
- "Increase the percentage of domestic BHN Ph.D. students by 10 percentage points" over five years. To achieve these targets, the BPC Plan authorized recruitment and outreach initiatives specifically focused on the "BHN" demographic, including targeted K–12 outreach, summer camps, and partnerships with identity-based organizations.

**RESPONSE:** The BPC Plan speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 75.

**F.3. Public Denial**

76. Defendant Magdalena Balazinska stated in a letter to the Asian American Coalition for Education (AACE) that "The University of Washington (and thus the Allen School) does not use race as a factor in admission decisions." This statement directly contradicts the DEIA Plan and the BPC Plan, which explicitly set racial enrollment targets.

**RESPONSE:** Magdalena Balazinska's letter quoted in Paragraph 76 speaks for itself, and no response is required regarding its contents. To the extent a response is required, Defendants deny the allegations in Paragraph 76.

77. As of August 5, 2025, the DEIA Plan ( https://www.cs.washington.edu/who-we-are/diversity-equity-inclusion-access/strategic-plan ) has been removed from the University website.

**RESPONSE:** Defendants admit that the DEIA Plan is no longer displayed on the University's website.

**F.4. Allen School's Transfer Admissions Rubric**

78. The Allen School's focus on racial identity extended to other evaluation criteria. The Allen School's Transfer Admissions Rubric for Spring and Fall 2023 solicited applicants to "Tell us about … your identities… This could include but not limited to: race, ethnicity…" The rubric directed evaluators to assign higher scores to applicants who "clearly [demonstrated] how they will contribute to the diversity of the Allen School community."

**RESPONSE:** The Transfer Admissions Rubric speaks for itself, and no response is required regarding its contents. To the extent a response is required, Defendants deny the allegations in Paragraph 78 and Defendants deny the mischaracterization of that Rubric as evincing a "focus on racial identity."

**F.5. Defendants' Systematic Discriminatory Policies**

79. The Allen School's race-conscious decision-making is not an outlier at UW; rather, it is a manifestation of a University-wide policy. This discriminatory framework is operationalized systematically at every level of the institution, from central administration down to individual colleges and departments.

**RESPONSE:** Defendants deny the allegations in Paragraph 79.

80. The University's Board of Regents maintains Regent Policy No. 32, which governs undergraduate admissions. The policy directs the University to pursue affirmative action and "a diverse student body, with representatives from all cultural backgrounds" as objectives of its undergraduate admissions process. This policy remains active and unamended despite the passage of Initiative 200 and the Supreme Court's decision in SFFA.

**RESPONSE:** Regent Policy No. 32 speaks for itself, and no response is required regarding its contents. Defendants admit a policy titled Regent Policy No. 32 – Policy

on Admissions is currently in force. Defendants otherwise deny the allegations in Paragraph 80.

81. The University centrally coordinates its diversity initiatives through the Diversity Blueprint 2022–2026. This document functions as a governing mandate for all University units. The Blueprint explicitly states that the University "must increase" the population of students and faculty from specific racial groups—namely "Indigenous, Black, and People of Color." To achieve this, the Blueprint imposes an "accountability" regime, requiring "leaders at all levels" to implement "new initiatives to achieve these goals."

**RESPONSE:** The 2022-2026 Diversity Blueprint speaks for itself, and no response is required regarding its contents. Defendants deny that Paragraph 81 accurately quotes the 2022-2026 Diversity Blueprint and otherwise deny the allegations in Paragraph 81.

82. The University's 2014 Diversity Blueprint defined "diversity" to include "groups or individuals with differences [in] culture or background, including, but not limited to, race." A current University website expanded this definition to "groups or individuals from historically underrepresented and underserved populations with different culture or background, including but not limited to, race," UW's Department of Global Health explicitly defined diversity to target "traditionally underrepresented groups (e.g. based on race, ethnicity,...)." UW Information School's Diversity webpage defines equity as "the ongoing practice of identifying and dismantling barriers to ensure fair treatment, access, opportunity, and outcomes for all, especially those historically marginalized." (Emphasis added.)

**RESPONSE:** The 2011-2014 Diversity Blueprint speaks for itself, and no response is required regarding its contents. The University's website speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 82.

83. The College of Engineering's official strategic plan designates DEI as "central to our mission." It sets a goal to "establish ARSR (attract, recruit, select and retain) goals... for underrepresented groups." For the 2022-2023 academic year, the College committed to establishing "recruitment, admissions and hiring goals." For 2023-2024, it directed units to

"identify and implement best practices for achieving recruitment, admissions and hiring goals." (Emphasis added.)

**RESPONSE:** The official strategic plan of the College of Engineering speaks for itself, and no response is required regarding its contents. Defendants deny that any "goal" constitutes a quota and otherwise deny the allegations in Paragraph 83.

84. The School of Medicine's "Commitment to Diversity" statement declares that the goal of admissions is to "select a regionally representative, inclusive student body… with diverse identities." It explicitly lists "[r]acial or ethnic communities underrepresented in medicine (URiM)" as a background that furthers academic objectives.

**RESPONSE:** The School of Medicine's Commitment to Diversity statement speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 84.

85. Policy 1.3 of the School of Medicine's MD Program Policies Handbook declares a "critical need" to increase the number of students from "historically excluded populations currently underrepresented in medicine and the health professions."

**RESPONSE:** The School of Medicine's MD Program Policies Handbook speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 85.

86. The Department of Comparative History of Ideas (CHID)'s policy declares that teaching and research must be guided by a commitment to address structures that marginalize "racial … identities." The policy values differences in "ability" and "race."

**RESPONSE:** The Department of Comparative History of Ideas' policy speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 86.

87. The Department of Anthropology's "Diversity Mission Statement" declares an objective to "collectively reflect the diversity of our society" and specifically targets "US minorities historically underrepresented" for "recruitment, retention and promotion."

**RESPONSE:** The Department of Anthropology's Diversity Mission Statement speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 87.

88. The Department of History's "Diversity Statement" formally declares that its diversity initiative is a "long-term project that should inform and transform everything we do." Crucially, this transformation is operationalized through a specific mandate to "attract and retain different populations" within its faculty and student body.

**RESPONSE:** The Department of History's Diversity Statement speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 88.

89. The Department of Sociology defines its core values as a mandate to "redress the exclusion of historically underrepresented groups" and commits to recruiting members from these communities to "redress" this legacy.

**RESPONSE:** The Department of Sociology's website speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 89.

90. In January 2025, the UW Bothell School of Interdisciplinary Arts & Sciences website states that "[w]e see diversity … includes, but is not limited to, race," and further declared that "[w]e seek to redistribute opportunities and resources to foster equity and social justice." Its diversity plan aims to "increase representation of (1) populations under-represented within academia" while "mirroring the shifting demographics of our region." As of December 14, 2025, this language has been removed from the UW website.

**RESPONSE:** The Bothell School of Interdisciplinary Arts & Sciences website speaks for itself, and no response is required regarding the contents of the statements. Defendants admit that the language quoted in Paragraph 90 does not appear on the UW Bothell School of Interdisciplinary Arts & Sciences' website as of the date of this Answer. Defendants otherwise deny the allegations in Paragraph 90.

91. On March 14, 2025, the U.S. Department of Education's Office for Civil Rights (OCR) announced an enforcement initiative regarding "race-exclusionary practices." The University of Washington is listed as a subject of investigation under this initiative.

**RESPONSE:** The announcement from the U.S. Department of Education cited in Paragraph 91 speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 91.

**G. Additional Institutional Practices Illustrating Admissions Framework**

**G.1. Race-based Graduate Admissions and Scholarships**

92. In April 2024, UW Professor Cliff Mass reported that graduate admissions matrices in certain departments now include a "DEI flag" while dropping objective measures such as the SAT and GRE exams. This flag is used to enhance the visibility of applicants based on their identity, heavily weighting the system to favor diversity over objective metrics.

**RESPONSE:** The statement from Professor Cliff Mass, which was posted on his personal blog, speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 92.

93. The Department of Computer Science maintains an "opt-in email list for undergraduates to share opportunities and resources available to those who identify with groups that are underrepresented in computing."

**RESPONSE:** Defendants deny the allegations in Paragraph 93.

94. In 2021, in response to SB 5228, the UW Medical School established the Incentive Scholarships program. In 2023, 100% of the recipients of these scholarships identified as "Underrepresented in Medicine" (URiM), indicating that the University is utilizing race and identity as a primary qualification for financial aid eligibility.

**RESPONSE:** Defendants admit that the University of Washington offers financial assistance to incentivize candidates to attend the University of Washington School of Medicine. Defendants otherwise deny the allegations in Paragraph 94.

**G.2. Faculty Hiring Policies Relevant to Institutional Admissions Culture**

95. **Nexus Between Hiring and Admissions:** Plaintiffs acknowledge that faculty employment is governed by distinct legal standards (e.g., Title VII) compared to undergraduate admissions. Crucially, unlike in higher education where the Supreme Court previously tolerated a temporary exception for race-conscious admissions, the Court has never carved out an exception for race-conscious hiring. Thus, the University's willingness to violate the even stricter prohibitions in the employment context—where no "diversity" defense has ever existed—demonstrates an unchecked institutional commitment to racial engineering that Plaintiffs allege permeates its admissions office as well.

**RESPONSE:** Paragraph 95 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 95.

96. Defendants operationalize racial preferences through financial coercion. The "Provost's Faculty Recruitment Initiative" offers "supplemental funds" to departments specifically to incentivize hires that "enhance the unit's diversity profile," effectively placing a financial bounty on race-based hiring decisions.

**RESPONSE:** The Provost's Faculty Recruitment Initiative speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 96.

97. In 2020-21, UW's Psychology Department produced a report titled Promising Practices for Increasing Equity in Faculty Searches, funded by Dean Daniel Pollack. The report detailed how the department achieved a 100% "BIPOC" hiring rate by prioritizing "Black … or Latinx" candidates. It explicitly recommended "working backwards" from pre-selected URM candidates to tailor job descriptions, as directed by Associate Vice Provost Chadwick Allen, and assigning staff to track why URM candidates were dropped at each stage.

**RESPONSE:** The University Psychology Department report quoted in Paragraph 97 speaks for itself and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 97.



ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

98. In 2023, the Psychology Department hiring committee initially ranked a White candidate first and an Asian candidate second, but subsequently re-ranked the finalists to prioritize a Black candidate. A subsequent investigation by UW's Complaint Investigation and Resolution Office (CIRO) concluded that "race was used as a substantial factor in the selection of the final candidate." The incident only came to light due to a public records request.

**RESPONSE:** The allegations in Paragraph 98 concern the content of a written document which speaks for itself, and no response is required regarding the document's contents. Defendants otherwise deny the allegations in Paragraph 98.

99. Internal emails revealed a clear "consciousness of guilt." One faculty member advised "deleting the statement … as it shows that URM applications were singled out and evaluated differently." Another suggested the committee "preemptively think our way around" legal risks.

**RESPONSE:** The allegations in Paragraph 99 quote from various documents which speak for themselves, and no response is required regarding their contents. Defendants otherwise deny the allegations in Paragraph 99.

100. In a subsequent meeting attended by several Deans, Psychology Professor Ione Fine alleged that the re-ranking was explicitly encouraged by Associate Vice Provost Chadwick Allen. Professor Fine stated: "There has been a pattern, a long-standing pattern, of illegal hiring in this university that was tacitly encouraged across the upper and central administration." Professor Fine accused Mr. Allen of "bullying junior faculty members" into reranking the candidates. She alleged that Dean Daniel Pollack "explicitly told [faculty] not to document race-based deliberations in writing." She further alleged that Dean Harris manipulated the CIRO investigation to scapegoat the department and "to hide the involvement of upper administration … at the highest levels, including the Board of Regents", by narrowing the CIRO investigation's scope to exclude Associate Vice Provost Allen's emails. Allen refused to answer questions when he was interviewed for the investigation.

**RESPONSE:** The allegations in Paragraph 100 appear to quote from an unauthenticated audio recording which contents speak for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 100.

101. Despite the discontinuation of mandatory diversity statements at peer institutions, the University of Washington continues to require them (e.g. Department of Statistics job opening, September 2025). These statements function as an ideological screening tool, allowing the University to proxy for race during the vetting process.

**RESPONSE:** Defendants deny the allegations in Paragraph 101.

102. Professor Cliff Mass shared in his blog, "My department is going through a faculty search right now, and the attestations of fealty to DEI principles by applicants were fulsome and exaggerated. The search committee structure ensures that only 'right-thinking' applicants have a chance."

**RESPONSE:** Cliff Mass's blog speaks for itself, and no response is required regarding its contents. Defendants otherwise deny the allegations in Paragraph 102.

### H. Statistical Disparities Indicating Suppression of Asian American Enrollment

103. According to the 2020 U.S. Census, Washington's Asian population grew by 51.9% between 2010 and 2020, making it the fastest-growing ethnic group in the state. Asian American Pacific Islander Vote (AAPIV) estimated that the AAPI voter pool in Washington grew by 54% during the same period, compared to a 16% change for the statewide eligible voting population.

**RESPONSE:** US Census and AAPIV data and estimates speak for themselves and no response is required as to their content.

104. Despite this demographic shift, Asian enrollment at the University of Washington has declined in relative terms. In 2013, UW's freshman class included 1,794 Asian American students, comprising 28.7% of the class. By 2024, Asians accounted for only 23% of UW's total enrollment.

**RESPONSE:** Defendants admit that the University of Washington in Seattle reported a Fall 2013 freshman class of 6,255 students and reported that the University of Washington in Seattle's Fall 2013 freshman class included 1,794 Asian Americans. Defendants admit that Asian students comprised approximately 23% of the University of Washington's Fall 2024 total enrollment. Defendants otherwise deny the allegations in Paragraph 104.

105. Data from the Washington Education Research & Data Center (ERDC) and national SAT trends reveals a substantial disparity between the pool of high-scoring applicants and UW enrollment. Based on 2018 ERDC data and national SAT performance distributions, Asian students comprise approximately 8.42% of Washington's K-12 population but account for a disproportionate share of top test scorers. Nationally, 25% of Asian SAT takers score in the top range between 1400–1600, compared to 6% of White students, 2% of Hispanic students, and 1% of Black students. Applying these national rates to Washington demographics, Asian top scorers represent approximately 2.11% (25%*8.42%) of all the SAT takers in Washington. White top scorers represent 3.57%, Hispanic top scorers 0.51%, and Black top scorers 0.05%. However, Asian, Hispanic and Black enrollments at UW are 23%, 10% and 5%, respectively, suggesting Asian enrollment is suppressed relative to their representation among the top scorers.

**RESPONSE:** The data from the ERDC and national SAT performance distributions speak for themselves, and no response is required with respect to those data. UW's publicly-available statistics speak for themselves, and no response is required thereto. Defendants otherwise deny the allegations in Paragraph 105.

106. In 2021, the University eliminated SAT/ACT requirements. While initially attributed to the COVID-19 pandemic, the University has maintained this policy indefinitely. This removal of objective standardized metrics prevents public analysis of score disparities between admitted racial groups.

**RESPONSE:** Defendants admit that the University eliminated the requirement that applicants submit an SAT or ACT score in 2020 and has not required applicants to submit

an SAT or ACT score since that time. Defendants otherwise deny the allegations in Paragraph 106.

107. The University does not publish admissions data disaggregated by race, nor does it release SAT score ranges or acceptance rates by racial group—a significant departure from accepted transparency norms. The University's 2024 entering class profile omitted Asian enrollment statistics entirely.

**RESPONSE:** Defendants admit the University does not publish SAT score ranges. Defendants otherwise deny the allegations in Paragraph 107.

108. The University does not disclose the number of National Merit Scholarship finalists among its admitted students, concealing whether similarly qualified applicants are being admitted on a consistent basis across racial lines.

**RESPONSE:** Defendants admit the University does not publish the number of National Merit Scholarship finalists that it admits. Defendants otherwise deny the allegations in Paragraph 108.

109. The divergence between the rapidly growing, high-achieving Asian American applicant pool and the declining Asian American enrollment share at UW raises a strong inference of artificial suppression. As the Supreme Court noted in *Reno v. Bossier Parish School Board*, the natural consequences of an action often provide probative evidence of intent. The sustained adverse impact on Asian American applicants suggests that the "holistic" admissions process is functioning as a mechanism to cap Asian enrollment, just as the admissions data in *SFFA v. Harvard* revealed.

**RESPONSE:** Paragraph 109 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 109.

110. Plaintiffs have secured the support of expert witnesses for Students for Fair Admissions, who have agreed to conduct a rigorous statistical analysis of UW's admissions practices once the admissions data is obtained through discovery.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 110 and therefore deny those allegations.

### I. "Holistic Review" as a Pretext for Race-Based Balancing

111. Following the Supreme Court's decision in SFFA, many peer institutions saw a surge in Asian American enrollment as merit-based criteria replaced racial balancing. The University of Washington, however, has maintained its racial enrollment targets by hiding behind the label of "holistic review." While the term implies a thorough, individualized assessment, the operational reality of UW's admissions process makes such a review highly implausible.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 111 pertaining to other institutions. Defendants otherwise deny the allegations in Paragraph 111.

112. The University requires its application readers to review approximately 8-10 applications per hour. This allows for only six to seven minutes per applicant. In this brief window, a reader must evaluate transcripts, extracurricular activities, essays, and recommendations—a file often exceeding 3,000 words.

**RESPONSE:** Defendants deny the allegations in Paragraph 112.

113. To process this volume of information in six minutes would require reading speeds approaching 500 words per minute—double the average for a college graduate—while simultaneously synthesizing complex qualitative data. Across an applicant pool of 69,177 (Fall 2024), this breakneck pace necessitates the use of heuristics and shortcuts. In the absence of objective metrics, these shortcuts create a heightened risk of relying on racial proxies and stereotypes.

**RESPONSE:** Defendants deny the allegations in Paragraph 113.

114. This cursory review stands in stark contrast to the hiring practices of major employers in the region, such as Google, which invest ten or more hours per candidate to assess merit. That is about 100 times more than UW. UW's process claims to be "holistic" but lacks the time allocation required to be anything other than superficial.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 114 that do not concern Defendants and

therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 114.

115. In 2021, the University abolished its SAT/ACT requirement, citing the COVID-19 pandemic. While peer institutions including MIT, Dartmouth, Yale, Brown, Harvard, Caltech, Cornell, and the University of Texas at Austin have since reinstated standardized testing to ensure academic preparedness and fairness, UW has refused to do so.

**RESPONSE:** Defendants admit that the University eliminated the requirement that applicants submit an SAT or ACT score in 2020 and has not required applicants to submit an SAT or ACT score since that time. Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 115 that do not concern Defendants and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 115.

116. The continued suspension of standardized testing serves to eliminate the most objective, verifiable data point in an admissions file. Without test scores, there is no objective anchor to counter-balance subjective bias or to expose disparities in academic standards between racial groups. This policy allows the University to reject high-achieving Asian American applicants without creating a statistical paper trail of "high-score rejections."

**RESPONSE:** Defendants deny the allegations in Paragraph 116.

117. Tellingly, "holistic review" is a legal term of art long used by universities openly engaged in race conscious admissions. The use of subjective "holistic" criteria to mask anti-Asian bias is a documented historical practice. As revealed in *SFFA*, and corroborating statements from former admissions officers at peer institutions, vague criteria like "personality" or "fit" have routinely been used to dismiss Asian American applicants with derogatory stereotypes such as "textureless math grind." By removing test scores and relying entirely on a six-minute subjective review, UW has optimized its system to facilitate exactly this kind of unverifiable discrimination.

**RESPONSE:** Paragraph 117 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 117.

118. When Stanley Zhong applied for the Fall 2023 term, this "test-optional," high-speed review system was in full effect. His application—stripped of the standardized test scores that objectively demonstrated his superiority to the average admit—was subjected to a rapid, subjective assessment. This process allowed admissions officers to bypass his objective merit and reject him based on unverifiable "holistic" factors, consistent with the University's broader goal of racial engineering.

**RESPONSE:** Defendants admit that the University eliminated the requirement that applicants submit an SAT or ACT score in 2020 and has not required applicants to submit an SAT or ACT score since that time. Defendants otherwise deny the allegations in Paragraph 118.

**J. <u>Elements of Prima Facie Discrimination Under McDonnell Douglas</u>**

119. The facts surrounding Stanley Zhong's rejection establish a prima facie case of racial discrimination under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and reaffirmed in *Ames v. Ohio Dep't of Youth Services*, 605 U.S. ___ (2025). Stanley satisfies all four elements required to shift the burden to the University to explain its decision.

**RESPONSE:** Paragraph 119 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 119.

120. **Protected Class (Element 1)**: Stanley is a member of a protected class (Asian American).

**RESPONSE:** Paragraph 120 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 120.

121. **Qualified for Admission (Element 2)**: Stanley applied for admission to the University's Computer Science and Human Centered Design and Engineering programs for the Fall 2023 cycle. He was objectively highly qualified for admission. His academic credentials, including a 3.97 unweighted GPA (4.42 weighted), a 1590 SAT score, the status as a National Merit Scholarship Finalist, numerous national and global coding competition awards, and the highest level of Presidential Volunteer Service Award, placed him in the highest tier of the

applicant pool. His technical achievements—including creating a free e-signing service praised by experts, and securing employment as a full-time Ph.D.-level software engineer at Google at age 18—exceeded the standard qualifications for undergraduate admission.

**RESPONSE:** Defendants admit that Plaintiff Stanley Zhong applied to the Allen School for enrollment in Fall 2023. Defendants admit Plaintiff Stanley Zhong reported a weighted high school grade point average of 4.42. Defendants admit Plaintiff Stanley Zhong reported a score of 1590 on the SAT. Beyond what Stanley Zhong provided in his admissions application, Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 121, including allegations that do not concern Defendants, and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 121.

122. **Adverse Action (Element 3)**: Despite these objectively superior qualifications, the University rejected Stanley's undergraduate application.

**RESPONSE:** Defendants admit that the University did not offer Plaintiff Stanley Zhong admission to the Allen School in Fall 2023. Defendants otherwise deny the allegations in Paragraph 122.

123. **Comparator Evidence (Element 4)**: Similarly situated individuals outside of Stanley's protected class received more favorable treatment. For the Fall 2023 enrollment cycle, the University's Computer Science program admitted 569 Washington residents and 83 domestic non-residents. On information and belief, Defendants admitted non-Asian applicants with academic and technical credentials substantially inferior to Stanley's, consistent with the statistical disparities detailed in Section IV.H.

**RESPONSE:** Paragraph 123 contains legal conclusions to which no response is required. Defendants admit 569 Washington residents and 83 domestic non-residents were offered admission to the Allen School's 2023 freshman class. Defendants otherwise deny the allegations in Paragraph 123.



ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

**K. Defendants' Deliberate Indifference to Plaintiffs' Constitutional Rights**

124. On January 26, 2025, Plaintiff Nan Zhong sent an email to the Regents of the University of Washington and President Cauce formally notifying them of the irregularities in Stanley's rejection. As of the filing of this Complaint, they have failed to respond or acknowledge this correspondence.

**RESPONSE:** Defendants admit that Nan Zhong advised he sent an email to certain Defendants. Defendants otherwise deny the allegations in Paragraph 124.

125. The application materials Stanley submitted to the University of Washington contained a similar technical portfolio that was subsequently reviewed by Google.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 125 and therefore deny those allegations.

126. The contrast in assessment is absolute. Google reviewed these technical achievements and determined they demonstrated competence equivalent to an L4 Software Engineer—a level requiring a Ph.D. or equivalent practical experience. The University of Washington reviewed the achievements and determined they did not qualify Stanley for undergraduate admission.

**RESPONSE:** Defendants admit that the University did not offer Plaintiff Stanley Zhong admission to the Allen School in 2023. Defendants lack knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 126 and therefore deny those allegations.

127. Defendants are aware of the strict legal prohibitions against racial discrimination under the Fourteenth Amendment, Title VI, 42 U.S.C. § 1981, and RCW 49.60.400. Consequently, Defendants have an incentive to conceal the specific mechanics of their race-conscious decision-making.

**RESPONSE:** Paragraph 127 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 127.

128. On information and belief, the specific evidence regarding how racial balancing was operationalized—including internal deliberations, "read sheets," and the precise weight

given to racial proxies in the "holistic" review of Stanley's application—is contained in non-public communications and internal documents currently within the exclusive control of the Defendants.

**RESPONSE:** Defendants deny the allegations in Paragraph 128.

**L. <u>Hostile Climate and Chilling Effect</u>**

129. Asian American students who challenge racial preferences on college campuses face documented social hostility and reputational risk. In the prevailing campus climate, advocacy for race-neutral admissions is frequently characterized as opposition to civil rights or "equity."

**RESPONSE:** Defendants deny the allegations in Paragraph 129.

130. Asian American students face a distinctive burden: they are subject to adverse action in the admissions process based on their race, yet are simultaneously discouraged from seeking redress. The institutional messaging across universities, which equates "anti-racism" with the support of race-conscious policies, effectively brands dissenters as "racist."

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of allegations concerning conditions at other academic institutions. As to the University of Washington, Defendants deny the allegations in Paragraph 130.

131. This environment creates a coercive effect that discourages Asian American applicants and students from asserting their legal rights. It is reasonable to infer that numerous prospective and current students, having been harmed by the University's admissions practices, remain silent due to a legitimate fear of social retaliation, academic professional ostracization, or labeling.

**RESPONSE:** Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 131 that do not concern Defendants and therefore deny those allegations. Defendants otherwise deny the allegations in Paragraph 131.



ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

**M. Imminent Injury and Standing of Plaintiff Minor Son**

132. Plaintiff Minor Son is currently a junior in high school. He anticipates applying to the University of Washington during the Fall in 2026, and has recently received recruiting materials from UW inviting him to apply.

**RESPONSE:** Plaintiff Minor Son's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Minor Son is required. Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 132 and therefore deny those allegations.

133. Minor Son possesses objectively superlative academic credentials. In October 2025, he scored in the top one percent of all U.S. test takers on the PSAT without any paid tutoring or test prep, qualifying as a National Merit Scholarship Semifinalist. He maintains a perfect 4.0 unweighted GPA, placing him at the very top of his class.

**RESPONSE:** Plaintiff Minor Son's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Minor Son is required. To the extent a response is required, Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 133 and therefore deny those allegations.

134. Minor Son demonstrates the "well-rounded" character ostensibly valued by the University.

**RESPONSE:** Plaintiff Minor Son's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Minor Son is required. To the extent a response is required, Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 134 and therefore deny those allegations.

135. A member of the Varsity Cross Country team since freshman year, he won the team MVP award in November 2025 and qualified for the State Championship, ending a seven-year hiatus for his high school at the state level.

**RESPONSE:** Plaintiff Minor Son's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Minor Son is required. To the extent a response is required, Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 135 and therefore deny those allegations.

136. He is a national-level Rubik's Cube competitor, capable of solving the cube in 6.25 seconds during official events. He also taught himself to juggle five balls, and performed on stage at the second largest annual juggling festival in North America.

**RESPONSE:** Plaintiff Minor Son's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Minor Son is required. To the extent a response is required, Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 136 and therefore deny those allegations.

137. Despite his qualifications, Minor Son faces a concrete and imminent injury. He is aware of the rejection of his brother, Stanley, and the statistical evidence indicating that the University penalizes Asian American applicants. The existence of a discriminatory barrier constitutes an injury-in-fact because it prevents a plaintiff from competing on an equal footing.

**RESPONSE:** Plaintiff Minor Son's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Minor Son is required. To the extent a response is required, Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 137 that do not concern Defendants and therefore deny those allegations. Paragraph 137 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 137.

138. Minor Son views an application to the University as a "fool's errand" due to his race. The University's conduct has concretely deterred him, creating a risk that he will not apply solely to avoid the humiliation of a race-based rejection. He is further deterred by the hostile

campus climate, where Asian American students who oppose racial discrimination are frequently stigmatized.

**RESPONSE:** Plaintiff Minor Son's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Minor Son is required. To the extent a response is required, Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations concerning Minor Son in Paragraph 138 and therefore deny those allegations. To the extent a response is required to allegations concerning Defendants, Defendants deny the allegations in Paragraph 138.

139. Minor Son is ready and able to apply to the University once the discriminatory barriers are removed.

**RESPONSE:** Plaintiff Minor Son's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Minor Son is required. To the extent a response is required, Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 139 and therefore deny those allegations. Paragraph 139 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 139.

140. Plaintiff Nan Zhong acknowledges the Ninth Circuit's holding in *Johns v. County of San Diego*, 114 F.3d 874 (9th Cir. 1997), regarding the representation of minors by non-attorney parents. However, Plaintiffs submit that the Johns rule is intended to protect the rights of the minor, not to extinguish them. Plaintiffs have made diligent efforts to retain counsel for this matter, as they successfully did in parallel litigation against the University of California, the University of Michigan, and Cornell University. Despite these efforts, no attorney has yet been willing or able to take this specific case. To bar Minor Son from seeking redress for an imminent constitutional violation solely due to the unavailability of counsel would result in a profound injustice and deny him the very protection *Johns* seeks to ensure. Plaintiffs continue to actively seek counsel and are proceeding pro se to prevent the expiration of claims and the occurrence of imminent and irreparable harm.

**RESPONSE:** Plaintiff Minor Son's and Plaintiff Nan Zhong's claims have been dismissed from this case by the order of the Court, ECF No. 50, and no response to allegations concerning Minor Son or Nan Zhong is required. Defendants lack knowledge and information sufficient to form a belief about the truth of allegations in Paragraph 140 that do not concern Defendants and therefore deny those allegations. Paragraph 140 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 140.

**N. Summary of Factual Allegations**

141. The foregoing facts demonstrate that the University of Washington utilizes race as a factor in its operations across multiple functional areas. This conduct is evidenced by the following specific allegations:

**RESPONSE:** Defendants incorporate their responses to the preceding paragraphs as if fully set forth herein and deny the allegations in Paragraph 141.

142. Undergraduate Admissions:

- **Individual Disparities**: The rejection of Plaintiff Stanley Zhong, despite technical qualifications evaluated by Google as equivalent to a Ph.D. level engineer, raises a strong inference that objective merit was subordinated to other factors.
- **Statistical Anomalies**: The Asian American population in Washington grew by over 50% between 2010 and 2020, yet Asian American enrollment at UW declined from 28.7% (2013) to 23% (2024).
- **Score Disparities**: 25% Asian American SAT takers score in the top-tier (1400–1600), yet their enrollment numbers at UW do not reflect this demographic concentration of academic merit.

**RESPONSE:** Defendants admit that Plaintiff Stanley Zhong applied to the Allen School for enrollment in Fall 2023. US Census, UW data, and SAT distribution data speak for themselves, and no response is required as to their content. Defendants otherwise deny the allegations in Paragraph 142.

143. Graduate Admissions:

- Use of "DEI Flags": As reported by Professor Cliff Mass, graduate admissions matrices in certain departments utilize "DEI flags" to weight applicants based on identity.
- Restricted Scholarships: The School of Medicine's "Incentive Scholarships" were awarded exclusively (100%) to students identifying as "Underrepresented in Medicine" in 2023.

**RESPONSE:** Statements by Professor Cliff Mass speak for themselves, and no response is required regarding their contents. Defendants admit that the University of Washington offers financial assistance to incentivize candidates to attend the University of Washington School of Medicine. Defendants otherwise deny the allegations in Paragraph 143.

144. Faculty Hiring:

- **Re-Ranking Candidates**: The Psychology Department explicitly re-ranked finalists to prioritize a Black candidate over a higher-ranked White candidate and Asian candidate.
- **Concealment of Intent**: Internal emails revealed faculty members advising the deletion of records to hide that URM applications were singled out and evaluated differently.
- **Coverup**: Whistleblower reports also exposed involvement and coverup by senior administrators.
- **Ideological Screening**: The University continues to require "Diversity Statements" for faculty positions, using them as a screening tool for racial and ideological alignment.

**RESPONSE:** The documents referenced in the allegations in Paragraph 144 speak for themselves, and no response is required. Defendants otherwise deny the allegations in Paragraph 144.

145. Administrative Intent:

- **Public Statements**: Senior administrators, including President Ana Mari Cauce, have publicly expressed "disappointment" with legal rulings prohibiting racial preferences and have advocated for the repeal of Initiative 200.
- **Data Suppression**: The University has eliminated standardized testing requirements and refuses to release admissions data disaggregated by race, preventing public scrutiny of the disparities detailed above.

**RESPONSE:** Statements from Ana Mari Cauce speak for themselves and no response is required regarding their contents. Defendants admit that the University eliminated the requirement that applicants submit an SAT or ACT score in 2020 and has not required applicants to submit an SAT or ACT score since that time. Defendants otherwise deny the allegations in Paragraph 145.

146. Plaintiffs allege that the admissions policies challenged herein are part of a broader institutional framework. Plaintiffs do not seek adjudication of all such practices at this stage and reserve the right to seek leave to amend following discovery.

**RESPONSE:** Paragraph 146 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 146.

## V. CLAIMS FOR RELIEF

## COUNT I VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT (42 U.S.C. § 1983) (AGAINST ALL INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL AND PERSONAL CAPACITIES)

147. Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

**RESPONSE:** Defendants incorporate their responses to the preceding paragraphs as if fully set forth herein.

148. The equal protection clause of the Fourteenth Amendment prohibits state actors from denying individuals equal protection of the laws, including through the use of race as a motivating factor in government decision-making.

**RESPONSE:** Paragraph 148 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 148.

149. Defendants, acting under color of state law as officers and administrators of the University of Washington, have deprived Plaintiffs of rights, privileges, and immunities secured by the Constitution.

**RESPONSE:** Paragraph 149 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 149.

150. Defendants' policy of engineering the student body to match the demographics of the "UW-Seattle average" or the "state population" constitutes racial balancing. Any government classification based on race is subject to strict scrutiny. To survive, the classification must be narrowly tailored to achieve a compelling governmental interest. The Supreme Court held that "racial balancing" and "diversity" are not compelling governmental interests.

**RESPONSE:** Paragraph 150 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 150.

151. Defendants failed to consider race-neutral alternatives and instead actively removed race-neutral metrics (SAT/ACT) to increase reliance on subjective, race-conscious discretion. Defendants' use of race is not limited in time, but is entrenched in "five-year plans" and administrative mandates that seek permanent demographic parity.

**RESPONSE:** Paragraph 151 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 151.

152. As detailed in the Factual Allegations, Defendants acted with discriminatory intent under the Arlington Heights framework:



ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

a. **Impact**: The policy bears more heavily on Asian Americans (declining enrollment despite growing population).

b. **Historical Background**: Defendants have a documented history of hostility toward race-neutral laws (I-200) and have explicitly sought to use racial preferences.

c. **Departures from Procedure**: Defendants manipulated established procedures, such as the removal of SAT requirements and the "re-ranking" of faculty candidates, to achieve racial results.

d. **Legislative/Administrative History**: Public statements by University leadership express disappointment with race-neutral outcomes and a commitment to racial engineering.

**RESPONSE:** Paragraph 152 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 152.

153. As detailed in the Factual Allegations, Defendants treated Stanley less favorably than similarly situated individuals outside the protected class.

**RESPONSE:** Paragraph 153 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 153.

154. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs have suffered and continue to suffer injury, including the denial of admission, the denial of the opportunity to compete on an equal footing, and the violation of their constitutional rights.

**RESPONSE:** Paragraph 154 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 154.

155. Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendants from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment, and because the harm Plaintiffs will otherwise continue to suffer is irreparable.


ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

**RESPONSE:** Paragraph 155 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 155.

156. Defendants acted with reckless or callous indifference to Plaintiffs' rights under the Equal Protection Clause. Accordingly, Plaintiffs seek punitive damages against the Individual Defendants to deter such unconstitutional conduct.

**RESPONSE:** Paragraph 156 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 156.

157. Defendants are not entitled to qualified immunity because their conduct violated clearly established constitutional rights of which a reasonable official would have known. Specifically, the prohibition against using rigid racial quotas (such as the "15%" targets alleged herein) or mechanical racial balancing was clearly established by Supreme Court precedent long before the SFFA decision (*see Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978); *Gratz v. Bollinger*, 539 U.S. 244 (2003)). Furthermore, Defendants' deliberate efforts to conceal their conduct—including the deletion of the quoted "DEIA Plan" from the UW website and the instruction to "delete the statement" regarding racial re-ranking—demonstrate a subjective consciousness of guilt that precludes any claim of "reasonable mistake."

**RESPONSE:** Paragraph 157 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 157.

158. Plaintiffs seek this relief under 42 U.S.C. § 1983 and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908).

**RESPONSE:** Paragraph 158 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 158.

**COUNT II Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.) (Against Defendant University of Washington and its Regents as its Governing Body)**

159. Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.



ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

**RESPONSE:** Defendants incorporate by reference the responses set forth to the preceding paragraphs.

160. Title VI of the Civil Rights Act of 1964 prohibits any program or activity receiving federal financial assistance from subjecting individuals to discrimination on the basis of race.

**RESPONSE:** Paragraph 160 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 160.

161. Defendant University of Washington is a recipient of federal financial assistance within the meaning of Title VI and is therefore prohibited from discriminating on the basis of race.

**RESPONSE:** Defendants admit that the University of Washington is a recipient of federal funds. The remaining allegations in Paragraph 161 are legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 161.

162. The standard for a violation of Title VI is coextensive with the Equal Protection Clause of the Fourteenth Amendment. Because Defendants' conduct violates the Equal Protection Clause (as set forth in Count I), it constitutes a per se violation of Title VI.

**RESPONSE:** Paragraph 162 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 162.

163. Defendants have engaged in a pattern and practice of intentional discrimination against Asian American applicants in undergraduate admissions, graduate admissions, and hiring. This discrimination is systemic, knowing, and ratified by the highest levels of the University administration.

**RESPONSE:** Paragraph 163 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 163.

164. Plaintiffs have been and will continue to be injured or face imminent harm by Defendants' ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.



ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

**RESPONSE:** Paragraph 164 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 164.

165. Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendants from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964, and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

**RESPONSE:** Paragraph 165 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 165.

**COUNT III Violation of 42 U.S.C. § 1981 (Race Discrimination in Contracting) (Against All Defendants)**

166. Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

**RESPONSE:** Defendants incorporate by reference the responses set forth to the preceding paragraphs.

167. 42 U.S.C. § 1981(a) guarantees that all persons within the jurisdiction of the United States shall have the same right "to make and enforce contracts … as is enjoyed by white citizens."

**RESPONSE:** Paragraph 167 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 167.

168. 42 U.S.C. § 1981(a) protects whites (and Asians) on the same terms that it protects "underrepresented" racial minorities. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295 (1976) ("[T]he Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.").

**RESPONSE:** Paragraph 168 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 168.

169. The relationship between a university and an applicant is contractual in nature. Plaintiffs paid an application fee and submitted materials in exchange for the University's promise to evaluate said application fairly and in accordance with its stated policies and the law.

**RESPONSE:** Paragraph 169 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 169.

170. Defendants intentionally impaired Plaintiffs' right to make and enforce this contract on the basis of race. By subjecting Asian American applicants to higher standards, and race-based "holistic" scrutiny, Defendants prevented Plaintiffs from entering into the contractual relationship of enrollment on the same terms as similarly situated non-Asian applicants.

**RESPONSE:** Paragraph 170 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 170.

171. This discrimination was intentional, purposeful, and motivated by racial animus or a desire to engineer a specific racial balance, in violation of § 1981.

**RESPONSE:** Paragraph 171 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 171.

172. As a result of Defendants' discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, financial loss, and reputational damage.

**RESPONSE:** Paragraph 172 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 172.

173. Plaintiffs have been and will continue to be injured or face imminent harm by Defendants' ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

**RESPONSE:** Paragraph 173 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 173.

174. Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendants from continuing to use admissions policies and practices that discriminate on the basis of race or

ethnicity in violation of 42 U.S.C. § 1981, and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

**RESPONSE:** Paragraph 174 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 174.

175. Defendants acted with reckless or callous indifference to Plaintiffs' rights under the Equal Protection Clause. Accordingly, Plaintiffs seek punitive damages against the Individual Defendants to deter such unconstitutional conduct.

**RESPONSE:** Paragraph 175 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 175.

176. The right to be free from intentional racial discrimination in contracting is a clearly established right protected by 42 U.S.C. § 1981. At the time of the events in question, no reasonable official could have believed that imposing racial targets or using "holistic" review as a pretext to cap Asian American enrollment was lawful. The existence of Washington State Initiative 200 (RCW 49.60.400), which has prohibited such preferences for over 25 years, further serves as notice to Defendants that their conduct was prohibited, rendering any claim of "good faith" objectively unreasonable.

**RESPONSE:** Paragraph 176 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 176.

177. Plaintiffs seek this relief under 42 U.S.C. § 1983, as well as the implied right of action that the Supreme Court has recognized to enforce 42 U.S.C. § 1981(a), and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908). *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975), and *Runyon v. McCrary*, 427 U.S. 160 (1976).

**RESPONSE:** Paragraph 177 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 177.

178. The text of 42 U.S.C. § 1981(a) makes no exceptions for "compelling state interests," "student-body diversity," or race-based affirmative-action programs. It prohibits all

forms of racial discrimination in contracting—regardless of whether that racial discrimination is independently prohibited by the Equal Protection Clause.

**RESPONSE:** Paragraph 178 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 178.

**COUNT IV Violation of the Washington State Civil Rights Act (RCW 49.60.400/Initiative 200) (Against All Defendants)**

179. Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

**RESPONSE:** Defendants incorporate by reference the responses set forth to the preceding paragraphs.

180. RCW 49.60.400 (enacted as Initiative 200) provides: "The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."

**RESPONSE:** The Court has dismissed all of Plaintiffs' claims under RCW 49.60.400 from this case. *See* ECF No. 50. Paragraph 180 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 180.

181. This statute provides broader protection than federal law by explicitly prohibiting "preferential treatment" regardless of any purported "compelling interest" in diversity.

**RESPONSE:** The Court has dismissed all of Plaintiffs' claims under RCW 49.60.400 from this case. *See* ECF No. 50. Paragraph 181 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 181.

182. Defendants' own public statements and internal materials confirm that race continues to play a determinative role in its operations. Defendants have resisted race-neutral alternatives and have openly declared opposition to I-200.

**RESPONSE:** The Court has dismissed all of Plaintiffs' claims under RCW 49.60.400 from this case. *See* ECF No. 50. To the extent the allegations in Paragraph 182 refer to statements and documents, those statements and documents speak for themselves, and


ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

no response is required regarding their contents. Defendants otherwise deny the allegations in Paragraph 182.

183. Defendants have violated RCW 49.60.400 by:

a. Establishing numerical enrollment targets (e.g., "at least 15%") for specific racial groups.

b. Granting preferential treatment to underrepresented minority applicants in the "holistic" review process to achieve these targets.

c. Discriminating against Asian American applicants by capping their enrollment relative to their qualifications. Establishing scholarship programs (Incentive Scholarships) that are exclusive to "Underrepresented in Medicine" groups.

**RESPONSE:** The Court has dismissed all of Plaintiffs' claims under RCW 49.60.400 from this case. *See* ECF No. 50. Paragraph 183 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 183.

184. These actions constitute a knowing and willful violation of state law.

**RESPONSE:** The Court has dismissed all of Plaintiffs' claims under RCW 49.60.400 from this case. *See* ECF No. 50. Paragraph 184 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 184.

185. Plaintiffs have been and will continue to be injured or face imminent harm by Defendants' ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

**RESPONSE:** The Court has dismissed all of Plaintiffs' claims under RCW 49.60.400 from this case. *See* ECF No. 50. Paragraph 185 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 185.

186. Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendant UW from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of RCW 49.60.400, and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

**RESPONSE:** The Court has dismissed all of Plaintiffs' claims under RCW 49.60.400 from this case. *See* ECF No. 50. Paragraph 186 contains legal conclusions to which no response is required. Defendants otherwise deny the allegations in Paragraph 186.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant the following relief:

**A. Declaratory Judgmen**t: A declaration that the Defendants' admissions policies and practices—including the use of "holistic review" as a pretext for racial balancing, the use of racial enrollment targets, and the "test-optional" policy as a shield for discrimination—violate the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act, 42 U.S.C. § 1981, and RCW 49.60.400.

**B. Permanent Injunction**: An order permanently enjoining Defendants, their officers, agents, associates, employees, and all persons in active concert or participation with them from: 1. Considering or using race as a factor in student admissions; 2. Using "holistic review" processes that fail to maintain objective, verifiable records of evaluation; 3. Collecting data on the race or ethnicity of applicants prior to the finalization of admission decisions; and 4. Pursuing or enforcing racial targets.

**C. Specific Performance/Injunctive Relief for Plaintiffs**: 1. An order directing Defendants to re-evaluate the application of Stanley Zhong under a strictly race-neutral standard, free from the discriminatory procedures identified herein. 2. An order prohibiting Defendants from discriminating against Plaintiff Minor Son in future admissions cycles.

**D. Discovery & Data Disclosure**: An order compelling Defendants to produce all internal admissions data, including "read sheets," internal correspondence regarding racial targets, and SAT/ACT scores of admitted students disaggregated by race, to allow for a full accounting of the discrimination.

**E. Nominal Damages**: An award of nominal damages for the violation of Plaintiffs' constitutional and statutory rights.


ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

**F. Compensatory Damages**: An award of compensatory damages to Plaintiffs for the denial of their constitutional rights, emotional distress, and lost educational and professional opportunities, in an amount to be determined at trial.

**G. Punitive Damages**: An award of punitive damages against the Individual Defendants in their individual capacities for their callous, reckless, and willful indifference to Plaintiffs' federally protected rights, in an amount to be determined at trial.

**H. Attorneys' Fees and Costs**: An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and RCW 49.60.030(2).

**I. Other Relief**: Such other and further relief as the Court deems just and proper.

**RESPONSE:** The Court has dismissed certain of Plaintiffs' claims, which forecloses certain of the relief requested. *See* ECF No. 50. Defendants deny the allegations in the foregoing paragraph, deny any wrongdoing, and deny that any relief is warranted.

JURY TRIAL DEMANDED Plaintiffs hereby demand a trial by jury on all issues so triable.



ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

## DEFENDANTS' AFFIRMATIVE DEFENSES

Defendants allege the following separate and additional defenses. By alleging these separate and additional defenses, Defendants are in no way conceding that they bear the burden of proof or persuasion on any of these issues. Defendants reserve the right to supplement, amend, or modify these affirmative defenses, as appropriate, based on information obtained during the course of this litigation.

### FIRST AFFIRMATIVE DEFENSE

**Failure to State a Claim**

The Second Amended Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

**Conformance with Laws**

The Second Amended Complaint is barred in whole or in part because Defendants conformed to all applicable laws, regulations, and industry standards.

### THIRD AFFIRMATIVE DEFENSE

**Lack of Article III Standing**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack Article III standing, including injury in fact, causation, and redressability, as to some or all claims and requested forms of relief.

### FOURTH AFFIRMATIVE DEFENSE

**Lack of Capacity or Improper Representation of Minor Son**

Any claims asserted on behalf of Minor Son are barred, in whole or in part, because Minor Son lacks proper representation and because a non-attorney parent may not prosecute claims on behalf of a minor child.

### FIFTH AFFIRMATIVE DEFENSE

**Eleventh Amendment and Sovereign Immunity**

Plaintiffs' claims are barred, in whole or in part, by sovereign immunity, Eleventh Amendment immunity, and related immunity doctrines, including as to claims against the University, the Regents, official-capacity defendants, and claims seeking damages or other relief barred by law.


ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

**SIXTH AFFIRMATIVE DEFENSE**

**Qualified Immunity**

The claims against the Individual Defendants in their personal capacities are barred, in whole or in part, by qualified immunity because the individual Defendants did not violate any clearly established statutory or constitutional right of which a reasonable official would have known.

**SEVENTH AFFIRMATIVE DEFENSE**

**No Personal Participation or Causal Connection**

Plaintiffs' claims against the Individual Defendants are barred, in whole or in part, because Plaintiffs cannot establish personal participation, causation, or any legally sufficient connection between any Individual Defendant and the alleged injury.

**EIGHTH AFFIRMATIVE DEFENSE**

**No Intentional Discrimination or Discriminatory Purpose**

Plaintiffs' claims are barred, in whole or in part, because Defendants did not act with discriminatory intent, discriminatory purpose, racial animus, deliberate indifference, recklessness, callousness, or any intent to discriminate on the basis of race or ethnicity.

**NINTH AFFIRMATIVE DEFENSE**

**Legitimate, Nondiscriminatory, Race-Neutral Admissions Decision**

Plaintiffs' claims are barred, in whole or in part, because any challenged admissions decision was based on legitimate, nondiscriminatory, race-neutral reasons and was not caused by Plaintiffs' race or ethnicity.

**TENTH AFFIRMATIVE DEFENSE**

**No Similarly Situated Comparators**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot identify similarly situated applicants outside Stanley Zhong's alleged protected class who received more favorable treatment under comparable circumstances.

**ELEVENTH AFFIRMATIVE DEFENSE**

**No Contractual Relationship or Impaired Contractual Right Under Section 1981**

Count III is barred, in whole or in part, because Plaintiffs cannot establish the existence of an impaired contractual relationship, the right to make or enforce a contract, or intentional race discrimination affecting any such right.

**TWELFTH AFFIRMATIVE DEFENSE**

**No Federal Funds**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot establish that the Allen School qualifies as receiving federal funds in the manner required for statutory liability.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**Failure to Establish Causation and Damages**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot establish that any act or omission by Defendants proximately caused any legally cognizable injury, damages, or entitlement to relief.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**Failure to Apportion Damages / Comparative Fault**

Plaintiffs' claims for damages are barred or limited, in whole or in part, because the alleged damages are due to actions by individuals and/or entities other than the Defendants.

**FIFTEENTH AFFIRMATIVE DEFENSE**

**Damages Barred, Limited, Speculative, or Unrecoverable**

Plaintiffs' claims for damages are barred or limited, in whole or in part, because the alleged damages are speculative, remote, not recoverable, not caused by Defendants, barred by immunity, or otherwise unavailable as a matter of law.

**SIXTEENTH AFFIRMATIVE DEFENSE**

**Punitive Damages Barred or Unavailable**

Plaintiffs' claims for punitive damages are barred, in whole or in part, because punitive damages are unavailable against some or all Defendants and because Plaintiffs cannot establish reckless, callous, willful, malicious, or otherwise culpable conduct sufficient to support punitive damages.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

**Failure to Mitigate**

Plaintiffs failed to mitigate their damages, if any.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

**Unclean Hands**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

**NINETEENTH AFFIRMATIVE DEFENSE**

**Statute of Limitations, Laches, and Timeliness**

Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations, laches, waiver, estoppel, and other timeliness doctrines.

**TWENTIETH AFFIRMATIVE DEFENSE**

**No Entitlement to Declaratory or Injunctive Relief**

Plaintiffs' claims for declaratory, injunctive, specific-performance, and data-disclosure relief are barred, in whole or in part, because Plaintiffs cannot establish an ongoing violation, irreparable harm, inadequacy of legal remedies, likelihood of future injury, or any other prerequisite for equitable relief.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

**Waiver, Estoppel, Acquiescence**

Plaintiffs' claims are barred, in whole or in part, by waiver, estoppel, and/or acquiescence.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

**Educational Malpractice Doctrine**

Plaintiffs' claims are barred, in whole or in part, by the educational malpractice doctrine.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

**Res Judicata, Collateral Estoppel**

Plaintiffs' claims are barred, in whole or in part, by the doctrines of res judicata, collateral estoppel, and/or other similar doctrines.



ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union St, Ste 3300, Seattle, WA 98101-2668
+1 206 839 4300

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

**Attorneys' Fees**

Plaintiffs are not entitled to attorneys' fees.

DATED: August 21, 2026

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: *s/Robert M. McKenna*
Robert M. McKenna (WSBA No. 18327)
rmckenna@orrick.com
401 Union Street, Suite 3300
Seattle, WA 98101-2668
Telephone: +1 206 839 4300
Facsimile: +1 206 839 4301

By: *s/Marc Shapiro*
Marc Shapiro (*pro hac vice*)
mrshapiro@orrick.com
51 West 52nd Street
New York, NY 10019-6142
Telephone: +1 212 506 5000

By: *s/Matthew D. LaBrie*
Matthew D. LaBrie (*pro hac vice*)
mlabrie@orrick.com
222 Berkeley Street, Suite 2000
Boston, MA 02116
Telephone: +1 617 880 1802

*Special Assistant Attorneys General*
*Attorneys for Defendants The Regents of the University of Washington, et al.*

**DECLARATION OF SERVICE**

I hereby certify that I caused the foregoing document to be served on all Parties registered for e-service in this matter via the Court's e-filing platform and that, per the Parties' agreement, I caused the foregoing document to be sent via email to Plaintiff Stanley Zhong.

Date: August 21, 2026

*s/Matthew D. LaBrie*